# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TYSON FOODS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil Action No.** |
| | ) | |
| **U.S. DEPARTMENT OF** | ) | |
| **AGRICULTURE, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## PLAINTIFF TYSON FOODS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff Tyson Foods, Inc. ("Tyson"), through undersigned counsel, respectfully moves the Court for an order temporarily restraining and/or preliminarily enjoining Defendants, the United States Department of Agriculture ("USDA"), the Food Safety and Inspection Service, Secretary Edward T. Schafer, and Under Secretary Richard Raymond (collectively "Defendants"), from applying against Plaintiff their unlawful standard that the injection of any antibiotic *in ovo* renders "false and misleading" any claim that poultry is "raised without antibiotics that impact antibiotic resistance in humans."

1.       Defendants have adopted a new regulatory standard in violation of the Administrative Procedure Act. Their failure to abide by the notice and comment requirements of the APA has produced a rule that is arbitrary, capricious, and contrary to law, and that was adopted without complying with required procedures. Furthermore, Defendants have applied this new rule against Tyson in an arbitrary and capricious manner.

2.      Tyson has agreed voluntarily to withdraw those poultry labels making such claims while USDA engages in a public process to address these issues, but Tyson requires an additional 60 days to produce new labeling so that it can continue to package its more than 400 different adversely-impacted products during this interim period.

3.      Defendants, however, have ordered Tyson to transition to new labeling by no later than June 18, 2008. That deadline, if not extended, will result in irreparable harm to Tyson in the form of damage to its business relationships, lost goodwill, and millions of dollars in unnecessary and wasteful costs.

4.      Accordingly, Tyson seeks temporary injunctive relief, not to exceed the period provided for in Federal Rule of Civil Procedure 65(b)(2), and preliminary injunctive relief, restraining defendants from applying their policy to Tyson for the shorter of 60 days from the Court's ruling on this motion, or until such time as the Court enters judgment on Tyson's claims for relief including declaratory judgment and permanent injunction.

5.      As attested to in the accompanying Certificate of Counsel submitted pursuant to Local Rule 65.1(a), counsel for Tyson has informed Defendants of its intention to seek preliminary injunctive relief in this matter, as well as the time of the making of the application, and has provided the Defendants with copies of Tyson's complaint, this motion, and all supporting papers, including the accompanying proposed order. Counsel for Tyson has complied with Local Rule 7(m) by discussing this motion with counsel for Defendants. Counsel for Defendants does not consent to the relief sought.

5.      Absent preliminary injunctive relief, Tyson will incur irreparable injury as noted above, and will incur millions of dollars in wasteful and unnecessary loss. Moreover, Tyson is likely to succeed on the merits of its claim that the federal rule being challenged was adopted and

2

enforced without notice and comment rulemaking and on the basis of *ex parte* evidence submitted by Tyson's competitors to which Tyson had no opportunity to respond. Preliminary injunctive relief moreover would not substantially injure defendants or other interested parties, and would serve the public interest. Preliminary injunctive relief is therefore just and appropriate, and the Court should grant the requested relief.

6.    Finally, Tyson respectfully requests an opportunity to be heard on its Motion before a Judge on the afternoon of Wednesday, June 11, 2008.

Respectfully submitted,

Alan Charles Raul (Bar No. 362605)
    *Counsel of Record
Paul J. Zidlicky (Bar No. 450196)
Gordon D. Todd (Bar No. 475203)
Eamon P. Joyce (Bar. No. 483127)
Ryan C. Morris (Bar No. 980347)

SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiff Tyson Foods, Inc.*

June 11, 2008

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TYSON FOODS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| U.S. DEPARTMENT OF | ) |
| AGRICULTURE, ET AL. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |

## PLAINTIFF TYSON FOODS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TYSON'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION

Alan Charles Raul (Bar No. 362605)
    * Counsel of Record
Paul J. Zidlicky (Bar No. 450196)
Gordon D. Todd (Bar No. 475203)
Eamon P. Joyce (Bar. No. 483127)
Ryan C. Morris (Bar No. 980347)

SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiff Tyson Foods, Inc.*

# TABLE OF CONTENTS

TABLE OF CONTENTS.......................................................................................................ii

INTRODUCTION .............................................................................................................. 2

BACKGROUND ............................................................................................................... 4

I.      Use of Antibiotics in Animal Husbandry.................................................................. 4

II.     Statutory and Regulatory Background........................................................................ 5

      A.      Regulation of Poultry Labeling............................................................................. 5

      B.      Distinguishing "In ovo" Claims from "Raising" Claims....................................... 5

      C.      Development of Tyson's "Raised Without Antibiotics" Labels............................. 6

      D.      Tyson's Voluntary Withdrawal Of Its Label. ...................................................... 8

      E.      Defendants' Unlawful Adoption Of A New Regulatory Standard. ..................... 10

      F.      Impact of Defendants' Conduct on Tyson. ........................................................ 12

ARGUMENT.................................................................................................................... 13

I.      PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS OF ITS SUIT ................... 14

      A.      Defendants' Policy Regarding Qualified RWA Claims For Products
              Subject To In ovo Administration of Antibiotics Is A Final Rule Subject
              To Judicial Review. ......................................................................................... 14

      B.      Defendants' Policy Was Adopted Improperly Without Notice And
              Comment Rulemaking. ..................................................................................... 18

      C.      The Adoption Of Defendants' Rule Was Arbitrary, Capricious And
              Contrary To Law, And Failed To Observe Required Procedure. .......................... 22

              1.      Defendants improperly relied on ex parte evidence,
                     submitted by Tyson's business rivals and litigation
                     opponents. ................................................................................. 22

              2.      Defendants adopted their new rule and applied it to
                     Tyson without first considering and reconciling
                     contrary rules promulgated within the same
                     Department................................................................................. 25

3. Defendants applied their new standard to Tyson by refusing to allow Tyson the necessary time for orderly withdrawal of the Qualified RWA Label. ........................ 28

4. Defendants applied their new standard arbitrarily, capriciously, and unlawfully in singling out Tyson for unequal treatment by refusing to allow Tyson a reasonable period to withdraw its Qualified RWA Label. ........................................................................................... 29

II. ABSENT PRELIMINARY INJUNCTIVE RELIEF, PLAINTIFF WILL SUFFER IRREPARABLE INJURY ............................................................................................ 30

III. THE IRREPARABLE INJURY TO TYSON SUBSTANTIALLY OUTWEIGHS ANY HARM TO DEFENDANTS OR OTHER INTERESTED PARTIES ..................... 33

IV. PRELIMINARY INJUNCTIVE RELIEF FAVORS THE PUBLIC INTEREST............ 34

CONCLUSION............................................................................................................. 36

# TABLE OF AUTHORITIES

## CASES

*Air Transportation Association of America v. FAA,*
169 F.3d 1 (D.C. Cir. 1999)..........................................................................................23, 25

*Airmark Corp. v. FAA,*
758 F.2d 685 (D.C. Cir. 1985)..................................................................................25

*American Bankers Association v. National Credit Union Administration,*
38 F. Supp. 2d 114 (D.D.C. 1999)...........................................................................35

*American Frozen Food Institute, Inc. v. United States,*
855 F. Supp. 388 (Ct. Int'l Trade 1994)....................................................................32

*\*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000)..........................................................................*passim*

*Armour & Co. v. Freeman,*
304 F.2d 404 (D.C. Cir. 1962)................................................................................31

*Association of Data Processing Service Organizations, Inc. v. Board of Governors of the
Federal Reserve System,*
745 F.2d 677 (D.C. Cir. 1984)................................................................................23

*Batterton v. Marshall,*
648 F.2d 694 (D.C. Cir. 1980)................................................................................18

*Belk v. Federal Bureau of Prisons,*
No. 07-C-301-C, 2004 WL 5352260 (W.D. Wis. Oct. 15, 2004) .................................31

*Bracco Diagnostics, Inc. v. Shalala,*
963 F. Supp. 20 (D.D.C. 1997)...............................................................................25

*Bradshaw v. Veneman,*
338 F. Supp. 2d 139 (D.D.C. 2004).........................................................................14

*Brendsel v. Office of Federal Housing Enterprise Oversight,*
339 F. Supp. 2d 52 (D.D.C. 2004)...........................................................................31

*C & K Manufacturing & Sales Co. v. Yeutter,*
749 F. Supp. 8 (D.D.C. 1990)................................................................................33

*Cement Kiln Recycling Coalition v. EPA,*
493 F.3d 207 (D.C. Cir. 2007)................................................................................19

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006).........................................................................................30

*CityFed Finance Corp. v. OTS,*
58 F.3d 738 (D.C. Cir. 1995)............................................................................................14

*Clarke v. Office of Federal Housing Enterprise Oversight,*
355 F. Supp. 2d 56 (D.D.C. 2004)....................................................................................35

*Community Nutrition Institute v. Young,*
818 F.2d 943 (D.C. Cir. 1987)..........................................................................................19

*Cobell v. Kempthorne,*
455 F.3d 301 (D.C. Cir. 2006)..........................................................................................34

*Contractors Transportation Corp. v. United States,*
537 F.2d 1160 (4th Cir. 1976) ..........................................................................................26

*CropLife America v. EPA,*
329 F.3d 876 (D.C. Cir. 2003)....................................................................................18, 19

*District 50, United Mine Workers of America v. International Union, United Mine
Workers of America,*
412 F.2d 165 (D.C. Cir. 1969)..........................................................................................30

*Environmental Defense Fund, Inc. v. Blum,*
458 F. Supp. 650 (D.D.C. 1978)..................................................................................14, 23

*Environmental Integrity Project v. EPA,*
425 F.3d 992 (D.C. Cir. 2005)....................................................................................14, 18

*\*Etelson v. OPM,*
684 F.2d 918 (D.C. Cir. 1982)..........................................................................................29

*Ferrero v. Associated Materials Inc.,*
923 F.2d 1441 (11th Cir. 1991) ........................................................................................33

*Gateway E. Railway Co. v. Terminal R.R. Association,*
35 F.3d 1134 (7th Cir. 1994) ............................................................................................32

*\*General Electric Co. v. EPA,*
290 F.3d 377 (D.C. Cir. 2002)...............................................................................15, 16, 19

*George Washington University v. District of Columbia,*
148 F. Supp. 2d 15 (D.D.C. 2001)....................................................................................34

*Grand River Enterprise Six Nations, Ltd. v. Pryor,*
481 F.3d 60 (2d Cir. 2007)......................................................................................................31

*Gray Panthers Advocacy Committee v. Sullivan,*
Civ. A. No. 89-0605, 1989 WL 97937 (D.D.C. June 28, 1989)......................................................35

*Grease Monkey International, Inc. v. Ralco Lubrication Services, Inc.,*
24 F. Supp. 2d 120 (D. Mass. 1998)...........................................................................................35

*Independent Petroleum Association v. Babbitt,*
92 F.3d 1248 (D.C. Cir. 1996)..................................................................................................25

*International Union, United Mine Workers of America v. Mine Safety & Health Admin.,*
407 F.3d 1250 (D.C. Cir. 2005)...........................................................................................14, 18

*Lancor v. Lebanon Housing Authority,*
760 F.2d 361 (1st Cir. 1985)....................................................................................................33

*Local 777, Democratic Union Organization Committee v. NLRB,*
603 F.2d 862 (D.C. Cir. 1978)..................................................................................................25

*Marilyn Manson, Inc. v. N.J. Sports & Exposition Authority,*
971 F. Supp. 875 (D.N.J. 1997)................................................................................................35

*Marsh v. Oregon Natural Resources Council,*
490 U.S. 360 (1989)...............................................................................................................22

*Mclouth Steel Products Corp. v. Thomas,*
838 F.2d 1317 (D.C. Cir. 1988).................................................................................................19

*Mich. Bell Telephone Co. v. Engler,*
257 F.3d 587 (6th Cir. 2001) ...................................................................................................32

*Morgan Stanley DW Inc. v. Rothe,*
150 F. Supp. 2d 67 (D.D.C. 2001).............................................................................................32

*National Association of Home Builders v. Norton,*
415 F.3d 8 (D.C. Cir. 2005).....................................................................................................15

*National Juice Products Association v. United States,*
628 F. Supp. 978 (Ct. Int'l Trade 1986)......................................................................................32

*\*National Association of Farmworkers Organizations v. Marshall,*
628 F.2d 604 (D.C. Cir. 1980)..................................................................................................33

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
290 F.3d 578 (3d Cir. 2002)........................................................................................................31

*\*Owner-Operator Independent Drivers Association v. Federal Motor Carrier Safety
Admin.*,
494 F.3d 188 (D.C. Cir. 2007).....................................................................................................23

*Patriot, Inc v. HUD*,
963 F. Supp. 1 (D.D.C. 1997).....................................................................................................35

*Penobscot Indian Nation v. HUD*,
539 F. Supp. 2d 40 (D.D.C. 2008)..............................................................................................22

*Precision Spending Metals, Inc. v. United States*,
116 F. Supp. 2d 1350 (Ct. Int'l Trade 2000).............................................................................32

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004)........................................................................................................32

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Commission*,
324 F.3d 726 (D.C. Cir. 2003)..............................................................................................12, 16

*Sampson v. Murray*,
415 U.S. 61 (1974).......................................................................................................................30

*Serono Laboratories, Inc. v. Shalala*,
158 F.3d 1313 (D.C. Cir. 1998)............................................................................................14, 35

*Tataranowicz v. Sullivan*, 959 F.2d 268 (D.C. Cir. 1992) ........................................................17

*\*Transactive Corp. v. United States*,
91 F.3d 232 (D.C. Cir. 1996)..........................................................................................25, 26, 27

*U.S. Telecom Association v. FCC*,
400 F.3d 29 (D.C. Cir. 2005)..................................................................................................19, 20

*University of Texas v. Camenisch*,
451 U.S. 390 (1981)....................................................................................................................30

## STATUTES AND REGULATIONS

5 U.S.C. § 553 ..................................................................................................................*passim*
5 U.S.C. § 604(a) .....................................................................................................................19
5 U.S.C. § 704 ..........................................................................................................................15
5 U.S.C. § 706(2) .............................................................................................................*passim*

19 U.S.C. § 1625(c) ..................................................................................................................32

21 U.S.C. § 451 *et seq.*............................................................................................................4
21 U.S.C. § 453(h)(1) ..............................................................................................................5
21 U.S.C. § 457........................................................................................................................4, 5

44 U.S.C. § 1505(a) ...............................................................................................................19

7 C.F.R. § 2.18(a)(1)(ii)(A) ...................................................................................................5
7 C.F.R. § 205.236(a)(1)..................................................................................................6, 21, 26
7 C.F.R. § 205.238(c)(1).......................................................................................................5, 26

9 C.F.R. § 381.132..................................................................................................................5

71 Fed. Reg. 32,803 (Jun. 6, 2006)......................................................................................6, 27
72 Fed. Reg. 67,266 (Nov. 28, 2007)..............................................................................6, 21, 27
72 Fed. Reg. 3432 (Jan. 25, 2007) .......................................................................................19

## OTHER AUTHORITIES

Associated Press, *Scientists, government hold differing views on antibiotic* (June 9, 2008) ..........3

Executive Order No. 12,866, §1(b)(10) (Sep. 30, 1993), as amended by Executive Orders
No. 13,258 (Feb. 26, 2002) & No. 13,422 (Jan. 18, 2007)............................................................26

*Executive Interview of Sanderson Farms President Lampkin Butts*, Poultry Magazine 28
(April/May 2008) .............................................................................................................................8

The National Organic Program, *Impact of Harvey v. Johanns and Restoring the NOP to
pre-Lawsuit Status: A Report to Congress* (March 2006) .............................................................27

Testimony of Dayna Shah, Managing Associate General Counsel for the Government
Accountability Office, before the House of Representatives Committee on Energy and
Commerce, Subcommittee on Health (May 15, 2008) ...................................................................19

United States General Accounting Office, *Antibiotic Resistance: Federal Agencies Need
to Better Focus Efforts to Address Risk to Humans from Antibiotic Use in Animals* (Apr.
22, 2004)...........................................................................................................................................4

\* Cases on which we chiefly rely.

Plaintiff Tyson Foods, Inc. ("Tyson") respectfully moves the Court for an order pursuant to Federal Rule of Civil Procedure 65 temporarily restraining and/or preliminarily enjoining the United States Department of Agriculture ("Department" or "USDA"), the Food Safety and Inspection Service ("FSIS"), Secretary of Agriculture Edward Schafer, and Under Secretary Dr. Richard Raymond (collectively "Defendants") from enforcing a recently adopted regulatory standard against Tyson that requires Tyson to adopt new labeling for millions of packages across more than 400 different products. Unless an injunction issues, that rule, which Defendants adopted in a manner contrary to the Administrative Procedure Act ("APA"), will cause Tyson immediate, concrete, and irreparable injury.

As Defendants effectively concede, the practices and products at issue here are not unsafe or unwholesome. The case revolves entirely around how animal husbandry practices should be characterized on labels for chicken products. While Tyson strongly disagrees with the new regulatory standard adopted by the Defendants, it voluntarily agreed to withdraw the label that Defendants challenge under their new policy. When Defendants refused to accept Tyson's time frame for an orderly winding down of the challenged label, Tyson further sought to avoid this controversy with the Defendants by requesting only 60 days to replace the labels for over 400 products. By letter dated June 10, 2008, Defendants refused to accommodate Tyson with any extension beyond June 18, but they did not provide any justification or even explanation why June 18 has any particular legal, factual or policy significance. As a result, Tyson has been forced to file suit in this Court to challenge the Defendants' defective new regulatory standard, and their draconian application of that standard to Tyson. For the reasons set forth below, Tyson is entitled to preliminary injunctive relief.

## INTRODUCTION

At issue in this case is whether Defendants properly adopted and implemented a policy governing poultry producers' ability to inform consumers in their USDA-approved labels that their chickens have been "[r]aised without antibiotics that impact antibiotic resistance in humans." Because Tyson raises these chickens – from hatch to slaughter – without administering antibiotics that affect antibiotic resistance in humans, Tyson sought and obtained approval of labeling that informed the consuming public of that fact. Tyson's application for approval of this label made clear for USDA that Tyson did not "administer[]" any antibiotics to these chickens that could affect human resistance during the "raising" period, which the application identified as the period from "hatch to slaughter."

Now, however, Defendants have adopted a rule that Tyson and others no longer can inform consumers that their products are "[r]aised without antibiotics that impact antibiotic resistance in humans" if antibiotics are administered "*in ovo*," *i.e.*, through pre-hatch vaccinations. Defendants have determined, in effect, to define the term "raised" to include practices that take place both *in ovo* and post-hatch. This new rule is substantive and final, but was adopted without even a modicum of the procedural requirements mandated by the APA. To the contrary, the rule adopted by Defendants (i) was based upon *ex parte* information never revealed to the public and interested parties, (ii) was not the subject of notice and comment rulemaking, and (iii) is flatly inconsistent with an analogous policy adopted by USDA in a directly related area.

In announcing their new mandate, Defendants recognized the need for a formal public process to explore this issue; admitted the need to ask detailed and probing questions into previously unexplored industry practices; and recognized the conflict between their new standard and existing Departmental rules. Yet, Defendants nevertheless promulgated a binding rule,

2

invalidating numerous previously-approved claims, without any articulated justification or demonstrated regulatory or consumer benefit.

The irregularity of Defendants' conduct has not gone unnoticed. For example, the Associated Press reports that "Margaret Mellon of the Union of Concerned Scientists, a nonprofit group that has criticized large agribusinesses like Tyson in the past, said using gentamicin was a common practice the government should have known about. She said the application only stopped infection at the injection site. 'It is an antibiotic, it's a human-use antibiotic and it's one we care about, but it's used in this case prior to hatching,' Mellon said. 'My view is that the federal government has dealt very unfairly to Tyson. It is inexplicable to me that the government professes to be surprised at every turn.'" Associated Press, *Scientists, government hold differing views on antibiotic* (June 9, 2008).

Defendants' misguided and mistaken conduct here underscores the very reasons why the APA prescribes precise, public, and inclusive rules for policy-setting, which are designed to rein in precipitous action in favor of reasoned, fact-based decision-making. Defendants' new rule is not based on any sound administrative record, nor was it adopted with the benefit of the necessary and appropriate public notice and comment. Moreover, Defendants seek to compound their error by forcing Tyson's compliance with this new rule on an unrealistic timetable. Application of this rule to Tyson under these circumstances will cause immediate, massive and irreparable harm.

This result is unjust and contrary to law. Tyson therefore moves the Court for an order enjoining Defendants preliminarily from applying this rule in order to allow Tyson reasonable time to secure new labeling for its products.

**BACKGROUND**

I.    **Use of Antibiotics in Animal Husbandry.**

In recent years, government, scientists, and industry have become increasingly focused on and concerned with the contribution that the use of antibiotics in animal husbandry makes to the development of antibiotic-resistant strains of bacteria that affect humans. *See, e.g.*, United States General Accounting Office, *Antibiotic Resistance: Federal Agencies Need to Better Focus Efforts to Address Risk to Humans from Antibiotic Use in Animals* (Apr. 22, 2004), *available at* http://www.gao.gov/new.items/d04490.pdf; Declaration of Dr. Patrick Pilkington ¶¶ 6-7 ("Pilkington Decl."). Recognizing this concern, Tyson has been an industry leader in managing and reducing such use, and, unlike many of its competitors who use growth promoting antibiotics in poultry feed, Tyson has greatly reduced its use of antibiotics, including the post-hatch use of antibiotics that promote human resistance to antibiotics. *Id.*

In line with industry standards, Tyson, like many other poultry producers, injects chicken eggs two to three days prior to hatch, or *in ovo*, with a vaccination designed to prevent Marek's disease. Marek's Disease causes tumors and immuno-suppression in chickens and results in a high mortality rate. Marek's Disease was historically controlled via post-hatch vaccinations through manual injection of each chick. Pilkington Decl. ¶ 18. *In ovo* vaccination, which was developed with the assistance of the Department, has become an industry-wide procedure. *Id.* ¶ 19; Ex. 2, Declaration of Alan Raul, Ex. Q at Ex. 1 ("Raul Dec."). Vaccination *in ovo* allows for rapid and uniform delivery of the vaccine to each embryo and results in earlier bird immunity. *Id.* It also reduces stress on the birds and minimizes bird handling. Pilkington Decl. ¶ 20; Raul. Decl. Ex. Q at Ex. 1.

The vaccine Tyson uses, as formulated by the manufacturer, contains an antibiotic as a preservative or bacteriostat to protect the integrity of the vaccine. Like most other industry

4

members, Tyson administers the *in ovo* vaccination by mixing it with a diluting solution, to which gentamicin sulfate is added, to sterilize the vaccine solution and thus prevent cross contamination of the eggs.

## II.    Statutory and Regulatory Background.

### A.    Regulation of Poultry Labeling.

The Poultry Products Inspection Act, 21 U.S.C. § 451 et seq., grants the Department jurisdiction to approve all aspects of labeling for poultry products, *id.* § 457. Poultry producers must submit proposed poultry labeling to the Department for approval before they may be used in commerce. *Id.*; 9 C.F.R. § 381.132. Within the Department, FSIS is primarily responsible for regulating poultry labeling. 21 U.S.C. § 457(b)-(c); 7 C.F.R. § 2.18(a)(1)(ii)(A). A poultry product label is deemed "misbranded" unless FSIS has declared it to be "not false and misleading." 21 U.S.C. § 453(h)(1).

### B.    Distinguishing "In ovo" Claims from "Raising" Claims.

It is common practice in the industry to distinguish between claims relating to *in ovo* practices and those relating to post-hatch or "raising" practices. For example, the Agricultural Marketing Service ("AMS"), another agency within the Department, has promulgated regulations under the National Organic Program addressing the use of antibiotics for claims that poultry has been "raised" or produced organically. Companies "must not," among other things, label "as organic any animal or edible product derived from any animal treated with antibiotics." 7 C.F.R. § 205.238(c)(1). Companies, however, can label their poultry products as organic so long as they do not treat the poultry with antibiotics after the first day of life. 7 C.F.R. § 205.236(a)(1) ("Poultry or edible poultry products must be from poultry that has been under continuous organic management beginning *no later than the second day of life*") (italics added); see also 71 Fed. Reg. 32803, 32806 (Jun. 6, 2006) (distinguishing organic dairy cows, which

must be compliant with organic rules from pre-birth, with poultry, which must be compliant from the second day post-hatch onwards). AMS also recently proposed a standard, which is the subject of notice and comment rulemaking, for "Naturally Raised" marketing claims for livestock and meat derived therefrom. 72 Fed. Reg. 67,266 (Nov. 28, 2007). Under this standard, "naturally raised" labels will be approved if the livestock was raised "entirely without growth promotants, antibiotics, and have never been fed mammalian or avian by-products." *Id.* The proposed prohibition against the use of antibiotics applies only for the period "from birth to slaughter." *Id.* The Federal Register notice explains that "AMS has worked closely with FSIS ... to develop and propose the voluntary naturally raised marketing claim standard," *id.* at 67,267, so FSIS cannot claim it was unaware that its sister agency expressly defined the claim "raised" as covering practices that take place after hatching.

## C.    Development of Tyson's "Raised Without Antibiotics" Labels.

In May 2007, Tyson secured approval from USDA to inform consumers on its poultry product labels of the availability of chicken that is raised without such antibiotics. Pilkington Decl. ¶¶ 4-5.

Specifically, on May 1, 2007, Tyson filed three applications with Defendants, followed by a fourth on May 8, 2007, seeking approval of labels indicating that Tyson chickens were "Raised Without Antibiotics" ("RWA"). Raul Decl. Exs. A-D. Tyson's applications specifically disclosed that its feed included ionophores, an additive used to prevent coccidiosis. *Id.*; Pilkington Decl. ¶ 4. Tyson expressly limited its claim to "the growing period," defined as the period "beginning at time of hatch and ending at time of slaughter." *Id.* FSIS approved Tyson's RWA Label applications on May 11, 15, and 16, 2007. Raul Decl. Exs. A-D. In doing so, FSIS concluded that Tyson's labels were neither false nor misleading. Other poultry producers using ionophores similarly sought and received approval of RWA labels.

6

On September 12, 2007, FSIS advised Tyson that FSIS believed it had made a mistake in approving Tyson's RWA labels in light of Tyson's use of ionophores. Raul Decl. Ex. E. After further communications, FSIS informed Tyson on November 6, 2007, that it considered ionophores to be antibiotics and intended to rescind its approval of Tyson's RWA labels. *Id.* Ex. F; Pilkington Decl. ¶¶ 9-10. FSIS provided Tyson a "45-day temporary approval to allow Tyson to remove" its RWA claim from its labels. *Id.* ¶ 10; Raul Decl. Ex. F. It also stated that Tyson could submit a "revised claim regarding ionophores." *Id.*

After further consultation with FSIS, Tyson applied for approval of a revised label containing the qualified language "[r]aised without antibiotics that impact antibiotic resistance in humans" ("Qualified RWA Label"). Pilkington Decl. ¶¶ 11-12; Raul Decl. Exs. I, J. Importantly, Tyson's application once again clearly and unambiguously stated that

> NO antibiotics will be *administered* at anytime during the growing period. The growing period is defined as **beginning** at the time of hatch and ending at the time of slaughter.

Raul Decl. Ex. J (first emphasis added).

FSIS concluded that the Qualified RWA Label was appropriate, approving it on December 19, 2007. *Id.* On January 7, 2008, having considered the application, Defendant Dr. Raymond wrote to Tyson reiterating that the Qualified RWA Label was approved because "FSIS has found that the claim describes the situation in a truthful and non-misleading way." Pilkington Decl. ¶ 13; Raul Decl. Ex. K.

At the same time, Dr. Raymond confirmed that "FSIS is providing Tyson with a time to transition all the labels that bore that old claim to the new claim." *Id.* On January 25, 2008, Tyson requested more time to accomplish this "time consuming" task, which involved, among other things, "developing new artwork, placing orders for new packaging, production time for new labels and plant distribution of new label[s]." *Id.* Ex. L. To ensure an orderly transition, on

7

February 6, 2008, FSIS granted Tyson "continued use of the unqualified RWA claim on existing labels until May 4, 2008," that is, nearly six months from the time that FSIS had withdrawn its approval of the unqualified RWA labeling. Pilkington Decl. ¶ 14; Raul Decl. Ex. M.

### D.    Tyson's Voluntary Withdrawal Of Its Label.

Tyson's competitors, some of which regularly administer growth promoting antibiotics to their chickens during the raising process, have consistently and actively opposed Tyson's attempts to inform consumers of important differences in Tyson's raising practices as they relate to antibiotics and have urged USDA to take adverse action against Tyson. Pilkington Decl. ¶ 15. *See Executive Interview of Sanderson Farms President Lampkin Butts*, Poultry Magazine 28 (April/May 2008).[1]

On April 16, 2008, a number of Tyson's competitors filed a letter petition with FSIS requesting that FSIS rescind Tyson's ("and any other company's") Qualified RWA Label. Raul Decl. Ex. O. The petition challenged Tyson's practice of administering *in ovo* vaccines that contain antibiotics. *Id.* The petition acknowledged that Tyson's "raised" claim was defined as "the period of time from hatch to slaughter" and recognized that "some of FSIS' staff may have been aware of" Tyson's *in ovo* vaccination procedures, but argued that administration of antibiotics prior to the raising period was "incompatible with any RWA label," which, they argued, "suggests 'no' antibiotics are used in the process of bringing a food product from egg to supermarket." *Id.*; Pilkington Decl. ¶¶ 15-16.

---

[1] Two of Tyson's competitors, Sanderson Farms, Inc. and Perdue Farms, Inc., filed suit against Tyson in January 2008 in the United States District Court for the District of Maryland. On April 22, 2008, the District Court preliminarily enjoined Tyson from using either of its RWA claims in non-label advertisements. *See* Raul Decl. Ex. GG. The district court's injunction was limited to traditional advertising and did not prohibit Tyson's use of the FSIS-approved Qualified RWA Label. Tyson's appeal of this injunction is now pending before the United States Court of Appeals for the Fourth Circuit.

On April 30, 2008, in response to this petition, FSIS requested information from Tyson, which Tyson supplied on May 2, 2008. Pilkington Decl. ¶¶ 17-22; Raul Decl. Exs. P-R. FSIS also issued a request for information to Tyson's competitors, who, unbeknownst (until recently) to Tyson, submitted additional materials and arguments to FSIS, including information on May 5, 2008. Pilkington Decl. ¶ 27; Raul Decl. Ex. AA.

Also on May 5, 2008, Tyson met with Defendant Dr. Raymond. At that meeting, FSIS provided Tyson with a copy of the April 16 petition, but made no mention of any other materials submitted by Tyson's competitors. *Id.* Ex. AA. Tyson submitted further materials to FSIS on May 6 and 7, 2008. *Id.* Exs. S, T. In its several responses, Tyson detailed its *in ovo* vaccination practices and demonstrated that its practices with regard to *in ovo* administration of vaccine were entirely consistent with its labeling claims, which addressed the period from hatch to slaughter.

To avoid uncertainty and the potential for further disruption, on May 5, 2008, Tyson informed Defendant Dr. Raymond that it was willing to cease its practice of including small doses of antibiotics when it administered *in ovo* vaccines, and thereby address the core challenge to its Qualified RWA Label made in the petition filed by Tyson's Competitors. Defendants never responded to this offer. Pilkington Decl. ¶ 23.

Thereafter, on May 30, 2008, in a further effort to avoid additional disruption and uncertainty, Tyson informed Defendants that it was voluntarily withdrawing the Qualified RWA Label. *Id.* ¶ 24; Raul Decl. Ex. U. Tyson proposed an orderly transition to new labeling whereby by August 31, 2008, Tyson plants would discontinue labeling fresh chicken products with the Qualified RWA Label and, by September 30, 2008, Tyson would no longer package any poultry products under that label. *Id.*

9

E.    Defendants' Unlawful Adoption Of A New Regulatory Standard.

On June 2, 2008, despite Tyson's voluntary withdrawal of its Qualified RWA label, FSIS

informed Tyson that it had adopted a new regulatory standard, which was being enforced against

Tyson. Pilkington Decl. ¶ 25.  FSIS stated that it

> will approve claims related to the use of antibiotics *only* when an
> establishment demonstrates to the satisfaction of the agency that no
> antibiotics were used *for any purpose whatsoever at any time*, with
> the exception of antibiotics used as a preservative in a vaccine and
> added to the vaccine at the vaccine manufacturing site.

Raul Decl. Ex. V (italics added).  FSIS stated that it "had no basis to evaluate the significance"

of Tyson's claim that "raised" applied only to the post-hatch period. *Id.*; *see also id.* Ex. Y.

FSIS acknowledged that Tyson had agreed to withdraw its Qualified RWA Labeling, but

refused to accept Tyson's proposed timeframe for doing so.  Instead, FSIS allowed Tyson only

15 days to comply, and directed Tyson to halt all use of the Qualified RWA label by June 18,

2008, informing it that "[n]o labels bearing any form of a 'Raised without antibiotics' claim may

be used after that date." *Id.* Ex. V.  FSIS provided no justification for refusing to allow Tyson

additional time for an orderly transition to labels that conformed to the new standard.

Subsequently, Dr. Raymond informally indicated to Tyson that FSIS had permitted Tyson only

15 days to adopt new labeling based on the perceived competitive advantage Tyson would

achieve by obtaining a longer period in which to cease use of the Qualified RWA Label. *Id.* Ex.

AA.  Tyson was not given any opportunity to review or rebut the basis for Dr. Raymond's

perception in this regard.

Defendants' new regulatory standard was further codified in a series of letters and public

statements.  On June 3, 2008, FSIS issued a letter to counsel for several of Tyson's competitors,

advising them that based on "the information that you submitted on May 5, 2008, and

information submitted by Tyson Foods, Inc.," FSIS "decided to grant your petition" to rescind

10

Tyson's Qualified RWA Label "based on the first point made therein," namely Tyson's *in ovo* vaccination practice. Pilkington Decl. ¶ 27; Raul Decl. Ex. X. On the same day, Defendant Dr. Raymond issued a public "Statement" stating that "FSIS, along with the USDA Agricultural Marketing Service, will initiate a public process to review policies on 'Raised without antibiotics' claims for poultry." *Id.* Ex. W. FSIS stated that it would apply its new rule broadly by "review[ing] any claim relating to the use of antibiotics in poultry that it has already approved for companies other than Tyson." *Id.*

On June 4, 2008, Defendants announced, in open letters to "label consultants" and holders of previously approved RWA claims, that FSIS "considers the injection of an antibiotic *in ovo* to render 'Raised without Antibiotics' or 'Raised without antibiotics that impact antibiotic resistance in humans' claims false and misleading." Pilkington Decl. ¶ 28; Raul Decl. Ex. Y. That letter confirms that label applicants must conform future applications to this new regulatory standard.

Apart from Tyson, FSIS did not require any other poultry producer using claims similar or identical to the Qualified RWA Label and administering *in ovo* antibiotics to cease using such claims by June 18, 2008. *Id.* Ex. W, Y.

On June 6, 2008, Tyson wrote Defendants, setting forth the substantial defects underlying Defendants' promulgation of a new rule regarding "raised" claims for *in ovo* administration of antibiotics and reiterating its request that Defendants forbear from enforcing the new regulatory standard pending a more reasonable timeframe to transition to a new label. Specifically, Tyson noted that the June 18 deadline was unduly burdensome, unreasonable, and unwarranted, especially in light of the almost six months previously provided to transition from the Qualified

RWA Label. *Id.* Ex. AA. Tyson requested a response by the close of business on June 9, 2008, in order to give it time to seek relief from the Court. *Id.*

In a letter delivered during the evening of June 10, Defendants declined to provide Tyson with any relief. Raul Decl. Ex. JJ. In a letter from the Honorable Marc L. Kesselman, General Counsel of USDA, Defendants asserted that they had not changed any of their policies. They acknowledged that their decision was based in part on May 5 submission by Tyson's competitors (a submission that was provided to Tyson for the first time on June 10th). *Id.* They denied without explanation the relevance of the AMS regulations noted above, which take a contrary view of the scope of the term "raising." And, they noted that Tyson could seek a hearing before an Administrative Law Judge, even though they acknowledge the futility of such a hearing, stating: "administrative hearing process will not delay or further extend the June 18, 2008, deadline for compliance with the FSIS determination." *Id.*

### F.    Impact of Defendants' Conduct on Tyson.

If Tyson is required to stop all use of its previously approved Qualified RWA Label as of June 18, 2008, Tyson will suffer massive, immediate, concrete, and irreparable injury. Ex. 3, Declaration of Donnie Smith ¶¶ 7-33 ("Smith Decl.").[2]

*First*, Tyson's business operations and plant personnel will suffer substantial disruption as they attempt to comply with FSIS's new rule in only two weeks. Tyson will have to order and secure new labeling and packaging materials complying with previously-approved labeling schemes. *Id.* ¶¶ 8-10. These materials must then be distributed to plants and inserted in

---

[2] Tyson's Motion is supported in part by the Declaration of Donnie Smith, Tyson's Group Vice President of Consumer Products. Because Mr. Smith's declaration contains information of a confidential commercial nature, it is the subject of a contemporaneously filed motion to file that declaration under seal. Accordingly, rather than set out the details of that declaration in this memorandum, the Court is referred to Mr. Smith's declaration.

packaging and labeling lines, replacing Tyson's existing materials. *Id.* ¶¶ 11-12. This effort will cover more than 400 different products, and will extend to over one billion dollars worth of chicken. *Id.* ¶ 8.

*Second*, for the reasons detailed in Mr. Smith's declaration, Tyson will suffer substantial reputational and goodwill loss with its retail customers. *Id.* ¶ 16. The resulting injury to the Tyson brand will have an immediate and detrimental effect on Tyson's business. *Id.* ¶¶ 17-20.

*Third*, also for the reasons detailed in Mr. Smith's declaration, Tyson will also suffer in its relationship with its ultimate customers, the consuming public. *Id.* ¶¶ 21-23.

*Fourth*, Tyson will suffer significant out-of-pocket costs in complying with FSIS's order. Tyson will have to secure, print and ship new labeling materials on an expedited basis, for which it will have to pay a premium. *Id.* ¶ 24. Additionally, Tyson will have to discard its existing packaging and labeling materials, again, at a significant cost. *Id.* ¶ 24. Tyson estimates these out-of-pocket costs – exclusive of brand and market injury – at $5 million. *Id.* ¶ 29.
In light of these anticipated injuries, Tyson requested that Defendants withdraw the new regulatory standard embodied in the letters and public statements of June 2-4 and provide Tyson with 60 days within which to cease using the Qualified RWA Label. Raul Decl. Ex. AA. On June 10, 2008, Defendants rejected Tyson's efforts to resolve this dispute without the need for litigation.

## ARGUMENT

In considering Tyson's request for preliminary injunctive relief, this Court takes into account (1) the substantial likelihood that Tyson will succeed on the merits of its claims; (2) whether Tyson will suffer irreparable injury absent an injunction; (3) whether injunctive relief would substantially harm the defendant or other interested parties; and (4) whether the public interest would be furthered by an injunction. *See Serono Labs., Inc. v. Shalala,* 158 F.3d 1313,

1317-18 (D.C. Cir. 1998).[3] Here, Plaintiff is substantially likely to succeed on the merits and

will suffer severe and irreparable injury absent preliminary injunctive relief. Moreover, such an

injunction will not substantially injure either the Defendants or other interested parties, and will

favor the public interest. Therefore, preliminary injunctive relief is appropriate.

## I.    PLAINTIFF IS LIKELY TO PREVAIL ON THE MERITS OF ITS SUIT

The Administrative Procedure Act requires federal agencies to conduct their business in

public, based on an established and open record, and in a reasoned and non-arbitrary or

capricious manner. Compliance with these bedrock standards serves to promote proper agency

action based on the best information possible, and with a full understanding of the effects and

consequences its decisions will have. *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C.

Cir. 2005); *Int'l Union, United Mine Workers of America v. Mine Safety & Health Admin.*, 407

F.3d 1250, 1259 (D.C. Cir. 2005); *Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650, 659-61

(D.D.C. 1978). In this case, Defendants flouted these settled principles and accordingly their

newly adopted rule should be set aside.

### A.    Defendants' Policy Regarding Qualified RWA Claims For Products Subject To *In ovo* Administration of Antibiotics Is A Final Rule Subject To Judicial Review.

The Administrative Procedure Act provides for judicial review of any "final agency

action" for which judicial review is not otherwise provided. 5 U.S.C. § 704. Agency action is

"final" for purposes of Section 704 when it "marks the consummation of the [agency's]

decisionmaking process and ... determines the rights and obligations of both [the parties] and the

---

[3] These factors are evaluated on a continuum and must be weighed together and against one another. *Bradshaw v. Veneman*, 338 F. Supp. 2d 139, 141 (D.D.C. 2004). Thus, "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Serono Labs.*, 158 F.3d at 1318; *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995).

Agency." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13-14 (D.C. Cir. 2005); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). Thus, final agency action is "definitive and has a direct and immediate effect on the day-to-day business of the party challenging the agency action." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003) (quotations, ellipses omitted). Differently stated, "[a]gency action is considered final to the extent it imposes an obligation, denies a right, or fixes some legal relationship." *Id.*

Defendants' actions with respect to RWA Labels constitute final agency action reviewable under the APA. On June 4, 2008, Defendants announced that "the Agency considers the injection of an antibiotic *in ovo* to render 'Raised without Antibiotics' or 'Raised without antibiotics that impact antibiotic resistance in humans' claims false and misleading." Raul Decl. Ex. Y, Z. Therefore, Defendants continued, "if you are making either of these claims and injecting poultry with an antibiotic *in ovo*, or using poultry raised in this way, *the Agency intends to revoke its approval of the claim.* In the interim, FSIS *will approve* claims related to the use of antibiotics *only when an establishment demonstrates* to the satisfaction of the agency that *no antibiotics were used for any purpose whatsoever at any time.*" *Id.* (italics added). Defendants' express application of this rule to Tyson, and their June 3 statements that they intend to apply this standard to all other holders of such labels, make clear the immediate and direct effect of this new agency rule. *See Reliable Automatic Sprinkler*, 324 F.3d at 731.

Plainly, Defendants' pronouncements establish a binding, legislative rule. As the D.C. Circuit explained in *General Electric*,

> A document will have practical binding effect before it is actually applied if the affected private parties are reasonably led to believe that failure to conform will bring adverse consequences, such as denial of an application. If the document is couched in mandatory

> language, or in terms indicating that it will be regularly applied, a
> binding intent is strongly evidenced.

290 F.3d at 383-84 (quotations, ellipsis omitted).  FSIS's letter squarely meets this test.

Defendants' concession that they will conduct, at some future time, a "public process" to address this issue, Raul Decl. Exs. Y, Z, highlights both their recognition that a "public process" is necessary and appropriate, and that they have failed so far to engage in any meaningful public notice and comment process before adopting the regulatory standard at issue.

The prospect of future public comment does not render Defendants' conduct to date non-final.  To the contrary, as the D.C. Circuit has held, "[i]f the possibility (indeed, the probability) of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule—and particularly one that must be updated periodically to reflect advances in science—would ever be final as a matter of law." *Gen. Elec.*, 290 F.3d at 380.  *See also Appalachian Power*, 208 F.3d at 1022 ("The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment.").

In their eleventh-hour response to Tyson's request for additional time, Defendants suggest that Tyson "may request a hearing pursuant to 9 C.F.R. § 500.8(b)(3)."  But this invitation is unhelpful for two reasons.

*First*, § 500.8(b)(3) addresses the administrative process for challenging a specific rescission determination.  But Tyson is not challenging Defendants' purported rescission of Tyson's label for the simple reason that on May 30, 2008, Tyson had already alerted defendants of its decision to withdraw its Qualified RWA labeling.  *See* Raul Decl. Ex. U.  Rather, Tyson is challenging the agency's adoption of a rule defining the term "raising" so as to prohibit any claim that poultry is raised without antibiotics that affect resistance in humans, based upon the *in*

*ovo* use of antibiotics, which rule was applied to deny Tyson a reasonable period of time to transition to another label.

Defendants were clear in their June 2 and June 4 letters that their new rule applies broadly to all regulated entities. On June 2 they stated that FSIS

> will approve claims related to the use of antibiotics *only* when an establishment demonstrates to the satisfaction of the agency that no antibiotics were used *for any purpose whatsoever at any time*, with the exception of antibiotics used as a preservative in a vaccine and added to the vaccine at the vaccine manufacturing site.

Raul Decl. Ex. V (italics added). And, on June 3 and 4, Defendants reiterated that they would apply this rule to any other similarly situated poultry producer. *Id.* Exs. W, Y.

*Second,* appeal to any such agency process would be futile. *See, e.g., Tataranowicz v. Sullivan,* 959 F.2d 268, 274-75 (D.C. Cir. 1992). First, in an agency adjudicative process, an administrative law judge is bound to apply the agency's policy, and here, there can be no doubt as to what that policy is. The Assistant Administrator for the FSIS Office of Policy and Program Development has informed Tyson that its label is "false and misleading" under the new rule. Raul Decl. Ex. V. The Under Secretary for Food Safety has announced publicly that all such claims must be reviewed. *Id.* Ex. W. The General Counsel for the Department has refused any deviation from this view, *id.* Ex. JJ, and, on information and belief, the Secretary of Agriculture himself has endorsed that view. The result of any administrative law process is thus a foregone conclusion. Moreover, as Defendants themselves point out in their June 10 letter, "recourse to the administrative hearing process will not delay or further extend the June 18, 2008, deadline for compliance with the FSIS determination." *Id.* Ex. JJ. Under these conditions, the only reasonable conclusion is that the internal administrative review process has run its course, and turning to an administrative law judge would be irrelevant.

In short, Defendants have adopted a binding, final rule regarding the labeling of poultry products with RWA claims if antibiotics were administered prior to the raising period.

## B.    Defendants' Policy Was Adopted Improperly Without Notice And Comment Rulemaking.

The APA requires that agencies submit proposed rules for public notice and comment.

5 U.S.C. § 553(b)-(c). What constitutes a rule is interpreted generously, *Batterton v. Marshall*,

648 F.2d 694, 700 (D.C. Cir. 1980), and government missives from guidance documents to press

releases have been held to be final rules subject to notice and comment rulemaking. *See*

*CropLife America v. EPA*, 329 F.3d 876, 884-85 (D.C. Cir. 2003) (press release); *Appalachian*

*Power*, 208 F.3d at 1028 (guidance document). Notice and comment rulemaking includes

publishing the time and place of the proposed proceeding, identifying the legal authority under

which it is conducted, and allowing "interested persons an opportunity to participate … through

submission of written data, views, or arguments." 5 U.S.C. § 553(c).

As the D.C. Circuit has explained:

> The APA's notice requirements are designed (1) to ensure that
> agency regulations are tested via exposure to diverse public
> comment, (2) to ensure fairness to affected parties, and (3) to give
> affected parties an opportunity to develop evidence in the record to
> support their objections to the rule and thereby enhance the quality
> of judicial review.

*Envtl. Integrity Project*, 425 F.3d at 996 (quoting *Int'l Union, United Mine Workers*, 407 F.3d at

1259). In contravention of these fundamental requirements, Defendants developed and

promulgated a rule that imposes industry-wide change, and which purports to declare "false and

misleading," labeling previously approved and declared by Defendants to be "truthful and non-

misleading." *Compare* Raul Decl. Ex. Y *with id.* Ex. K. That change has been undertaken without public notice, comment, or hearing.[4]

Section 553 applies here because Defendants' rule is "legislative," not merely "interpretive." 5 U.S.C. § 553; *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34 (D.C. Cir. 2005). Central to whether a rule is legislative is whether it "reflects an obvious change in established agency practice [and] creates a binding norm that is finally determinative of the issues or rights to which it is addressed." *CropLife Am.*, 329 F.3d at 881 (quotations omitted). A rule is considered binding if it either (1) "appears on its face to be binding," or (2) "is applied by the agency in a way that indicates it is binding." *Gen. Elec.*, 290 F.3d at 383; *see also Cement Kiln Recycling Coalition v. EPA*, 493 F.3d 207, 216 (D.C. Cir. 2007); *Appalachian Power*, 208 F.3d at 1021-23; *Mclouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320-21 (D.C. Cir. 1988); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987) (*per curiam*).

From time to time, agencies seek to avoid compliance with the APA by issuing "guidance," which the agency then enforces as law without benefit of notice and comment rulemaking.[5] Nevertheless, as the D.C. Circuit has admonished, "fidelity to the rulemaking requirements of the APA bars courts from permitting agencies to avoid those requirements by calling a substantive regulatory change an interpretive rule." *U.S. Telecom*, 400 F.3d at 35.

---

[4] In addition to bypassing notice and comment rulemaking, Defendants also failed to comply with the Federal Register Act, which requires publication of such rules in the Federal Register, 44 U.S.C. § 1505(a), and with the Regulatory Flexibility Act, which requires a regulatory flexibility analysis of any rule subject to Section 553. 5 U.S.C. § 604(a).

[5] *See, e.g.*, OMB, Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007) (discussing the problems inherent in agency use of guidance to avoid formal rulemaking); Testimony of Dayna Shah, Managing Associate General Counsel for the Government Accountability Office, before the House of Representatives Committee on Energy and Commerce, Subcommittee on Health (May 15, 2008) (same in the context of CMS letters concerning the SCHIPS program).

Defendants' rule imposes new and binding legal obligations and therefore Defendants were obligated to follow Section 553 notice and comment rulemaking.

*First*, Defendants' rule imposes a binding legal obligation. Under their new rule, Defendants informed Tyson, and all other holders of poultry-related antibiotics labels, that "the injection of an antibiotic *in ovo* [renders] 'Raised with Antibiotics' or 'Raised without antibiotics that impact antibiotic resistance in humans' claims false and misleading." Raul Decl. Exs. Y, Z; *see also* Pilkington Decl. ¶ 27. Moreover, the agency has confirmed that it would apply this rule in a binding manner. In its own words, "if you are making either of these claims and injecting the poultry with an antibiotic *in ovo*, or using poultry raised in this way, the Agency *intends to revoke its approval of the claim*." Raul Decl. Ex. Y (italics added). Moreover, FSIS has made clear that "in the interim, FSIS *will approve* claims related to the use of antibiotics *only when an establishment demonstrates* to the satisfaction of the agency that *no antibiotics were used for any purpose whatsoever at any time*." Raul Decl. Exs. V, X-Z (italics added). Indeed, Defendants *have already applied* this policy to rescind Tyson's labels and to refuse Tyson a reasonable extension of time to withdraw its Amended RWA label. Pilkington Decl. ¶ 26; Raul Decl. Ex. V. Thus, Defendants' new rule imposes new legal obligations, declaring previously approved labels to be "false and misleading."

*Second*, Defendants' new rule substantively alters the legal landscape. The administration of antibiotics *in ovo* is a widespread, standard and well-known industry practice. Pilkington Decl. ¶ 19. Moreover, as noted above, prior to the adoption of this rule, there existed in the industry (and, indeed, at the USDA), a well understood distinction between *in ovo* claims and "raising" claims: the former applying, obviously, to the period before hatching, and the latter regarding the period from hatching through slaughter. Setting forth this distinction, Tyson

20

carefully and appropriately made clear in its applications that its RWA label and Qualified RWA Label were "raising" claims. Tyson's applications stated that:

> NO antibiotics will be administered at anytime during the growing period. The growing period is defined as beginning at the time of hatch and ending at the time of slaughter.

Raul Decl. Exs. A-D; *see also id.* Ex. J. This language plainly limited the scope of the claim to the "growing period" and expressly defines the "growing period" as the time "beginning at the time of hatch and ending at the time of slaughter." If Defendants had concerns, they were both permitted and obligated to inquire further. Instead of doing so, Defendants approved and expressly found Tyson's proposed "raising" claim to be "truthful and non-misleading." *Id.* Ex. K, *see also id.* Exs A-D, J.

Indeed, other USDA regulations, promulgated by the Agricultural Marketing Service, make this same distinction. For example, the National Organic Program, under which poultry may be labeled as organic so long as organic standards are applied, does not require withholding of antibiotics until "the second day of life." 7 C.F.R. § 205.236(a)(1). Similarly, USDA's proposed "naturally raised" program proposes this same distinction in establishing standards to support certain marketing claims. "No antibiotics can be administered . . . *from birth to slaughter*." 72 Fed. Reg. 67,268 (Nov. 28, 2007) (italics added).

Prior to June 2, 2008, Defendants had approved, on a case-by-case basis, numerous Qualified RWA labels for poultry companies, including Tyson, because no antibiotics that affect resistance in humans are administered during the growing period from hatch to slaughter. Pilkington Decl. ¶¶ 4-5; Raul Decl. Exs. Y, Z. Defendants' past approach is exemplified by the measured manner in which it proceeded in a similar scenario. Asked by a competitor to rescind "natural" labels for sodium lactate products, FSIS took precisely the steps absent here. It sought information from potentially affected parties; published a request for comments; and announced

21

a public meeting to solicit additional information regarding the practices at issues. *Id.* Ex. II. In that instance, the Department stressed its "case-by-case" approach. *Id.*

Here, by contrast, there has been no such measured approach, and Defendants new policy eschews any such case-by-case approach. Defendants' new policy broadly prohibits RWA claims, and, in Tyson's case (and only in Tyson's case) requires use of such labeling to be discontinued by June 18, 2008. Because this rule effects a substantive and binding change in applicable laws, and because it was adopted without Section 553 notice and comment rulemaking, it was improperly adopted and must be set aside.

## C.     The Adoption Of Defendants' Rule Was Arbitrary, Capricious And Contrary To Law, And Failed To Observe Required Procedure.

The APA requires the Court to set aside agency actions or conclusions that are arbitrary, capricious, or an abuse of discretion, or which were adopted not in accordance with the law or without observing legally required procedures. 5 U.S.C. § 706(2)(A), (D); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 375 (1989). "In reviewing the agency's actions, the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered all relevant factors." *Penobscot Indian Nation v. HUD*, 539 F. Supp. 2d 40, 47 (D.D.C. 2008). Defendants' rule was adopted in violation of these standards.

### 1.     Defendants improperly relied on ex parte evidence, submitted by Tyson's business rivals and litigation opponents.

Defendants' new rule must be set aside because it was adopted in part based on information provided ex parte to Defendants by Tyson's business rivals, which information was never provided to Tyson or to interested members of the public.

22

The APA requires Defendants to "give interested persons an opportunity to participate in the rule making." 5 U.S.C. § 553(c). This means that, at the very "least[,] the most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) (Scalia, J.); *accord Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999); *see also Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007). Agency reliance on "integral" factual material that has been submitted ex parte and kept secret during a proceeding flatly violates the APA. *Id.* at 201 ("failure to provide an opportunity for comment on" an "integral part" of the agency's model "constitutes a violation of the APA's notice-and-comment requirements" (citing *Chamber of Commerce v. SEC*, 443 F.3d 890, 902 (D.C. Cir. 2006))); *accord Air Transp. Ass'n*, 169 F.3d at 7-8; *Envtl. Def. Fund*, 458 F. Supp. at 659-61. Indeed, consideration of such information upsets "'the critical role of adversarial comment in ensuring proper functioning of agency decisionmaking and effective judicial review.'" *Id.* at 659 (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 542 (D.C. Cir. 1978)).

Nevertheless, precisely this sort of secrecy infected Defendants' decisionmaking. On April 16, 2008, Tyson's competitors, Sanderson Farms, Perdue Farms, and Foster Farms, filed a petition with FSIS seeking withdrawal of Tyson's Qualified RWA claim. Raul Decl. Ex. O. On May 5, 2008, FSIS provided Tyson with a copy of that petition, but made no mention of any other materials submitted by Tyson's competitors. *Id.* Ex. AA.

Nearly a month later, on June 2, 2008, FSIS informed Tyson that it was rescinding the Qualified RWA Label that Tyson had already voluntarily withdrawn, and was refusing to allow

Tyson the reasonable period necessary to complete that withdrawal in an orderly fashion. Defendants made no mention of reliance on any other, undisclosed materials, yet, the very next day, FSIS wrote to Tyson's competitors to inform them that "after carefully considering [*inter alia*] the information you submitted on May 5, 2008, … we have decided to grant your petition." Raul Dec. Ex. X.

Along with their June 10, 2008 response, Defendants for the first time[6] provided Tyson with a copy of Tyson's competitors' May 5 submission. *Id.* Ex. KK. Reviewing this document now, Tyson is appalled that it had no opportunity to respond to the highly selective submission of certain transcript excerpts, the misrepresentation of the conclusions of a consumer survey, or the false suggestion that in declining to stay the injunction against Tyson the Fourth Circuit had ruled on the merits of the litigation. *Id.* Most shockingly, Tyson was not able to respond to the insinuation that the author of the letter possessed additional, confidential documents of Tyson's "that may be relevant," which the author could not supply, but which the district court had ostensibly relied upon in its ruling. *Id.* at 2-3. Defendants' reliance on such one-sided, *ex parte* advocacy materials from certain interested parties as the basis for the new regulatory standard constitutes a classic denial of due process and reasoned decision making.

The denial of an opportunity to comment upon secret information is prejudicial because the agency itself admitted that the *ex parte* materials were considered as part of its adoption of the new agency rule. Those materials have not been disclosed, thereby depriving Tyson of the ability to make any substantive challenge to them. Such a denial is necessarily prejudicial when

---

[6] Defendants assert that FSIS claims to have provided Tyson with this letter. Tyson has no record of that, and certainly would have responded to it if Tyson had been aware of the rank inaccuracies it contained.

the party "had no knowledge of the new information until the final decision was made and had no subsequent opportunity to provide comments." *Air Transp. Ass'n*, 169 F.3d at 8.

Defendants' consideration of *ex parte* submissions from Tyson's competitors violates the APA, 5 U.S.C. §§ 553, 706(2)(D), and requires that the rule be set aside.

> **2. Defendants adopted their new rule and applied it to Tyson without first considering and reconciling contrary rules promulgated within the same Department.**

Defendants' new rule also should be set aside because it was promulgated without resolving (or even addressing) directly contradictory regulations and guidance promulgated by the same Department specifically permitting "raising" claims limited to conduct during the period from hatch until slaughter.

Agency action is arbitrary and capricious "when the agency offer[s] insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 57 (1983)); *Airmark Corp. v. FAA*, 758 F.2d 685, 691-92 (D.C. Cir. 1985); *Local 777, Democratic Union Org. Comm. v. NLRB*, 603 F.2d 862, 872 (D.C. Cir. 1978)). That is, an agency must treat "functionally indistinguishable" situations consistently, *Indep. Petroleum Ass'n v. Babbitt*, 92 F.3d 1248, 1262 (D.C. Cir. 1996), "unless it can provide a legitimate reason for failing to do so," *id.* at 1258 (citing *Nat'l Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1201 (D.C. Cir. 1984)); *accord Transactive Corp.*, 91 F.3d at 237; *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27-28 (D.D.C. 1997).[7] Moreover, the agency must supply the legitimate reason for its departure on the record, because courts may not supply an

---

[7] In fact, federal agencies are specifically directed to "avoid regulations and guidance that are inconsistent, incompatible, or duplicative with its other regulations and guidance documents." Exec. Order No. 12,866, §1(b)(10) (Sep. 30, 1993), *as amended by* Exec. Orders No. 13,258 (Feb. 26, 2002) & No. 13,422 (Jan. 18, 2007).

explanation where the agency has not. *See, e.g., Contractors Transp. Corp. v. United States*, 537 F.2d 1160, 1162 (4th Cir. 1976) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). Failure to reconcile a new policy with existing agency policies, or to provide a reasoned explanation for disparate policies, renders the new policy arbitrary and capricious. *Transactive Corp.*, 91 F.3d at 237.

Here, Defendants' new rule fundamentally conflicts with parallel USDA policies under the National Organic Program. There, the Department, through the Agricultural Marketing Service ("AMS"), provides that poultry may be labeled "organic" if that poultry satisfies the statutory requirements – including a ban on the administration of antibiotics – which apply only after the first day of life. Under this program, those wishing to label their products "organic" "must not," among other things, label "as organic any animal or edible product derived from any animal treated with antibiotics." 7 C.F.R. § 205.238(c)(1). However, these regulatory requirements do not take effect until after hatching: "Poultry or edible poultry products must be from poultry that has been under continuous organic management beginning *no later than the second day of life*." 7 C.F.R. § 205.236(a)(1) (italics added)).

The Department has itself highlighted how this rule for chickens compares with the more restrictive rule applicable to other slaughter livestock. "When a dairy cow is slaughtered, she cannot be sold as organic slaughter stock unless she was raised organically from the last third of the mother's gestation, the same as other slaughter livestock (except poultry, which must be raised organically *beginning with the second day of life*)." 71 Fed. Reg. 32803, 32806 (Jun. 6, 2006) (italics added); *accord* The National Organic Program, *Impact of* Harvey v. Johanns *and Restoring the NOP to pre-Lawsuit Status: A Report to Congress*, 20 (March 2006).

Similarly, AMS premises its "naturally raised" marketing program on antibiotics not being administered from the time of birth to slaughter. Under this program, companies qualify for marketing claims that livestock is "naturally raised" if they do not administer antibiotics, administer "growth promotants," or allow animal by-products in their feed. 72 Fed. Reg. 67,268 (Nov. 21, 2007). This prohibition against "naturally rais[ing]" livestock without antibiotics, however, applies expressly only to the period "from birth to slaughter."[8]

Having been presented with these conflicting policies in Tyson's June 6 letter, Defendants' only response was to declare them, without explanation, "inapposite." Raul Decl. Ex. JJ. Yet, Defendants failed to respond *inter alia* to the very clear statement in the Federal Register that "AMS has worked closely with FSIS" in defining "naturally raised" to mean the practice of raising animals without administering antibiotics between "birth and slaughter." 72 Fed. Reg. 67,266, 67,267. It is entirely unreasonable for FSIS to repudiate the position of its sister agency within the same Department that was developed in conjunction with FSIS itself.

Defendants' failure to reconcile their new rule with these functionally indistinguishable policies is arbitrary, capricious, and contrary to law. These policies govern claims that may be made concerning how poultry is "raised" or produced and specifically govern when administration of antibiotics will preclude such claims. Yet, in contrast to Defendants' new rule,

---

[8] As is clear from Tyson's repeated submissions to FSIS in May 2008, Tyson relied – and reasonably so – on both the industry's traditional distinction between pre- and post-hatch claims, as well as on the agency's express drawing of this distinction in Departmental regulations. Raul Decl. Exs. P, R, S. Yet, despite Tyson having repeatedly presented this issue to Defendants for resolution, the agency's letters of June 2 through June 4 failed to resolve the conflict between USDA's old and new rules, and failed to acknowledge or resolve the conflict at all. Indeed, Defendants implicitly acknowledged the conflict by noting that "FSIS, along with [AMS] will initiate a public process to review policies on 'Raised without antibiotics' claims for poultry," Raul Decl. Ex. W. As such, Defendants were aware that the rule that they had adopted conflicts with existing agency rules in indistinguishable circumstances but made no effort to justify or reconcile those fundamental contradictions. Defendants' failure to do so renders the new rule arbitrary and capricious. 5 U.S.C. § 706(2)(B); *Transactive Corp.*, 91 F.3d at 237.

27

each of these policies defines the relevant period for such "raised" or production claims as the period from "birth to slaughter." The new rule, in stark contrast, and without any justification or explanation, prohibits the use of antibiotics "at any time" and "for any purpose." Raul Decl. Exs. V, Y.

### 3. Defendants applied their new standard to Tyson by refusing to allow Tyson the necessary time for orderly withdrawal of the Qualified RWA Label.

Forcing Tyson to adopt new labeling within two weeks for billions of dollars worth of poultry products in over 400 products is unreasonable and unrealistic. Smith Decl. ¶¶ 8-33. For the reasons stated in the accompanying declaration of Donnie Smith, Tyson, compliance with this deadline will cause Tyson immeasurable and irreparable injury to Tyson's brand, reputation, and relationships with its retail clients, and impose upon it substantial out-of-pocket costs, and all immediately before the Independence Day holiday, a significant time of year for poultry producers. *Id.* ¶¶ 15-23.

Extension of the June 18 deadline would not provide Tyson with any unfair competitive advantage.[9] *First*, Tyson has agreed to withdraw its Qualified RWA Label, which decision it has announced publicly. Raul Decl. Ex. HH. *Second*, Tyson has been enjoined from advertising any of its chicken products using the claims in the Qualified RWA Label. *Id.* Ex. GG. In view of Tyson's limited request, Defendants have not articulated any rationale as to why the appropriate course of action is to implement a timetable that will impose highly restrictive and punitive costs and conditions on Tyson. Smith Decl. ¶¶ 15, 29.

---

[9] Only after Tyson petitioned the agency to reconsider the matter of the extension did Defendants supply a basis for its refusal to allow additional time to transition from the existing Qualified RWA labels to new labeling. Specifically, on June 6, 2008, Defendant Dr. Raymond informed Tyson that the June 18 deadline reflected Defendants' concerns that a longer period of temporary approval would grant Tyson an unfair competitive advantage. Raul Decl. Ex. AA. This rationale did not accompany the agency's actual order that Tyson stop using its Qualified RWA Label by June 18, 2008. *Id.* Ex. V.

In sum, Defendants have arbitrarily and capriciously applied their unlawful new rule to deny Tyson a reasonable period in which to withdraw its Qualified RWA labeling.

> **4.    Defendants applied their new standard arbitrarily, capriciously, and unlawfully in singling out Tyson for unequal treatment by refusing to allow Tyson a reasonable period to withdraw its Qualified RWA Label.**

Finally, not only did Defendants apply their new rule to Tyson capriciously and without basis, but also did so arbitrarily and inconsistently. A court shall set aside agency actions or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the D.C. Circuit has recognized, "[g]overnment is at its most arbitrary when it treats similarly situated people differently." *Etelson v. OPM*, 684 F.2d 918, 926 (D.C. Cir. 1982).

Defendants here commanded Tyson to withdraw its Qualified RWA Label by June 18, 2008. But, while Defendants announced that their new *per se* standard against any antibiotic use "at any time" and "for any purpose" would apply broadly, including to those companies that have already-approved RWA labels, Raul Decl. Exs. X-Z, the June 18, 2008, deadline applies only to Tyson. On June 4, 2008, FSIS began mailing to every holder of an approved claim regarding the use of antibiotics in the raising of poultry a letter setting forth Defendants' new rule. As described above, this letter made clear Defendants' view that any pre-hatch use of antibiotics rendered claims substantially similar to Tyson's "false and misleading." Raul Decl. Exs. Z; *see also id.* Ex. Y. Moreover, the letter stated unambiguously Defendants' intention "to revoke its approval of [such] claim[s]." *Id.* Ex. Z. Yet, despite Defendants' acknowledgement that others suffer the same perceived legal deficiency, it is only Tyson who bears this burden. Smith Decl. ¶ 15. Such inconsistent treatment of similarly-situated companies without any reasoned explanation for deferring treatment is plainly arbitrary and capricious.

## II.    ABSENT PRELIMINARY INJUNCTIVE RELIEF, PLAINTIFF WILL SUFFER IRREPARABLE INJURY

If the implementation of Defendants' new rule obliges Tyson to discontinue all use of its Qualified RWA Label on June 18, 2008, Tyson will suffer immediate, concrete, and substantial irreversible injury.

The "basis of injunctive relief in the federal courts has always been irreparable harm," *Sampson v. Murray*, 415 U.S. 61, 88 (1974), and such relief is intended to preserve the parties' relative positions pending judicial disposition on the merits, *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation."). To show irreparable injury, a party must demonstrate an injury that is "imminen[t]," "certain and great," and "actual and not theoretical." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quotations omitted). These requirements are readily satisfied in this case because Defendants' decision to require Tyson to stop all use of its Qualified RWA Labels by June 18 will cause Tyson substantial and irreparable injury.

If required to stop using its previously approved Qualified RWA labeling by June 18, 2008, Tyson will suffer immediate and irreparable injury. As explained by Mr. Smith, Compliance with that timetable will result in massive disruption affecting over 400 different products, fundamentally impacting Tyson's business operations. Smith Decl. ¶¶ 8-15. Such disruption will have serious negative repercussions for Tyson, for its brand, for its reputation, and for its core relationships with its retail customers. Tyson depends on the goodwill that it has earned through long-standing relationships with retailers, which depend on Tyson for providing them with sufficient supply to meet the needs of the consuming public. The June 18 deadline

adopted by Defendants threatens these longstanding relationships with significant and irreparable injury. *Id.* ¶¶ 15-21. It also will impose substantial out-of-pocket costs on Tyson. *Id.* ¶¶ 22-28.

The D.C. Circuit has recognized that "damage" to "[plaintiff's] good name" and "loss of profits which could never be recaptured" constitute irreparable harms sufficient to support an injunction. *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962). And, as the Third Circuit has explained, "[i]n a competitive industry where consumers are brand-loyal … loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'" *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (citation omitted); *accord Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007) (per curiam) ("It is well-established that a movant's loss of current or future market share may constitute irreparable harm.").

Tyson's out-of-pocket costs are likewise irreparable. Under the June 18 deadline, Tyson will be obligated to destroy millions of dollars of Qualified RWA Labels. Smith Decl. ¶¶ 22-28. Where, as here, a Plaintiff seeks injunctive relief against the Government for violations of the APA, monetary damages are not available. *See, e.g.*, *Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66 (D.D.C. 2004) (recognizing that alternative remedies were "of no avail in this case where the plaintiff will be unable to sue to recover any monetary damages"); *Belk v. Fed. Bureau of Prisons*, No. 07-C-301-C, 2004 WL 5352260, at *10 (W.D. Wis. Oct. 15, 2004) ("Money damages would not be an adequate remedy in this case and they are not allowed under the APA in any event."). Indeed, the Court of International Trade has found irreparable harm in circumstances essentially identical to those in this case. *See Nat'l Juice Prods. Ass'n v. United States*, 628 F. Supp. 978, 987 (Ct. Int'l Trade 1986) (finding "irreparable harm" under statute in light of "the business disruption likely to occur because of the inability of the industry

31

packagers to satisfy the simultaneous demand for new labels, the cost of discarding or storing noncomplying labels, and the cost of redesigning packaging, would be substantial and none of these expenses could be recouped should plaintiffs ultimately prevail on the merits"), *superseded by statute*, 19 U.S.C. § 1625(c), *as recognized in Precision Spending Metals, Inc. v. United States*, 116 F. Supp. 2d 1350 (Ct. Int'l Trade 2000).[10]

The foregoing injuries will be particularly grave as they affect Tyson immediately prior to the July 4th holiday, which is one of the most important times of year for the poultry industry. Smith Decl. ¶ 19. Retailers, concerned with Tyson's ability to supply their needs, may place their orders elsewhere. *See, e.g., Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 78 (D.D.C. 2001) (loss of customers and possibly permanently damaged relationships with customers constitute irreparable harm); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (loss of reputation, good will, and business opportunities constitute irreparable harm); *Mich. Bell Tel. Co. v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001) ("loss of established goodwill may irreparably harm a company") (collecting cases); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n*, 35 F.3d 1134, 1140 (7th Cir. 1994) (affirming district court's finding that loss of goodwill qualified as irreparable harm); *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (lost long-time consumers and goodwill constitute irreparable harms).

In the absence of immediate injunctive relief, Tyson will suffer irreparable and massive injury to its reputation.

---

[10] *Accord Am. Frozen Food Inst., Inc. v. United States*, 855 F. Supp. 388, 393-94 (Ct. Int'l Trade 1994) (finding "irreparable harm" under the same statute where plaintiffs in the business of packaging and marketing frozen produce showed that they would incur substantial costs in having to destroy old labels and produce new ones to bring themselves into compliance with a decision of the Treasury Department).

## III.    THE IRREPARABLE INJURY TO TYSON SUBSTANTIALLY OUTWEIGHS ANY HARM TO DEFENDANTS OR OTHER INTERESTED PARTIES

The harm to Tyson greatly outweighs any harm that might result from an order enjoining defendants from enforcing their arbitrary June 18, 2008, deadline.

*First*, preliminary injunctive relief will not injure Defendants or the public interests they are charged with serving. Moreover, the D.C. Circuit has rejected abstract claims that injunctive relief can injure a Department's enforcement interests. In *National Association of Farmworkers Organizations v. Marshall*, 628 F.2d 604, 615 (D.C. Cir. 1980), the Circuit Court rejected the argument that an injunction prohibiting promulgation of a list of approved pesticides would cause the Department of Labor a cognizable "harm." Such an injunction, the court observed, would result only in "the suspension of its list of approved pesticides, and the pressure to respond to demands by [industry] and child protection groups." *Id.* These, the court concluded, "are no different from the Department's burdens under the statutory scheme." *Id.*[11]

Any possible injury to Defendants would be far outweighed by the irreparable harm to Tyson by the arbitrary and capricious June 18 deadline. This is especially so given that Tyson has agreed voluntary to withdraw its Qualified RWA labeling, and seeks merely an additional 60 days to transition to new labels for its more than 400 products. The short duration of the proposed injunction undermines any claim that Defendants would suffer injury if relief is granted to Tyson. *See, e.g., George Washington Univ. v. Dist. of Columbia*, 148 F. Supp. 2d 15, 18-19 (D.D.C. 2001) (government established "no injury, irreparable or otherwise" that they would

---

[11] *Accord C & K Mfg. & Sales Co. v. Yeutter*, 749 F. Supp. 8, 14 (D.D.C. 1990) (holding injunction would inflict "little or no injury" on USDA and FSIS because the injunction sought "simply order[s] them to follow their own regulations, as due process requires"); *Lancor v. Lebanon Hous. Auth.*, 760 F.2d 361, 363 (1st Cir. 1985) (rejecting argument by local agency that balance of hardships tipped in its favor because an injunction would cause it "to lose all credibility" with the individuals it regulated and "diminish its ability effectively to maintain control" of the properties within its jurisdiction).

sustain if the enforcement of a zoning order were delayed to "provide enough lead time to put it into effect consistent with" plaintiff's previous commitments).

Likewise, any potential injury to third parties also is substantially outweighed by the irreparable injury to Tyson by the June 18 deadline. "The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation." *Cobell v. Kempthorne*, 455 F.3d 301, 314 (D.C. Cir. 2006), *cert. denied*, 127 S. Ct. 175 (2007). Preservation of the status quo is necessary here as FSIS's response to its purported concern regarding the competitive effect of its rulings is to impose a timetable that imposes punitive and highly disruptive costs on Tyson. Smith Decl. ¶¶ 15, 29. Indeed, imposition of this deadline may well serve as a dramatic windfall for Tyson's competitors.

## IV.    PRELIMINARY INJUNCTIVE RELIEF FAVORS THE PUBLIC INTEREST

Finally, entry of a preliminary injunction would serve the public interest. First, and foremost, continued use of Tyson's Qualified RWA Label poses no risk of health, safety, or dietary problems to consumers. Indeed, FSIS's June 2, 2008, letter allowing Tyson to continue using its label until June 18 implicitly reflects FSIS's determination that continued use of the Qualified RWA Label poses no risk of health, safety or dietary problems to consumers.[12]

Given these facts, the public interest here is "inextricably linked with the merits of the case." *Serono Labs.,* 158 F.3d at 1326. That is logical, given the public's significant interest in having federal agencies abide by the strictures of federal law, including required administrative procedures. *See, e.g., Clarke v. Office of Fed. Hous. Enter. Oversight*, 355 F. Supp. 2d 56, 66 (D.D.C. 2004) (holding that there is "a substantial public interest in ensuring that [an agency]

---

[12] Defendant Dr. Raymond confirmed that conclusion when he informed Tyson that the reason Tyson was afforded only until June 18 to transition from Qualified RWA labels across over 400 different products was concern that Tyson would gain an unfair competitive advantage. Raul Decl. Ex. AA.

acts within the limits of its authority"); *Gray Panthers Advocacy Comm. v. Sullivan*, Civ. A. No. 89-0605, 1989 WL 97937, at \*4 (D.D.C. June 28, 1989). Indeed, "the public interest is best served by having federal agencies comply with the requirements of federal law, particularly the notice and comment requirements of the APA, and the agency's own stated polices." *Patriot, Inc v. HUD*, 963 F. Supp. 1, 6 (D.D.C. 1997) (preliminarily enjoining agency action which violated APA and its own regulations); *accord Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F. Supp. 2d 114, 142 (D.D.C. 1999). The public here is otherwise ill served by Defendants' head-long rush to impose a punitive and arbitrary penalty on Tyson alone, sweeping aside numerous procedural safeguards.

The public is also well-served by injunctive relief designed to avoid unnecessary economic injury and disruption that would result from implementation of Defendants' June 18 deadline. Absent a credible health risk to consumers, it would be senseless to undermine Tyson's business operations in the manner described by Mr. Smith. Smith Decl. ¶¶ 15-21. Such disruption would affect not only Tyson's operations, but also the operations of its customers, and the consuming public. *Grease Monkey Int'l, Inc. v. Ralco Lubrication Servs., Inc.*, 24 F. Supp. 2d 120, 126 (D. Mass. 1998) (denying injunction because public interest would not be served if consumers would be deprived of a "fast service automobile lubrication service"); *Marilyn Manson, Inc. v. N.J. Sports & Exposition Auth.*, 971 F. Supp. 875, 891 (D.N.J. 1997) (finding injunction in the public interest where a government entity would have prevented an otherwise "profitable economic endeavor" from taking place).

The public interest is best served by an injunction that allows Tyson to complete its voluntary withdrawal in an orderly manner without upset to its retailers, its customers, or to the

35

economy, and which preserves the status quo for judicial resolution of the merits of Tyson's APA claims.

## CONCLUSION

For the foregoing reasons, Tyson respectfully moves the Court for an order enjoining Defendants from enforcing or otherwise applying their rule to previously approved Qualified RWA claims, and from requiring Tyson to cease using the Qualified RWA Label over the following 60 days.

Respectfully submitted,

Alan Charles Raul (Bar No. 362605)
   *Counsel of Record
Paul J. Zidlicky (Bar No. 450196)
Gordon D. Todd (Bar No. 475203)
Eamon P. Joyce (Bar. No. 483127)
Ryan C. Morris (Bar. No. 980347)

SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
(202) 736-8711 (fax)

*Attorneys for Plaintiff Tyson Foods, Inc.*

June 11, 2008

36

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TYSON FOODS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| U.S. DEPARTMENT OF | ) | |
| AGRICULTURE, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DECLARATION OF ALAN CHARLES RAUL

I, Alan Charles Raul, do declare and state the following under penalty of perjury:

1.    I am an attorney with Sidley Austin LLP, a member of the bar of the District of Columbia and of this Court, and counsel for Plaintiff Tyson Foods, Inc ("Tyson") in the above captioned matter.  I submit this declaration in support of Tyson's Memorandum of Points and Authorities in Support of Tyson's Motion for Temporary Restraining Order and/or a Preliminary Injunction.

2.    Attached hereto as Exhibit A is a true and correct copy of Tyson's May 1, 2007, Application for Approval of Labels, Marking or Device related to Tyson 873, 2873-929 Chicken Thighs (PM#99009335), which was approved on May 11, 2007.  This material was obtained from Tyson's files.

3.    Attached hereto as Exhibit B is a true and correct copy of Tyson's May 1, 2007, Application for Approval of Labels, Marking or Device related to Tyson 2810, 100810-929 Chicken Wings (PM#99009319), (PM#99009323), which was approved on May 15, 2007.  This material was obtained from Tyson's files.

4.     Attached hereto as Exhibit C is a true and correct copy of Tyson's May 1, 2007, Application for Approval of Labels, Marking or Device related to Tyson 100664-929 Chicken Breast Tenderloins (PM#990092863), which was approved on May 16, 2007. This material was obtained from Tyson's files.

5.     Attached hereto as Exhibit D is a true and correct copy of Tyson's May 8, 2007, Application for Approval of Labels, Marking or Device related to Tyson 3428-929 Ground Chicken (PM#99009572), (LL#11057621), which was approved on May 15, 2007. This material was obtained from Tyson's files.

6.     Attached hereto as Exhibit E is a true and correct copy of a letter from Nancy S. Bryson and Michael T. Roberts, Venable LLP, to Philip S. Derfler, U.S. Department of Agriculture, Food Safety and Inspection Service ("FSIS"), dated September 26, 2007. This material was obtained from Tyson's files.

7.     Attached hereto as Exhibit F is a true and correct copy of a letter from Philip S. Derfler, FSIS, to Nancy S. Bryson, Venable LLP, dated November 6, 2007. This material was obtained from Tyson's files.

8.     Attached hereto as Exhibit G is a true and correct copy of a letter from Nancy S. Bryson, Venable LLP, to Charles Gioglio and Rosalyn Murphy-Jenkins, FSIS, dated November 20, 2007. This material was obtained from Tyson's files.

9.     Attached hereto as Exhibit H is true and correct copies of form letters from Philip S. Derfler, FSIS, to poultry producers on December 17, 2007, regarding FSIS rescission of "Raised Without Antibiotics" labels. A copy of this material was obtained from Tyson's files.

2

10.    Attached hereto as Exhibit I is a true and correct copy of a letter from Nancy S. Bryson, Venable LLP, to Charles Gioglio and Rosalyn Murphy-Jenkins, FSIS, dated December 18, 2007. This material was obtained from Tyson's files.

11.    Attached hereto as Exhibit J is a true and correct copy of Tyson's December 17, 2007, Application for Approval of Labels, Marking or Device related to Tyson 600829-929 All Natural Boneless Skinless Chicken Breasts w/ Rib Meat, which was approved on December 19, 2007. This material was obtained from Tyson's files.

12.    Attached hereto as Exhibit K is a true and correct copy of a letter from Richard A. Raymond, M.D., FSIS, to Archie Shaffer, Tyson, dated January 7, 2008. This material was obtained from Tyson's files.

13.    Attached hereto as Exhibit L is a true and correct copy of a letter from Nancy S. Bryson and Michael T. Roberts, Venable LLP, to Charles Gioglio and Rosalyn Murphy-Jenkins, FSIS, dated January 25, 2008. This material was obtained from Tyson's files.

14.    Attached hereto as Exhibit M is a true and correct copy of a letter from Charles L. Gioglio, FSIS, to Nancy S. Bryson, Venable LLP, dated February 6, 2008. This material was obtained from Tyson's files.

15.    Attached hereto as Exhibit O is a true and correct copy of a letter from Randall K. Miller, Arnold & Porter LLP, to Alfred V. Almanza, FSIS, dated April 16, 2008. This material was obtained from Tyson's files.

16.    Attached hereto as Exhibit P is a true and correct copy of Interim Response of Tyson Foods to April 30, 2008 FSIS Information Request, dated May 2, 2008. This material was obtained from Tyson's files.

17.    Attached hereto as Exhibit Q is a true and correct copy of Exhibits to Interim Response of Tyson Foods to April 30, 2008, FSIS Information Request, dated May 2, 2008. This material was obtained from Tyson's files.

18.    Attached hereto as Exhibit R is a true and correct copy of a letter, with accompanying exhibits, from Nancy S. Bryson, The Bryson Group PLLC, to Philip S. Derfler, FSIS, dated May 2, 2008. This material was obtained from Tyson's files.

19.    Attached hereto as Exhibit S is a true and correct copy of a letter, with enclosure, from Nancy S. Bryson, The Bryson Group PLLC, to Alfred V. Almanza, FSIS, dated May 6, 2008. This material was obtained from Tyson's files.

20.    Attached hereto as Exhibit T is a true and correct copy of a letter, with enclosures, from Nancy S. Bryson, The Bryson Group PLLC, to Philip S. Derfler, FSIS, dated May 7, 2008. This material was obtained from Tyson's files.

21.    Attached hereto as Exhibit U is a true and correct copy of a letter from Archie Schaffer, Tyson, to Dr. Richard Raymond, United States Department of Agriculture ("USDA"), dated May 30, 2008. This material was obtained from Tyson's files.

22.    Attached hereto as Exhibit V is a true and correct copy of a letter from Philip S. Derfler, FSIS, to Sara Lilygren, Tyson, dated June 2, 2008. This material was obtained from Tyson's files.

23.    Attached hereto as Exhibit W is a true and correct copy of a June 3, 2008 Statement by Under Secretary for Food Safety Dr. Richard Raymond Regarding the Tyson Foods, Inc. Raised without Antibiotics Label Claim Withdrawal, printed from the internet on June 6, 2008. A copy of this material was obtained from the USDA's website.

4

24.     Attached hereto as Exhibit X is a true and correct copy of a letter from Philip S. Derfler, FSIS, to Randall K. Miller, Arnold & Porter LLP, dated June 3, 2008. A copy of this material was obtained from FSIS.

25.     Attached hereto as Exhibit Y is a true and correct copy of a generic letter from Tammie Myrick, Murray Penner and Tawana Duncan-Harrington, FSIS, to "Label Consultant Firms" dated June 4, 2008. A copy of this material was obtained from Tyson's files.

26.     Attached hereto as Exhibit Z is a true and correct copy of a letter from Charles L. Gioglio, FSIS, to Alderfer, Inc., dated June 4, 2008. A copy of this material was obtained from FSIS.

27.     Attached hereto as Exhibit AA is a true and correct copy of a letter from Alan Charles Raul, Sidley Austin LLP, to Honorable Marc L. Kesselman, USDA, dated June 6, 2008.

28.     Attached hereto as Exhibit BB is a true and correct copy of a February 28, 2008, memorandum with the subject: "Remove, Destroy, and Replace RWA Base and Trimmed & Ready POS." This material was obtained from Tyson's files.

29.     Attached hereto as Exhibit CC is a true and correct copy of a spreadsheet entitled "Tyson RWA Customer POS and Packaging Update," dated January 10, 2008. This material was obtained from Tyson's files.

30.     Attached hereto as Exhibit DD are true and correct copies of a series of spreadsheets entitled "RWA Inventory Transition." This material was obtained from Tyson's files.

31.     Attached hereto as Exhibit EE is a true and correct copy of a letter from Carol Tucker Foreman and Chris Waldrop, Food Policy Institute, to Charles F. Conner, USDA, dated December 17, 2007. This material was obtained from Tyson's files.

5

32.    Attached hereto as Exhibit FF is a true and correct copy of Memorandum Opinion, *Sanderson Farms, Inc. v. Tyson Foods, Inc.* No. 08-210 (D. Md.), filed on April 22, 2008.

33.    Attached hereto as Exhibit GG is a true and correct copy of Preliminary Injunction Order, *Sanderson Farms, Inc. v. Tyson Foods, Inc.* No. 08-210 (D. Md.), filed on April 22, 2008.

34.    Attached hereto as Exhibit HH is a true and correct copy of a press release captioned "Tyson to Withdraw Qualified Raised Without Antibiotics Chicken Label," dated June 2, 2008. This material was obtained from Tyson's files.

35.    Attached hereto as Exhibit II is a true and correct copy of the Declaration of Philip S. Derfler submitted on behalf of FSIS in *Hormel Foods Corporation v. United States Department of Agriculture*, 07-01724 (D.D.C.), dated April 24, 2008.    This material was obtained from Tyson's files.

36.    Attached hereto as Exhibit JJ is a true and correct copy of a letter from Marc L. Kesselman, USDA, to Alan Charles Raul, Sidley Austin LLP, dated June 10, 2008.

37.    Attached hereto as Exhibit KK is a true and correct copy of a letter from Randall K. Miller, Arnold & Porter LLP, to Philip S. Derfler and Charles Gioglio, FSIS, dated May 5, 2008. This material was obtained from FSIS.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. on the 11th day of June, 2008.

Alan Charles Raul

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**TYSON FOODS, INC.,**

       **Plaintiff,**

    **v.**                          **Civil Action No.**

**U.S. DEPARTMENT OF AGRICULTURE, ET AL.,**

       **Defendants.**

---

## DECLARATION OF PATRICK PILKINGTON, D.V.M.

    I, Patrick Pilkington, D.V.M., declare and state the following under penalty of perjury:

    1.    I hold a doctorate in veterinary medicine, have a license to practice in Arkansas, and am a United States Department of Agriculture accredited veterinarian.  I am a member of the American Veterinary Medical Association, the Association of Veterinarians in Broiler Production, the American Association of Avian Pathologists, and I am board certified by the American College of Poultry Veterinarians.

    2.    I currently serve as Vice President of State Government Relations and Regulatory Affairs at Tyson Foods, Inc. ("Tyson").  I began my career with Tyson in 1996 as a field veterinarian in the Southeastern United States.  In that role, I was responsible for the health and production programs for approximately 20% of Tyson's chicken production.

    3.    In 2001, I was promoted to Vice President of Live Production Operations and became responsible for the veterinary programs for all of the company's chicken production.  In

that capacity, I led a department responsible for veterinary, nutritional, hatchery, and feed milling services. I make this declaration with knowledge of the facts set forth herein and based on my training and experience.

4. In May 2007, Tyson applied to the Food Safety and Inspection Service ("FSIS") for approval to carry the label "Chicken Raised Without Antibiotics" on several product lines of chicken. Tyson's applications specifically advised FSIS that (i) it used ionophores in its chicken feed, and (ii) the term "raised" referred to the "growing period," which was "defined as beginning at time of hatch and ending at time of slaughter."

5. In May 2007, FSIS approved the usage of "Raised Without Antibiotics" ("RWA") labeling for all of the products in question.

6. In response to widespread consumer concern about "superbugs," infections that are resistant to the antibiotics used in humans, Tyson has taken considerable steps to reduce the extent to which it uses antibiotics in the production of poultry products. Tyson does not routinely administer to its chickens antibiotics that are important to human medicine during the period the birds are raised. Where it becomes necessary to prescribe an antibiotic to treat clinical disease, poultry so treated is not used for RWA-labeled product.

7. Whereas many poultry producers use antibiotics that are indicated to promote poultry growth, Tyson does not use such antibiotics. Ionophores are not approved in the United States by FDA for the purpose of promoting poultry growth.

8. On September 12, 2007, however, FSIS advised Tyson that it had reconsidered its approval of the RWA label. The agency explained that it believed the RWA label might be inappropriate because Tyson uses ionophores in its chicken feed to prevent coccidiosis, a parasite that affects poultry.

2

9.     Following discussions between Tyson and FSIS, on November 6, 2007, FSIS informed Tyson that it made a mistake in approving the RWA Labels, and that it subsequently determined that ionophores are antibiotics—though they are not used in humans.

10.     FSIS advised Tyson that it intended to rescind the labels bearing the RWA claim. FSIS gave Tyson a "45-day temporary approval" to permit Tyson to remove the claim.  FSIS also informed Tyson that it could submit a "revised claim regarding ionophores."

11.     On December 19, 2007, Tyson and FSIS agreed to new labeling language.  That language stated "Raised Without Antibiotics that impact antibiotic resistance in humans" (hereinafter, the "Qualified RWA Label" or the "Qualified RWA claim").

12.     Tyson's application for its revised labels informed FSIS that the term "raised" referred to the period "beginning at time of hatch and ending at time of slaughter."

13.     On January 7, 2008, Dr. Richard A. Raymond of the United States Department of Agriculture ("USDA") informed Tyson that the Qualified RWA claim "describes the situation in a truthful and non-misleading way."

14.     On February 6, 2008, FSIS also granted Tyson "continued use of the unqualified RWA claim on existing labels until May 4, 2008."

15.     On April 16, 2008, Foster Farms, Sanderson, Inc., Perdue, and a group known as the Truthful Labeling Coalition filed a petition asking FSIS to rescind Tyson's Qualified RWA Label based, in part, because Tyson administered vaccines *in ovo* that contain antibiotics.

16.     The petition noted that Tyson's Qualified RWA applications defined "raised" as "the period of time from hatch to slaughter," and that "some of FSIS' staff may have been aware" of the *in ovo* vaccinations.

17.     On April 30, 2008, FSIS requested information from Tyson about its vaccination protocol. In early May, Tyson provided information in response to those requests.

18.     In line with industry standards, Tyson, like many other poultry producers, injects chicken eggs two to three days prior to hatch, or *in ovo*, with a vaccination designed to prevent Marek's disease. Marek's disease causes tumors and immuno-suppression in chickens and results in a high mortality rate.

19.     *In ovo* vaccination has become an industry-wide procedure.

20.     Vaccination *in ovo* allows for rapid and uniform delivery of the vaccine to each embryo, reduces stress on the birds, and minimizes bird handling.

21.     Tyson explained to the agency that (i) the vaccine it uses is formulated by the manufacturer to contain an antibiotic as a preservative to protect the vaccine's integrity, (ii) that Tyson, like most other industry members, mixes the vaccine with a diluting solution, to which gentamicin sulfate is added, and (iii) that the gentamicin is used to sterilize the vaccine and prevent cross-contamination of eggs.

22.     After the chickens hatch, the birds are not slaughtered until after the FDA approved withdrawal period for any administered antibiotics has fully expired.

23.     On May 5, 2008, Tyson informed the USDA and FSIS that it was willing to cease its use of the small doses of antibiotics it administered through *in ovo* vaccines. I am not aware that either the USDA or FSIS ever responded to Tyson's offer.

24.     On May 30, 2008, Tyson wrote FSIS to advise that it was voluntarily withdrawing the Qualified RWA Label. Tyson proposed to complete the voluntary withdrawal under an orderly timeframe, whereby Tyson plants would no longer package fresh chicken products with

Qualified RWA Labels by August 31, 2008, and it would no longer package any poultry products with a Qualified RWA Label by September 30, 2008.

25.    On June 2, 2008, FSIS wrote Tyson to inform the company that it was adopting a new regulatory standard for RWA claims.  The agency stated that it "will approve claims related to the use of antibiotics only when an establishment demonstrates to the satisfaction of the agency that no antibiotics were used for any purpose whatsoever at any time, with the exception of antibiotics used as a preservative in a vaccine and added to the vaccine at the vaccine manufacturing site."

26.    FSIS enforced its new standard against Tyson, ordering the company to stop using the Qualified RWA Label by June 18, 2008.

27.    On June 4, 2008, FSIS issued an open letter in which it stated that it "considers the injection of an antibiotic *in ovo* to render 'Raised Without Antibiotics' or 'Raised without antibiotics that impact antibiotic resistance in humans' claims false and misleading."

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Springdale, Arkansas on the 10th day of June, 2008.

Patrick Pilkington, D.V.M.

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June, 2008, I caused to be hand delivered true and correct copies of the foregoing TYSON'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION, PLAINTIFF TYSON FOODS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT thereof, DECLARATION OF PATRICK PILKINGTON, D.V.M., in support thereof, DECLARATION OF ALAN CHARLES RAUL, and PROPOSED ORDER, to each of the following at the addresses listed:

Michael B. Mukasey
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Ave, N.W.
Washington, D.C. 20530

Honorable Marc L. Kesselman, esq.
General Counsel
U.S. Department of Agriculture
1400 Independence Ave, S.W.
Washington, D.C. 20250

Jeffery A. Taylor
U.S. Attorney for the District of Columbia
U.S. Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530

Gordon D. Todd

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TYSON FOODS, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action No.** |
| | ) |
| **U.S. DEPARTMENT OF** | ) |
| **AGRICULTURE, ET AL.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### CERTIFICATE OF COUNSEL PURSUANT TO LOCAL RULE 65.1(a)

I, Alan Charles Raul, do declare and state the following under penalty of perjury:

1.     I am an attorney licensed to practice and in good standing in the District of Columbia and in the United States District Court for the District of Columbia. I am a partner in the law firm of Sidley Austin LLP, and am counsel for Plaintiff Tyson Foods, Inc. ("Tyson") in the above-captioned matter.

2.     Pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Civil Rule 65.1(a), I attest that I have provided Defendants with actual notice of the time that Tyson would be making this application for a Temporary Restraining Order and/or Preliminary Injunction, and that I have furnished Defendants with copies of all pleadings, motions, memoranda and exhibits filed in this action to date.

3.     In a June 2, 2008, letter to Tyson, the Food Safety Inspection Service ("FSIS") adopted, without notice and comment and other requirements and safeguards mandated by the Administrative Procedure Act, a new regulatory policy regarding statements in the labeling of poultry products that such products were "raised without antibiotics." In the June 2 letter, FSIS

enforced its new standard against Tyson's previously approved labels which stated that the products were "Raised Without Antibiotics that impact antibiotic resistance in humans." FSIS's letter directed Tyson to halt the use of all such labeling by June 18, 2008. On June 4, 2008, FSIS issued a release publicly announcing the agency's new rule regarding "raised without antibiotics" labeling claims, but, in doing so, FSIS did not order other poultry producers to cease using similar (or identical) labeling claims on the same expedited basis that applies to Tyson. These actions necessitated Tyson's filing of a Complaint, as well as a Motion for Temporary Restraining Order and/or Preliminary Injunction.

4.     On June 6, 2008, on behalf of Tyson, I wrote Marc. L. Kesselman, General Counsel of the US Department of Agriculture ("USDA"), to inform him that Tyson "may seek emergency judicial relief to set aside FSIS' new regulatory policy" if the agency's June 2 letter and June 4 public release were not withdrawn before the close of business on Monday, June 9, 2008. I carbon copied Defendant Dr. Richard Raymond, M.D., on the letter.

5.     On June 10, 2008, I spoke with Mr. Kesselman and James Michael Kelly, Deputy General Counsel of USDA. They informed me that Defendants were rejecting Tyson's request to withdraw the June 2 letter and June 4 release or otherwise cease their enforcement of the standard against Tyson. I informed them that Tyson would purse emergency judicial relief, including a request for a temporary restraining order and/or preliminary injunction. I requested that they consider jointly approaching the Court on Wednesday, June 11, 2008. They did not consent. I informed them that Tyson would request a hearing for the afternoon of Wednesday, June 11, 2008.

6.     On June 10, 2008, I received a letter from Mr. Kesselman officially rejecting Tyson's request.

2

7.      On June 10, 2008, I also notified Mr. Kesselman that I, or one of my colleagues, would be forwarding Defendants' counsel copies of the Complaint, Motion for Temporary Restraining Order and/or Preliminary Injunction, Memorandum in Support of the Motion, as well as all supporting documents, and all papers filed to date, at the same time as the papers were being filed with the Court.

8.      During business hours later today, June 11, 2008, I plan to contact Counsel for Defendants and offer to provide them with electronic copies of the materials filed under seal if they would provide me with their assurance that they would treat such material as though it were subject to a legally binding protective order, pending the court's consideration of Tyson's motion to file materials under seal. I anticipate that Counsel for Defendants will provide such an assurance, and assuming they do, I will forthwith cause electronic copies of such material to be delivered to Counsel for Defendants.

9.      On June 11, 2008, at the time of this submission, I have caused the Complaint, Motion for Temporary Restraining Order and/or Preliminary Injunction, Memorandum in Support of the Motion, as well as all supporting documents and declarations to be filed in this Court, except those documents filed under seal. I have also caused the Complaint, Motion for Temporary Restraining Order and/or Preliminary Injunction, Memorandum in Support of the Motion, and all supporting documents, except those documents filed under seal and the exhibits to the Declaration of Alan Charles Raul, to be sent to Defendants and their counsel via electronic mail, and advised them that paper copies of the same documents would follow via hand delivery. My electronic mail to Defendants' counsel also informed them that Tyson has requested an opportunity to be heard on its motion in the afternoon of Wednesday, June 11, 2008, and requested that they contact me to discuss scheduling. Additionally, I have caused to be served on Michael B. Mukasey, United

3

States Attorney General, and Jeffery A. Taylor, U.S. Attorney for the District of Columbia, copies of the Complaint, Motion for Temporary Restraining Order and/or Preliminary Injunction, Memorandum in Support of the Motion, and all supporting documents, except those documents filed under seal.

10.    After these papers are filed, the Complaint, Motion for Temporary Restraining Order and/or Preliminary Injunction, Memorandum in Support of the Motion, and all supporting documents, except those documents filed under seal, will be served immediately upon Defendants via hand delivery. The cover letter that accompanied the hand delivery again informed counsel for each Defendants that Tyson has requested to be heard by the Court in the afternoon of Wednesday, June 11, 2008, and requested that counsel for each Defendant contact me to discuss scheduling.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Washington, D.C. on the 11th day of June, 2008.

Alan Charles Raul (Bar No. 362605)

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **TYSON FOODS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| **U.S. DEPARTMENT OF AGRICULTURE, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

<u>**PROPOSED ORDER**</u>

This matter is before the Court on Plaintiff Tyson Foods, Inc.'s Motion for a Temporary Restraining Order and/or a Preliminary Injunction. I have considered the parties' submissions and arguments. I have also considered (1) the substantial likelihood that Tyson will succeed on the merits of its claims; (2) whether Tyson will suffer irreparable injury absent an injunction; (3) whether injunctive relief would substantially harm the defendants or other interested parties; and (4) whether the public interest would be furthered by an injunction. Weighing these factors, I conclude that Tyson is entitled to a temporary restraining order and preliminary injunctive relief.

Wherefore, pursuant to Federal Rule of Civil Procedure 65, Defendants are hereby enjoined for 60 days from entry of this order from enforcing or otherwise applying their rule to previously approved Qualified RWA claims, and from requiring Tyson to cease using the Qualified RWA Label over the following 60 days.

So ordered this _____ day of June, 2008.

_____
United States District Court Judge