UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TYSON FOODS, INC.,

    Plaintiff,

    v.

DEPARTMENT OF AGRICULTURE, et al.

    Defendants.

    and

TRUTHFUL LABELING COALITION,
SANDERSON FARMS, INC., PERDUE
FARMS, INC., AND FOSTER FARMS,

    Proposed Defendants-Intervenors.

Civil Action No. 08cv01000

## EMERGENCY MOTION TO INTERVENE

The Truthful Labeling Coalition ("TLC"), Sanderson Farms, Inc. ("Sanderson"), Perdue

Farms, Inc. ("Perdue"), and Foster Farms ("Foster") (collectively "Movants"), by and through

undersigned counsel, respectfully move to intervene as of right or permissibly under Federal

Rule of Civil Procedure 24.

As explained more fully in the accompanying Memorandum, Movants are petitioners in

the USDA proceeding challenged in this case; additionally, Movants Sanderson and Perdue are

plaintiffs in the case Tyson denominated before this Court as "related" (but mentioned nowhere

in its papers) *Sanderson Farms, Inc. et al. v. Tyson Foods, Inc.* (D. Md.) (Civil Action No. RDB

08cv210). In that case, the U.S. District Court for the District of Maryland (Bennett, J.), held

that Tyson's "raised without antibiotics" slogan was false and deceptive, and enjoined Tyson from making that claim in advertising.

Undersigned counsel requested consent for this motion, but counsel for Tyson refused such consent. Counsel for the government takes no position on the motion.

*Request for Expedited Decision.* Because Tyson seeks emergency injunctive relief, Movants request expedited consideration of this motion and permission to appear at any argument or hearing that is scheduled in this case.

Respectfully submitted,

ARNOLD & PORTER LLP

David Fauvre (DC Bar # 488381)
555 Twelfth St, NW
Washington, DC 20004-1206
Direct: 202.942.5041
Facsimile: 202.942.5999
Email. David.Fauvre@aporter.com

Randall K. Miller (DC Bar #460682)
Nicholas M. DePalma (DC Bar #974664)*
1600 Tyson Boulevard, Suite 900
McLean, VA 22102-4865
Direct: 703.720.7030
Facsimile: 703.720.7399
Email: Randall.Miller@aporter.com
Email: Nicholas.Depalma@aporter.com

Dated: June 13, 2008

* subject to admission to this Court

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 13th day of June, 2008, I have caused the foregoing

Emergency Motion to Intervene to be served via first-class mail and email on the following:

      Paul J. Zidlicky, Esq.
      Sidley Austin LLP
      1501 K Street, N.W.
      Washington D.C.  20005
      Pzidlicky@sidley.com

      Thomas Walsh, Esq.
      Assistant General Counsel for Regulatory Division
      U.S. Department of Agriculture
      Washington, D.C.
      Thomas.Walsh@usda.gov

      Jim Gilligan, Esq.
      Managing Attorney
      Federal Program Branch
      U.S. Department of Justice
      Washington, D.C.
      By Facsimile:  202-616-8470

David Fauvre

UNITED STATES DISTRICT COURT
FOR THE DISTRICT COLUMBIA

| | |
|---|---|
| TYSON FOODS, INC.,<br><br>     Plaintiff,<br><br>     v.<br><br>DEPARTMENT OF AGRICULTURE,<br><br>    Defendants.<br><br>       and<br><br>TRUTHFUL LABELING COALITION,<br>SANDERSON FARMS, INC., PERDUE<br>FARMS, INC., AND FOSTER FARMS,<br><br>    Proposed Defendants-Intervenors. | Civil Action No. 08cv01000 |

## MEMORANDUM IN SUPPORT OF
## EMERGENCY MOTION TO INTERVENE

The Truthful Labeling Coalition ("TLC"), Sanderson Farms, Inc. ("Sanderson"), Perdue

Farms, Inc. ("Perdue"), and Foster Farms ("Foster") (collectively "Movants"), by and through

undersigned counsel, respectfully submit this Memorandum in support of their Emergency

Motion to Intervene under Rule 24 of the Federal Rules of Civil Procedure.

## BACKGROUND

Tyson challenges the decision of the U.S. Department of Agriculture ("USDA") to

revoke Tyson's literally false label: "raised without antibiotics" ("RWA"). Yet Tyson mentions

nowhere that it was enjoined approximately 50 days ago, by the U.S. District Court for the

District of Maryland (Bennett, J.), from making identical RWA claims in national advertising

and in 8,500 stores across the country. Were it not for rules requiring Tyson to list "related cases" by form, Tyson apparently would have concealed this injunction and related factual findings from this Court. Tyson certainly hid the instant case from Movants, who are parties to all prior and ongoing proceedings.

Indeed, Movants Sanderson and Perdue are plaintiffs in the very case concealed by Tyson, where Judge Bennett of the Baltimore federal court ruled that Tyson's claim is literally false, deceives consumers about an important health and safety issue, and causes irreparable harm to Movants Perdue and Sanderson.

Movants are also the petitioners in the USDA decision that Tyson challenges, in which Movants provided the USDA with information developed in the District Court. USDA's revocation was based in part on this information, information that Tyson itself placed at issue in the case. And, as in the District Court, one of the factors that USDA considered in denying Tyson's request for an lengthy transition time for its false label was the competitive harm that Tyson caused to the rest of the industry.

In this case, Tyson attempts a second bite at the apple and invites this Court to make findings inconsistent with Judge Bennett's published decision. Tyson also attempted to obtain a TRO without informing the Court of the contents of Judge Bennett's ruling or notifying the Movants of the TRO proceeding. The fact is that Movants, as parties to all prior and ongoing related proceedings, will be directly and materially harmed if Tyson's motion is granted, and Movants are therefore entitled to intervene in this matter as a matter of right under Rule 24 including so that Movants can make known to the Court these material issues and Movants' unique interests.

A.    **Related Case Pending in the U.S. District Court for the District of Maryland**

1.    **Summary and Selected Findings of Fact**

As set forth in the attached Declaration of Randall K. Miller, on April 22, 2008, Judge

Bennett issued a published opinion preliminarily enjoining Tyson from using RWA claims in its

advertising. *See Sanderson Farms, Inc. v. Tyson Foods, Inc.*, --- F. Supp. 2d ---, 2008 WL

1838719 (D. Md. 2008), Miller Decl Ex. 1. After a 4-day trial involving sworn testimony of

Tyson executives (including Patrick Pilkington, a declarant in this case) on identical issues such

as Tyson's extensive use of antibiotics in its "raised without antibiotics"-labeled chicken, Judge

Bennett rejected Tyson's arguments and issued an injunction. Judge Bennett ordered that Tyson

immediately take down its advertising, including television, radio, billboards, print

advertisements, and in-store point-of-sale materials. Miller Decl. ¶ 5. On April 28, 2008, Tyson

sought an emergency stay from the U.S. Court of Appeals for the Fourth Circuit (making

arguments related to irreparable harm identical to those it makes in the instant papers); on April

30, 2008 the Fourth Circuit denied Tyson's request. Miller Decl. ¶ 7. The preliminary

injunction went into effect on 12:01 am May 1, 2008, and Tyson was required to tear down its

deceptive advertising by May 15, 2008. Miller Decl. ¶ 8.

After a four day evidentiary hearing, the District Court issued a 31 page opinion

enjoining Tyson from using the RWA claim. *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, --- F.

Supp. 2d ---, 2008 WL 1838719 (D. Md. 2008), Miller Decl Ex. 1. The following are selected

facts:

1.    **"This Court is satisfied that the consumer public is being mislead by
Defendant's 'Raised Without Antibiotics' advertising."** (*Id.* at *16)

2.    **Tyson's advertising is false.** "[C]onsumers are misled into believing that
Tyson's mass-marketed chicken and Perdue's specialty chicken are both-

antibiotic-free, when, in fact, Tyson feeds its chicken ionophores and injects its chicken eggs with antibiotics." (*Id.* at *3);

3. **Defendant's chicken is not 'Raised Without Antibiotics' when ionophores are used in chicken feed and other antibiotics are injected into the chicken egg two to three days before hatch."** (*Id.* at *16);

4. **Tyson did not disclose or receive USDA approval to label injected chickens with any RWA label.** Tyson's human antibiotic injections were "not revealed in Tyson's USDA application for label approval. (*Id.* at *2);

5. **Tyson's motive is to "price up" its chicken.** "Tyson executives have acknowledged that this permits them to 'price up,' meaning that the company can raise the price of its [RWA] chicken . . . ." (*Id.* at *3);

6. **Tyson's campaign is causing "incalculable loss" to Perdue and Sanderson**. "[Tyson]'s advertising campaign 'wrecked Perdue' . . . and 'devalued the Perdue brand.'" (*Id.* at *7). "Sanderson's revenues and sales have decreased thus far in 2008." (*Id.* at *6). Perdue suffered "truckloads of lost volume." (*Id.* at *7);

7. **But "sales of Tyson chicken increased by almost thirty-five million pounds."** (*Id.* at *5); and

8. Tyson sought to keep its false claims in advertising and "**delay the phase-out period for as long as possible.**" *Id.* at *5.

For these reasons, the District Court enjoined Tyson from using its RWA claims in commerce. Perdue and Sanderson proved at trial that Tyson deceived the USDA and specifically concealed from USDA the fact that Tyson injects human antibiotics into the chicken eggs prior to hatch.

Ironically, Tyson invoked the USDA process as a defense, but failed. Tyson provided the Baltimore court great detail about specific meetings, telephone calls, and letters outlining the entire course of dealing between USDA and Tyson. This evidentiary record was presented under oath, subjected to cross examination, and evaluated by the District Court.[1]

---

[1] In fact, the District Court overruled Tyson's motion to dismiss on the issue. *See Sanderson Farms, Inc. v. Tyson Foods, Inc.*, --- F. Supp. 2d ---, 2008 WL 1733607 (D. Md. 2008).

**2.    Tyson's Court Papers In This Case Contradict Rulings in the Maryland Case**

Tyson invites this Court to make findings that contradict the published opinion of the

U.S. District Court for the District of Maryland, made after four days of testimony, including

sworn testimony from Tyson's own witnesses, a USDA expert, hundreds of exhibits including

Tyson's extensive interactions with USDA, and extensive briefing.  For example:

1.    In this case, Tyson asserts that there are "no food safety or public health concerns at issue." Compl. ¶ 10.  But Judge Bennett found that Tyson's claim caused "consumer deception about the relative *safety and health* of Tyson's chicken." *Sanderson Farms, Inc.* --- F. Supp. 2d ---, 2008 WL 1838719 at *10 (emphasis added).

2.    In this case, Tyson asserts that there is "debate" about whether the ionophores with which Tyson laces its feed "should be considered antibiotics." Compl. ¶ 37.  But Judge Bennett found it "*undisputed* in this case that ionophores are antibiotics" adding that the scientific literature, USDA, the FDA, the American Veterinary Medical Association ("AVMA"), and both Plaintiffs' and Defendant's witnesses "are all in agreement on this point," *Id*. at *2 (emphasis added) -- *including Dr. Patrick Pilkington*, a witness in Baltimore and a declarant in this case.

3.    Tyson claims that it is an "industry leader" with regard to antibiotic use. But Judge Bennett found that Tyson's ionophore use is *mainstream* (*Id*. at *2-3).  Tyson is an industry outlier only in the sense that it tries, through deceit, to exploit public fears about antibiotic resistance to "price up" its chicken. *See id*. at *3.

**B.    Tyson Challenges Movants' USDA Petition**

Movants filed the USDA petition at issue in this case because Tyson's false label, like its

false advertising, poses a grave threat to Movants' rights.  On April 16, 2008, Movants petitioned

the USDA to revoke Tyson's label based on the same scientific evidence that they developed at

the preliminary injunction hearing.  Indeed, the USDA found persuasive Tyson's sworn

testimony that it:  (1) used human antibiotics prior to hatch; and (2) did not disclose its use its

antibiotics to USDA.  On June 2, 2008, USDA granted Movant's petition and revoked Tyson's

label.  Miller Decl. Exhibit 2.

Notably, just as Tyson conceals the District Court proceedings, Tyson again conceals key facts about Movant's USDA petition. Tyson argues that USDA's decision was made based on submissions "without notice and comment." Compl. ¶¶ 12-14. But Tyson omits the damning fact that it obtained its initial RWA label approval (Compl. ¶ 38) without notice and comment rulemaking. Perhaps this lack of formal notice and comment allowed Tyson to mislead USDA and conceal in the first place that its chickens labeled "raised without antibiotics" were actually injected with human antibiotics. *See* USDA press release dated June 2, 2008, Miller Decl. Ex. 2.

## ARGUMENT

The Court should grant the motion to intervene as of right, or alternatively, for permissive intervention. As explained more fully below, Movants seek to intervene because: (1) Movants are petitioners in the agency decision at issue; (2) Movants Sanderson and Perdue are plaintiffs in a "related" federal case pending in Maryland; (3) Movants will be directly harmed if Tyson is successful; (4) Movants interests are not adequately represented; and (5) Movants have significant knowledge that will assist the Court's decision-making and counteract Tyson's astonishing attempts to mischaracterize the ongoing, related proceedings.

## II. MOVANTS ARE ENTITLED TO INTERVENE AS OF RIGHT

### A. Legal Standard

The "right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 130 (D.C. Cir. 1972). Federal Rule of Civil Procedure 24(a) provides intervention as of right when an applicant has "an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action

may . . . impair or impede the applicant's ability to protect that interest." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003).

The District of Columbia Circuit has explained that intervention as of right depends on the Court's consideration of four factors:

> (1) the timeliness of the motion;
>
> (2) whether the applicant "claims an interest relating to the proper transaction which is the subject of the action";
>
> (3) whether "the applicant is so situated that disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and
>
> (4) whether "the applicant's interest is adequately represented by existing parties."

*Friends of Animals v. Kempthorne*, 452 F. Supp. 2d 64, 68 (D.D.C. 2006) (citing *Fund for Animals v. Norton*, 322 F.3d 728, 731(D.C. Cir. 2003)).  This test has been liberally construed for the benefit of the potential intervenor and any doubts are resolved in his favor.  *See Fed. Sav. & Loan Ins. Corp. v. Falls Chase Special Taxing Dist.*, 983 F.2d 211, 216 (11th Cir. 1993).

### B.    Movants' Motion to Intervene Is Timely

Movants filed this motion only one day after learning of Tyson's actions, and only two days after the action was filed.  Miller Decl. ¶¶ 12-14.  No hearing has occurred, and the USDA has yet to file an answer.  Movants' motion is therefore unquestionably timely.  *See Applicant v. FDA*, 310 F. Supp. 2d 194, 197 (D.D.C. 2004) (motion to intervene within two months of notice of the initial proceeding was timely); *accord Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) (holding that whether "a motion to intervene is timely made is to be determined from all of the circumstances, including the purpose for which intervention is sought . . . and the improbability of prejudice to those already in the case."); *Glamis Imperial Corp. v. U.S. Dept. of*

*the Interior*, 2001 WL 1704305 (D.D.C. Nov. 13, 2001) (motion to intervene timely where filed

before answer). Indeed, had Tyson provided Movants notice of this suit, undersigned counsel

would have filed this motion the day the Complaint was filed.

### C.    Movants Claim An Interest Related to the Subject of this Action

Movants have a substantial interest in this action. Sanderson and Perdue already

demonstrated to the satisfaction of the U.S. District Court for the District of Maryland that they

face imminent and irreparable harm from Tyson's false and deceptive RWA claim. *See* Section

A(1) *supra*. Tyson's "raised without antibiotics" claim is a literal falsity that deceives

consumers about an important health and safety matter. Movants Perdue and Sanderson

demonstrated through scientific testimony that consumers understand "raised without

antibiotics" to mean that Tyson's chicken has no antibiotics (a conclusion that is demonstratively

false given that Tyson twice administers antibiotics to its chicken during the production process).

In addition, Movants Sanderson and Perdue demonstrated that consumers interpret "raised

without antibiotics" to imply a comparative superiority claim and that they specifically

understand the claim to mean that Tyson chicken is superior with regard to important health and

safety attributes compared to Sanderson and Perdue chicken, which is a blatant falsehood. *See*

*id.* Indeed, the District Court held that Tyson's false RWA claim "wrecked" and "devalued"

Perdue and Sanderson's brand. These facts demonstrate that Movants Sanderson and Perdue

have unique and substantial rights related to USDA's revoking the identical claim on Tyson's

label.

The fact that Perdue and Sanderson have demonstrated imminent irreparable harm and

the devaluation of their brands underscores the necessary conclusion that all Movants, as direct

competitors to Tyson in the chicken market, have substantial financial and economic interests at

stake in the disposition of this case. The D.C. Circuit has long held that a party's economic

interest in the outcome of litigation is a legally-protectable interest sufficient to satisfy Rule

24(a)(2). *See, e.g., Smuck v. Hobson*, 408 F.2d 175, 178-79 (D.C. Cir. 1969); *accord Mova*

*Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) (holding that potential

impairment of economic rights or market share satisfies Rule 24).

All Movants are also petitioners in the parallel USDA proceeding, which is the subject of

Tyson's attack in this case. As at the Baltimore federal court, Movants demonstrated to the

USDA that Tyson deceived the USDA with regard to antibiotics used in the production process

and in particular concealed its practice of injecting human antibiotics into chickens immediately

prior to hatch. Movants also demonstrated that consumers would have absolutely no way to

know about Tyson's definition of "raised" to exclude these injections. Movants explained to

USDA that the false claim that Tyson was disseminating into interstate commerce was causing

immediate and irreparable harm to Movants, all of whom compete against Tyson in the

marketplace for chicken products in the United States.

Movants further developed the facts, scientific evidence, and expertise regarding the

deception and harm that is being perpetrated by Tyson's egregiously false claim. Under these

circumstances, Movants motion to intervene as of right should be granted. *See Appelton v. FDA*,

310 F. Supp. 2d 194 (D.D.C. 2004) (granting motion to intervene as of right where plaintiff

sought to compel agency action that would harm intervenor); *Glamis Imperial Corp. v. U.S.*

*Dept. of the Interior*, 2001 WL 1704305 (D.D.C. Nov. 13, 2001) (granting motion to intervene as

of right where plaintiff sought to reverse agency action and harm intervenor).

**D.    Tyson's Lawsuit Threatens to Impair Movants' Substantial Interests**

Movants' legal interests would be impaired by Tyson's suit.  Tyson seeks to undo the USDA's decision revoking Tyson's label and providing for restricted transition time.  USDA's regulations required that it consider whether "unfair competitive advantage would result" in evaluating transition time.  *See* 9 C.F.R. § 381.132(f)(1)(iv).  Like the District Court, which ordered Tyson to remove its RWA advertising *within 15 days* (the Fourth Circuit rejected Tyson's plea of undue burden) in part because of the irreparable harm to Movants Sanderson and Perdue, USDA rescinded Tyson's label with a transition time based on minimizing Tyson's "unfair competitive advantage" against Movants.

Tyson's Proposed Order (Docket No. 4-7) aggressively requests *60 days* for Tyson to use a blatantly false and misleading claim which the United States District Court of Maryland already determined caused Sanderson and Perdue irreparable harm when used in advertising.  If Tyson is successful, Tyson would continue "devaluing" Movants' brands, decreasing "revenues and sales" and costing Movants "truckloads of lost volume"  *See* Section A(1) *supra*.

The D.C. Circuit has repeatedly recognized that "loss of revenues during any interim period" satisfies this Rule 24 factor.  *See Fund for Animals, Inc. v. Norton*, 322 F. 3d 728, 735 (D.C. Cir. 2003) (granting motion to intervene); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) ("danger of losing market share" if the district court "allowed product on the market").  *See, e.g.*, Wright & Miller, Federal Practice & Procedure 2d § 908, at 301 (intervention as of right should be granted to those who "might be practically disadvantaged by disposition of the action").

E.      **Movants' Interests Are Not Adequately Represented**

The Court should permit intervention because Movants' unique competitive interests may not be fully represented adequately by the United States.  *See Trbovic v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) (intervenor need only show that its interest in the action may be inadequately represented by the existing parties to the suit and "the burden of making that showing should be treated as minimal.") *accord Fed. Sav. & Loan Ins. Corp.*, 983 F.2d 211, 216 (11th Cir. 1993) ('The proposed intervenors' burden to show that their interests may be inadequately represented is minimal.').

Movants easily meet the "minimal" requirement that their interests are not adequately represented by the existing parties.  *See Fund for Animals*, 322 F.3d at 735; *see also Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986).  In contrast to Tyson's goal of keeping its false and deceptively labeled products on the market for as long as possible, Movants sued and petitioned for them to be removed immediately.  *See Sanderson Farms*, 2008 WL 1838719, at *5 ("It is quite clear to this Court that it was in Tyson's financial interest to delay the phase-out period as long as possible").  Similarly, the USDA responds to and evaluates petitions based on its governmental mandate and not based on Movants' narrower interests.  *See, e.g., Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003) ("[W]e have often concluded that governmental entities do not adequately represent the interests of aspiring intervenors").

III.    **IN THE ALTERNATIVE, MOVANTS SHOULD BE GRANTED PERMISSIVE INTERVENTION**

Alternatively, the Court should grant permissive intervention.  Rule 24(b) provides that an applicant may be permitted to intervene when the applicant and the parties in the main action have a "question of law or fact in common."  In exercising its discretion, the Court should consider whether the intervenor's legal interest is related to a legal interest in the main action.

*See Glamis Imperial Corp.*, 2001 WL 1704305, at *2 (D.D.C. Nov. 13, 2001) (citing Fed. R.

Civ. P. 24(b)).  *See also UPS World Forwarding, Inc. v. U.S. Postal Serv.*, 66 F.3d 621 (3d Cir.

1995) (granting permissive intervention where trade association came within 'zone of interests'

protected by contested statutory provisions).

      Here, for all of the reasons set forth in Section II, Movants should be granted permissive

intervention.  *See E.E.O.C. v. Nat'l Children's Center, Inc.*, 146 F.3d 1042 (D.C. Cir. 1998)

(reversing and remanding with instructions to grant permissive intervention to challenge

confidentiality order); *Glamis*, 2001 WL 1704305 at *4 (granting permissive intervention to

Sierra club where motion was filed before substantive proceedings on the merits).  Because

Movants are parties to all ongoing related proceedings, at both the USDA and the U.S. District

Court in Maryland, there are necessarily "questions of law or fact in common."  Additionally,

permitting Movants to intervene would allow Movants to share their unique knowledge and

experience, which would enhance the Court's decision-making.  *See Natural Res. Def. Council,*

*Inc. v. Tennessee Valley Auth.*, 340 F. Supp. 400, 408-409 (S.D.N.Y. 1971) , *rev'd on other*

*grounds*, 459 F.2d 255 (2d Cir. 1972) (granting permissive intervention to Audubon Society in

NEPA dispute in part because intervenor had "a long-standing interest in and familiarity with

strip-mining, expertise that may be helpful in clarifying the facts and issues"); *General Motors*

*Corp. v. Burns*, 50 F.R.D. 401, 405 (D. Haw. 1970) (granting permissive intervention in part

because intervenor had "unique knowledge of the Hawaii automobile industry and [will help] to

fully present to the Court all of the facts in this case'').

## CONCLUSION

      For the foregoing reasons, Movants respectfully request that the Court (i) grant the

motion to intervene as of right or, alternatively, by permission under Federal Rule of Civil

Procedure 24; (ii) permit Movants to attend and be heard at all hearings in this matter; and (iii)

grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

ARNOLD & PORTER LLP

David Fauvre (DC Bar # 488381)
555 Twelfth St, NW
Washington, DC 20004-1206
Direct: 202.942.5041
Facsimile: 202.942.5999
Email. David.Fauvre@aporter.com


Randall K. Miller (DC Bar #460682)
Nicholas M. DePalma (DC Bar #974664)*
1600 Tyson Boulevard, Suite 900
McLean, VA 22102-4865
Direct: 703.720.7030
Facsimile: 703.720.7399
Email: Randall.Miller@aporter.com
Email: Nicholas.Depalma@aporter.com


Dated: June 13, 2008


* subject to admission to this Court

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2008, I have caused the foregoing

Memorandum in Support of Motion to Intervene to be served via first-class mail and email on

the following:

Paul J. Zidlicky, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington D.C.  20005
Pzidlicky@sidley.com

Thomas Walsh, Esq.
Assistant General Counsel for Regulatory Division
U.S. Department of Agriculture
Washington, D.C.
Thomas.Walsh@usda.gov

Jim Gilligan, Esq.
Managing Attorney
Federal Program Branch
U.S. Department of Justice
Washington, D.C.
By Facsimile:  202-616-8470

_____
David Fauvre

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TYSON FOODS, INC., <br><br>     Plaintiff, <br><br>     v. <br><br> DEPARTMENT OF AGRICULTURE, et al. <br><br>     Defendants. <br><br>     and <br><br> TRUTHFUL LABELING COALITION, SANDERSON FARMS, INC., PERDUE FARMS, INC., AND FOSTER FARMS, <br><br>     Proposed Defendants-Intervenors. | Civil Action No. 08cv01000 |

## DECLARATION OF RANDALL K. MILLER

I, Randall K. Miller, declare under penalty of perjury as follows:

1.  I am a partner in the law firm of Arnold & Porter LLP.

2.  I represent the Movants Truthful Labeling Coalition, Sanderson Farms, Inc. ("Sanderson"), Perdue Farms, Inc. ("Perdue"), and Foster Farms ("Foster") (together "Movants").

3.  I am counsel for Movants in their petition to the USDA that is being attacked in this case; I am also counsel for Movants Sanderson and Perdue in the case *Sanderson Farms, Inc. et al. v. Tyson Foods, Inc.* (D. Md.) (Civil Action No. RDB 08CV210) in which the Baltimore federal court adjudicated directly overlapping issues raised in this case and entered an injunction against Tyson Foods ("Tyson") ordering Tyson to halt all use of its "raised without antibiotics" slogan in advertising.

4.  I submit this Declaration in support of Movants' Emergency Motion to Intervene and Motion to Transfer Venue.

5.  On April 22, 2008, the U.S. District Court for the District of Maryland issued a preliminary injunction preliminarily enjoining Tyson from using any sort of "raised without

antibiotics" claim in advertising and specifically ordered Tyson to take down all of its advertising, including television, radio, billboards, and in-store point-of-sale materials.

      6.     Attached as <u>Exhibit 1</u> is a copy of *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, --- F. Supp. 2d ---, 2008 WL 1838719 (D. Md. 2008), which granted the preliminary injunction.

      7.     On April 28, 2008, Tyson sought an emergency stay from the U.S. Court of Appeals for the Fourth Circuit making arguments similar to those advanced in this case that a 15-day take down period was unduly burdensome, and on April 30, 2008 the Fourth Circuit denied Tyson's request.

      8.     The preliminary injunction went into effect on 12:01 am May 1, 2008, and Tyson was required to comply (take is, remove all RWA advertising including point of sale materials at 8,500 stores) by May 15, 2008.

      9.     On April 16, 2008, Movants petitioned the USDA to revoke Tyson's label based on the same scientific evidence that was developed at the preliminary injunction hearing in U.S. District Court in Baltimore.

      10.    On June 2, 2008, USDA granted our petition and revoked Tyson's label. USDA's press release, website posting, and letter to Movants are attached hereto as <u>Exhibit 2</u>.

      11.    In the Maryland case, Tyson introduced extensive documentary evidence and witness testimony about the very USDA process that is at issue in this case. Tyson counsel elicited testimony from Tyson witnesses that described in detail Tyson's interactions with the USDA on every aspect of its "raised without antibiotics" label, including information about meetings, phone calls, and correspondence with USDA. Tyson's counsel also submitted to the Baltimore court correspondence with USDA on the Movants' petition and USDA decision granting that petition (that is the decision that Tyson challenges in this case). I estimate that the collection of USDA materials submitted to the court was the largest collection of exhibits considered by the court. The Baltimore federal court made findings about and based on these USDA materials. At every turn, Tyson sought to use the USDA materials and label decisions in the Baltimore case and specifically argued that the USDA-approved label immunized Tyson from any attack on Tyson advertising (at the time, Tyson had an approved RWA label -- that label was later revoked on June 2, which decision is the subject of this case). Movants Sanderson and Perdue argued to the Baltimore court successfully that the USDA proceedings were fully relevant and would be considered by the jury in any disposition of the Baltimore case, but did not immunize Tyson.

      12.    On June 11, 2008, undersigned counsel was in discussions with lawyers for Tyson who have entered appearances in this case, together with top executives at Tyson to discuss matters regarding the "related case" in Baltimore and at the Fourth Circuit. Never once was the existence of or intention to file this case mentioned. It now appears that these same lawyers were simultaneously making filings in this Court in the present action, and this was not disclosed as part of the parties' discussion.

      13.    On June 12, 2008, undersigned counsel first learned of this case and within two to three hours called the Court's Chambers to notify Chambers of our intent to intervene in the

case. I confirmed our intent to intervene in a letter sent to the Court on June 12, a copy of which was simultaneously sent to lawyers for all parties including Paul Zidlicky, who is counsel for Tyson in this case and who is also counsel for Tyson in the "related" appeal to the Fourth Circuit.

14.     On June 12, I asked counsel for all parties to consent to our motion to intervene and motion to transfer venue. Tyson's counsel refused consent. Counsel for the government takes no position.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Randall K. Miller

Dated this 13th day of June, 2008.

# EXHIBIT 1

--- F.Supp.2d ----

Page 1

--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)

**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

**H**

**Sanderson** Farms, Inc. v. **Tyson** Foods, Inc.

D.Md.,2008.

Only the Westlaw citation is currently available.

United States District Court,D. Maryland.

**SANDERSON** FARMS, INC. and Perdue Farms, Inc.,
Plaintiffs,

v.

**TYSON** FOODS, INC., Defendant.

**Civil Case No. RDB-08-210.**

April 22, 2008.

**Background:** Sellers of chicken meat products sued competitor, alleging violations of the Lanham Act, specifically claiming that advertisements containing the claims "Raised Without Antibiotics" and "Raised Without Antibiotics that impact antibiotic resistance in humans" were false and misleading. Sellers moved for a preliminary injunction.

**Holding:** The District Court, Richard D. Bennett, J., held that sellers were entitled to preliminary injunctive relief.

Ordered accordingly.

**[1] Injunction 212 ⚖️135**

212 Injunction
  212IV Preliminary and Interlocutory Injunctions
    212IV(A) Grounds and Proceedings to Procure
      212IV(A)1 In General
        212k135 k. Discretion of Court. Most Cited Cases

Decision whether to issue a preliminary injunction is committed to the sound discretion of the trial court. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

**[2] Injunction 212 ⚖️138.1**

212 Injunction
  212IV Preliminary and Interlocutory Injunctions
    212IV(A) Grounds and Proceedings to Procure
      212IV(A)2 Grounds and Objections

212k138.1 k. In General. Most Cited Cases

To determine whether a preliminary injunction is appropriate, the court must apply the four-factor hardship balancing test, considering the following: 1) the likelihood of irreparable harm to the plaintiff if injunctive relief is denied, 2) the likelihood of harm to the defendant if injunctive relief is granted, 3) the likelihood that the plaintiff will succeed on the merits, and 4) the public interest. Fed.Rules Civ.Proc.Rule 65, 28 U.S.C.A.

**[3] Antitrust and Trade Regulation 29T ⚖️104(2)**

29T Antitrust and Trade Regulation
  29TII Unfair Competition
    29TII(C) Relief
      29Tk101 Injunction
        29Tk104 Preliminary or Temporary Relief, Grounds, Subjects, and Scope
          29Tk104(2) k. Particular Cases. Most Cited Cases

Sellers of chicken meat products were entitled to preliminary injunctive relief against a competitor alleged to have made false and misleading claims in advertisements, in violation of the Lanham Act; an unqualified "Raised Without Antibiotics" claim was literally false, given the use of ionophores in chicken feed and the injection of other antibiotics into chicken eggs two to three days before hatch, the claim was likely to be misleading to consumers, the qualified language "Raised Without Antibiotics that impact antibiotic resistance in humans" was not likely to have been understood by a significant portion of the consumer public, and the advertising campaign had affected sales dramatically. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

**[4] Antitrust and Trade Regulation 29T ⚖️22**

29T Antitrust and Trade Regulation
  29TII Unfair Competition
    29TII(A) In General
      29Tk21 Advertising, Marketing, and Promotion
        29Tk22 k. In General. Most Cited Cases

Elements of a false advertising claim under the Lanham

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

Act are as follows: (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. Lanham Act, § 43(a), 15 U.S.C.A. § 1125(a).

Randall Karl Miller, Arnold and Porter LLP, McLean, VA, Nicholas M. Depalma, Ross S. Goldstein, Arnold and Porter LLP, Washington, DC, for Plaintiffs.

Helene D. Jaffe, Laura J. Protzmann, Randi W. Singer, Weil Gotshal and Manges LLP, New York, NY, John J. Connolly, William J. Murphy, Murphy and Shaffer LLC, Baltimore, MD, Joshua D. Janow, Weil Gotshal and Manges LLP, Washington, DC, for Defendant.

### MEMORANDUM OPINION

RICHARD D. BENNETT, District Judge.
**\*1** Plaintiffs **Sanderson** Farms, Inc. ("**Sanderson**") and **Perdue** Farms, Inc. ("**Perdue**") (collectively, "Plaintiffs") bring this suit against their competitor, **Tyson** Foods, Inc. ("**Tyson**" or "Defendant"), alleging violations of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Plaintiffs' Amended Complaint alleges that **Tyson's** advertisements containing the claims "Raised Without Antibiotics" and "Raised Without Antibiotics that impact antibiotic resistance in humans" are false and misleading to the consumer. Plaintiffs specifically allege that **Tyson** uses ionophores in its chicken feed and that ionophores are antibiotics.

Pending before this Court is Plaintiffs' Supplemental Motion for a Preliminary Injunction. Plaintiffs' Motion seeks to require that **Tyson** immediately cease all non-label advertising using the unqualified "Raised Without Antibiotics" claim and the qualified "Raised Without Antibiotics that impact antibiotic resistance in humans" claim. Plaintiffs' Amended Complaint requests injunct-

ive relief against "any claim, direct or indirect, qualified or unqualified, in words or in substance, that **Tyson's** chicken is raised without antibiotics."

This Court held a hearing over four days, commencing on Monday, April 7, 2008 and concluding on Thursday, April 10, 2008, to allow the parties to present oral argument, testimony, and evidence.[FN1] Having heard the testimony of numerous witnesses, including experts proffered by the parties, and having reviewed hundreds of exhibits, this Court finds that consumers are being misled by **Tyson's** advertisements proclaiming that its chicken is "Raised Without Antibiotics." Based largely on Plaintiffs' consumer survey, this Court also finds that the qualified language "Raised Without Antibiotics that impact antibiotic resistance in humans" is not likely to be understood by a significant portion of the consumer public. This Court further finds that there is a strong likelihood of success by Plaintiffs on the merits of this case when it proceeds to trial. Moreover, this Court finds that the public interest compels the issuance of a preliminary injunction during the pendency of this case. Accordingly, for the reasons set forth in the following findings of fact and conclusions of law, Plaintiffs' Supplemental Motion for a Preliminary Injunction is GRANTED.

### FINDINGS OF FACT

At the hearing, Plaintiffs offered the testimony of the following witnesses: 1) Dr. Bruce Stewart Brown, **Perdue's** Vice President of Food Safety and Quality; 2) Hilary Burroughs, **Sanderson's** Manager of Marketing; 3) John Bartelme, **Perdue's** Chief Marketing Officer; 4) Michael B. Mazis, Ph.D., Professor of Marketing at American University's Kogod School of Business; and 5) David Hogberg, **Tyson's** Senior Vice President of Product Marketing.[FN2] Defendant offered the testimony of the following witnesses: 1) Steve Roth, a market research consultant; 2) Dr. Patrick Pilkington, **Tyson's** Vice President of State and Government Affairs; and 3) David Hogberg. In addition, both parties submitted a substantial amount of evidence, with hundreds of exhibits being introduced.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                    Page 3
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

**I. Ionophores, the USDA, and Tyson's** Labels

**A. Ionophores Are Antibiotics**

**\*2** It is undisputed in this case that ionophores are antibiotics. The United States Department of Agriculture ("USDA"), the Food and Drug Administration ("FDA"), and the American Veterinary Medical Association ("AVMA") are all in agreement on this point. The Food Safety and Inspection Service ("FSIS"), the USDA agency to which Congress has delegated the authority to regulate poultry labels, confirmed this fact on several occasions. After FSIS notified **Tyson** in September 2007 of its classification of ionophores as antibiotics, it reiterated its position on December 19, 2007, explaining as follows:

> It is longstanding FSIS policy that ionophores are antibiotics because they meet the AVMA definition. The Food and Drug Administration (FDA) agrees that by strict definition, ionophores are antibiotics thus; poultry meat from birds to which ionophores have been administered is not eligible to bear a "RWA" claim.

(Pls.' Ex. 1.)

Moreover, both Plaintiffs' and Defendant's witnesses uniformly testified that ionophores are antibiotics. Dr. Bruce Stewart Brown, **Perdue's** Vice President of Food Safety and Quality, testified that it is indisputable that ionophores are antibiotics, as the scientific literature supporting this conclusion is voluminous and consistent. Dr. Patrick Pilkington, **Tyson's** Vice President of State and Government Affairs, acknowledged that ionophores are antibiotics because the FDA classifies them as such. David Hogberg, **Tyson's** Senior Vice President of Product Marketing, also acknowledged that ionophores are antibiotics.

The potential that humans might develop antibiotic resistance is behind the public's fear of so-called "superbugs," strains of bacteria that become impervious to antibiotic treatment. Because ionophores are not used in human drugs, however, the use of ionophores in chicken products presents only a minuscule threat to antibiotic resistance in humans. Dr. Pilkington testified that the inability of ionophores to cause antibiotic resistance in humans is as close to a scientific certainty as possible, although he could not rule out the possibility.FN3

**B. The Chicken Industry and Ionophores**

All three chicken producers in this case-**Sanderson**, **Perdue**, and **Tyson**-use ionophores in their chicken feed. In fact, the use of ionophores is a widespread industry practice. Ionophores effectively prevent coccidiosis, a disease caused by a protozoan-type parasite that lives and multiplies in the intestinal tract of animals, including chicken. Coccidiosis may cause severe symptoms, such as the inhibition of food digestion and nutrient absorption, as well as dehydration and blood loss. Coccidiosis may also result in death. The spread of coccidiosis is a significant concern in the industry.

In addition to using ionophores in its chicken feed, it was clearly established at the hearing that **Tyson** injects a vaccine containing antibiotics into its chicken eggs two or three days before the egg hatches. **Tyson** technically defines "Raised Without Antibiotics" to mean from hatch until slaughter, a definition that was not revealed in **Tyson's** USDA application for label approval. **Tyson** also does not inform the consumer public that the term "Raised" does not refer to the period before hatch, nor does **Tyson** inform the consumer public that it injects its chicken eggs with antibiotics.

**\*3** Among the three chicken producers involved in this case, only **Perdue's** Harvestland brand does not use any antibiotics at any time. Therefore, **Perdue** truthfully markets this brand using the slogan "No Antibiotics Ever." Harvestland chicken products are more expensive for **Perdue** to produce in terms of both husbandry and raising, because, without ionophores, costly precautions are needed to prevent against the risk of coccidiosis. This increased cost is passed to the consumer in the form of higher retail prices, a price premium that certain consumers are willing to pay for antibiotic-free chicken.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                    Page 4
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

The evidence established that **Tyson** is able to directly compete with **Perdue's** more expensive Harvestland brand by using the unqualified "Raised Without Antibiotics" claim and the qualified "Raised Without Antibiotics that impact antibiotic resistance in humans" claim. This Court is satisfied by a preponderance of the evidence that consumers are misled into believing that **Tyson's** mass-marketed chicken and **Perdue's** specialty chicken are both antibiotic-free, when, in fact, **Tyson** feeds its chicken ionophores and injects its chicken eggs with antibiotics. **Tyson** executives have acknowledged that this permits them to "price up," meaning that the company can raise the price of its "Raised Without Antibiotics" chicken without seeing a corresponding decrease in sales figures.

**C. FSIS Approves and Subsequently Revokes Tyson's** "Raised Without Antibiotics" Label

The Food Safety and Inspection Service erroneously approved **Tyson's** unqualified "Raised Without Antibiotics" label application on May 16, 2007. (Def.'s Exs. 65-68.) **Tyson's** application listed three ionophores (salinomycin, narasin, and monensin) in the feed ingredient list. This approval resulted in **Perdue** seeking similar agency approval for the same label language.FN4(Def.'s Exs. 173-177.)

On September 12, 2007, FSIS unambiguously informed **Tyson** that it had made a mistake and intended to revoke its prior approval. According to a letter drafted on September 26, 2007 by **Tyson's** outside counsel, Nancy S. Bryson, the agency had "contacted **Tyson** [on September 12, 2007] to advise that FSIS had subsequently determined that approval of the ["Raised Without Antibiotics"] labels was a mistake and should be rescinded."(Def.'s Ex. 62.) Therefore, as early as September 12, 2007, **Tyson** was on clear notice that FSIS believed it had made a mistake and intended to revoke its approval.

On September 19, 2007, **Tyson** executives, along with Ms. Bryson, met with FSIS officials. After the meeting, FSIS permitted **Tyson** to formally respond to its concerns, which **Tyson** did by way of Ms. Bryson's

September 26, 2007 letter. On November 6, 2007, Philip S. Derfler, Assistant Administrator of FSIS, replied to Ms. Bryson. In the letter, Mr. Derfler, on behalf of FSIS, stated that

> [i]t is longstanding FSIS policy that ionophores are antibiotics and, therefore, FSIS has not approved labels bearing a "Raised Without Antibiotics" claim if the source animals were fed ionophores. The **Tyson** labels at issue were thus approved in error by FSIS staff. Accordingly, we advised **Tyson** that FSIS intended to revoke their approval. Your letter dated September 26, 2007, asks us to reconsider this decision and to permit the continued use of these labels.

**\*4** (Def.'s Ex. 35.) Mr. Derfler formally denied **Tyson's** request for reconsideration: "Because ionophores are antibiotics under the AVMA definition, FSIS will not change its longstanding policy regarding ionophores."(*Id.*) FSIS did, however, provide four different options to **Tyson**: 1) remove all "Raised Without Antibiotics" labels within forty-five days; 2) stop using ionophores in its feed formulation, in which case the "Raised Without Antibiotics" label would be technically accurate; 3) petition FSIS to initiate a public notice and comment process on the use of ionophores in poultry and meat; or 4) submit a revised label application. (*Id.*)

**D. FSIS Approves a Qualified "Raised Without Antibiotics" Label**

On December 18, 2007, **Tyson** submitted an application to FSIS seeking approval of a revised label containing qualifying language. On December 19, 2007, FSIS approved **Tyson's** application seeking permission to use "Raised Without Antibiotics that impact antibiotic resistance in humans" on its labels.

On January 7, 2008, the Under Secretary of the USDA, Richard A. Raymond, sent a letter to the Senior Vice President of **Tyson**, Archie Shaffer III, confirming that **Tyson** and the USDA "reached an agreement" on the qualified label. (Def.'s Ex. 36.) Mr. Raymond stated that FSIS believed the qualified "Raised Without Antibiotics" claim described "the situation in a truthful and non-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

misleading way."(*Id.*) The letter also indicated that FS-IS would be willing to grant a period of time for **Tyson** to transition from the unqualified label to the qualified label. On February 25, 2008, FSIS formally approved **Tyson's** temporary use of the unqualified "Raised Without Antibiotics" through a date that has been redacted for this litigation.

## II. Tyson's Aggressive Advertising Campaign

During the same time period that **Tyson** was actively involved with the USDA in having both the unqualified and qualified language approved for use on its labels, it was also incorporating both the unqualified and qualified language into a multimillion-dollar nationwide advertisement campaign that utilized television, radio, billboards, print media, posters, and point-of-purchase materials.

## A. Tyson's Advertising Campaign Uses the Unqualified "Raised Without Antibiotics" Claim

After **Tyson's** unqualified "Raised Without Antibiotics" claim was initially approved by FSIS, the company initiated a multimedia advertising campaign that was internally termed "Project Sting." A subsection of Project Sting, the "Thank You" campaign, placed significant importance on the "Raised Without Antibiotics" language. The advertisements uniformly featured smiling children, often accompanied by a parent. Many of the advertisements included a heading in large print declaring "Chicken your family deserves, raised without antibiotics."(*See, e.g.,* Pls.' Exs. 14-18.) Project Sting was clearly intended to "[s]trengthen [the] emotional connection to [the] **Tyson** brand" by appealing to the public's safety and health concerns. (Pls.' Ex. 122.)

**\*5 Tyson** received overwhelmingly positive consumer feedback and believed this multimedia campaign was a large-scale success. From the advertisements, consumers understood that **Tyson** did not use antibiotics, and many consumers indicated that **Tyson's** chicken was "better" or "safer" than competitors' chicken. (Pls.' Ex. 119.) After conducting market research in the form of consumer reaction groups, Mr. Hogberg relayed to

coworkers specific consumer quotes that he believed "summarize[d] how this campaign makes people feel [.]"(*Id.*)Among the sample quotes was the following: "It [**Tyson's**'Raised Without Antibiotics' chicken] is safer chicken than others."(*Id.*) In a separate internal document, **Tyson** quoted another consumer as saying the following: "[**Tyson's**'Raised Without Antibiotics' chicken] has made me very happy as I am a cancer survivor and I believe that all the antibiotics and artificial ingredients contribute to this major disease."(Pls.' Ex. 31.)

**Tyson's** data also indicated that nine out of ten consumers considered it important to have antibiotic-free chicken; in fact, it was the second most important claim that consumers looked for when shopping for chicken. (Pls.' Exs. 122, 126.) As a result of the advertising campaign, sales of **Tyson** chicken increased by almost thirty-five million pounds. (Pls.' Ex. 95.) The "Raised Without Antibiotics" advertising campaign was internally described as having a "dramatic" effect on sales. (Pls.' Ex. 108.)

Project Sting's success is also strongly corroborated by the fact that advertisements containing the unqualified "Raised Without Antibiotics" claim remained in the marketplace months after September 12, 2007, the date in which the USDA clearly communicated that it had made a mistake in approving the label. Indeed, as late as November 30, 2007, weeks after the USDA refused to reconsider its revocation, Mr. Hogberg was telling other **Tyson** employees that "no one should be holding up anything because of the RWA labeling issue."(Pls.' Ex. 108.) Indeed, he was encouraging others to "GO! GO! GO!" onward with the campaign. (*Id.*) This Court finds that **Tyson's** continuation of Project Sting was done with full knowledge that the USDA intended to revoke the unqualified "Raised Without Antibiotics" label. Indeed, Mr. Hogberg's "GO! GO! GO!" directive is demonstrated by the fact that **Tyson** purchased additional television advertisements featuring the "Raised Without Antibiotics" language on September 27, 2007, to run through January 20, 2008. This decision was made despite the fact that the USDA unambiguously indicated its intent to revoke the unqualified "Raised Without Antibiotics" label.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Moreover, **Tyson** distributed point-of-purchase materials to supermarkets across the country. Hilary Burroughs of **Sanderson** Farms attached sixty-one photographs to her affidavit that purport to show point-of-purchase materials with the unqualified "Raised Without Antibiotics" language. The photographs were all taken between January 29, 2008 and February 18, 2008, in stores located in seven states (Alabama, Arizona, California, Colorado, Mississippi, Georgia, and South Carolina).[FN5] Despite **Tyson** having constant communication with the USDA from September 2007 until December 2007, **Tyson** took no action to remove unqualified point-of-purchase materials from the market until February 28, 2008. On that date, **Tyson** sent out an internal "action notice" intended to begin the phase out of all point-of-purchase materials that contained the unqualified "Raised Without Antibiotics" language. Mr. Hogberg, Senior Vice President of Product Marketing, testified about this delay, and this Court finds his explanation unacceptable. It is quite clear to this Court that it was in **Tyson's** financial interest to delay the phase-out period as long as possible.[FN6]

**\*6** Additional advertisements containing the unqualified "Raised Without Antibiotics" language appeared in other media outlets long after **Tyson's** original label was revoked by FSIS. A billboard in Mississippi containing the unqualified "Raised Without Antibiotics" language was not taken down until mid-January 2008. (Pls.' Ex. 110.) Ironically, Joe **Sanderson**, the Chairman and CEO of **Sanderson** Farms, received at his home a retail store circular advertisement containing **Tyson** chicken coupons that included unqualified "Raised Without Antibiotics" language during the week of March 9, 2008 (Pls.' Ex. 117), approximately *six months* after **Tyson** received unambiguous notice from the USDA that the unqualified label would be revoked and *five months* after it was made clear to **Tyson** that the USDA, FDA, and the AVMA all agreed that ionophores were antibiotics. Although **Tyson** did not pay for the circular advertisement, it is certainly well within the company's power to insist, with little more than a phone call or email, that retail stores cease all use of the unqualified claim in circular advertisement.

**B. Tyson** Begins Using Variations of the Qualified "Raised Without Antibiotics" Claim

Further evidencing the aggressiveness of its marketing campaign, **Tyson** began purchasing advertisements using qualified "Raised With Antibiotics" language before FSIS approved **Tyson's** application on December 19, 2008. For this reason, many of the most recent **Tyson** advertisements contain qualifying language that differs from the approved qualified language "Raised Without Antibiotics that impact antibiotic resistance in humans."

For example, the March/April 2008 edition of Weight Watchers magazine contains an advertisement using the language "raised without antibiotics that *create* antibiotic resistance in humans."(Pls.' Exs. 70-71. (emphasis added)) Other magazine advertisements and free-standing newspaper inserts purchased by **Tyson** do not include the qualifying language immediately following the unqualified "Raised Without Antibiotics" claim. For instance, in some advertisements, the unqualified claim was followed by an asterisk, leading the reader elsewhere on the page to a similar, but not USDA-approved, qualification typed in small print. (Def.'s Exs. 47-48.) This Court finds that the addition of qualifying language does little to correct the initial deception resulting from the early stages of the Project Sting campaign.

**C. Tyson's** Raised Without Antibiotics Advertising Campaign Has a Negative Impact on **Sanderson** and **Perdue**

**Tyson's** advertising campaign correspondingly had a negative financial impact on both **Sanderson** and **Perdue**. Ms. Burroughs testified that **Sanderson** lost approximately $4.1 million as a result of **Tyson's** advertising campaign utilizing the unqualified and qualified "Raised Without Antibiotics" claims. (Pls.' Ex. 47.) She testified that a large supermarket retail account that had been using **Sanderson** for a decade switched to **Tyson** during the time period **Tyson** was airing the "Raised Without Antibiotics" advertisements. Despite increased revenues in the final months of 2007, **Sanderson's** revenues and sales have decreased thus far in 2008. As far as the consumer effect, Ms. Burroughs testified that it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

typically takes eight to twelve months for an advertising campaign to actually penetrate the market, so the largest consumer effect of **Tyson's** "Raised Without Antibiotics" campaign will not be felt by **Sanderson** for some time.

**\*7** Mr. Bartelme testified that **Tyson's** advertising campaign has been a "big problem" for **Perdue**, resulting in "truckloads of lost volume." **Perdue** has lost three major retail accounts to **Tyson** as a result of **Tyson's** "Raised Without Antibiotics" advertising campaign, causing a net loss to the company of approximately $10 million. (Pls.' Exs. 46, 116.) Unlike **Sanderson**, **Perdue** did not receive any new accounts during the same time period.

At the four-day hearing, evidence was introduced clearly reflecting **Tyson's** marketing strategy and the financial harm inflicted on **Perdue**. Internal **Tyson** documentation indicates that the "Raised Without Antibiotics" advertising campaign had "wrecked **Perdue's** overall enterprise strategy" and that "elevating the **Tyson** brand with RWA has also devalued the **Perdue** brand."(Pls.' Ex. 106.)

### III. Plaintiffs' Consumer Survey

Professor Michael B. Mazis's consumer survey, submitted on Plaintiffs' behalf, presents compelling evidence of consumer confusion with respect to both the unqualified and qualified "Raised Without Antibiotics" claims and stands uncontradicted in all important respects. Professor Mazis's testimony at the four-day hearing also clearly established that the qualified language is not understood by a substantial percentage of consumers.

The consumer survey included 608 consumers in twenty-eight shopping malls across the United States.FN7The 608 participants were broken down into four equally distributed cells, each with approximately 150 people. The participants were assigned randomly to the four cells. Each cell was shown a different stimulus. The first two cells were shown an unqualified "Raised Without Antibiotics" **Tyson** advertisement-the first cell was shown a television commercial and the second cell

was shown a print stimulus, such as would appear in a magazine. The third cell was shown a print stimulus with the qualified "Raised Without Antibiotics" claim, using the language approved by the USDA, *i.e.,*"Raised Without Antibiotics that impact antibiotic resistance in humans."The fourth cell was shown a control print stimulus containing the following promotional statement: "chicken with great taste, high quality and unmatched variety."The fourth cell was not shown anything relating to **Tyson's** "Raised Without Antibiotics" claim, whether unqualified or qualified.

Professor Mazis reached two conclusions based on the consumer survey. First, the individuals that participated in the survey largely responded the same way to the qualified "Raised Without Antibiotics that impact antibiotic resistance in humans" claim as they did to the unqualified "Raised Without Antibiotics" claim. Second, participants viewed both the unqualified and qualified claims as implying that **Tyson's** chicken is safer and healthier than competitors' chicken. FN8

### A. Open-Ended Questions-Participants Interpreted the Unqualified Language and the Qualified Language the Same

**\*8** Participants were asked "[w]hat is the main idea that the advertisement is trying to communicate?"Respondents who indicated that the advertisement communicated something about **Tyson's** chicken and antibiotics were then asked "[w]hat does the advertisement imply or state about **Tyson** and antibiotics?"Professor Mazis concluded from the responses to these open-ended questions that consumers process the "unqualified" and "qualified" messages in the same fashion. In short, consumers believe that there are no antibiotics given to **Tyson's** chickens.

In the first cell (unqualified "Raised Without Antibiotics" television commercial), 71.4% of respondents felt that the commercial communicated a "no antibiotics" claim. In the second cell (unqualified "Raised Without Antibiotics" print advertisement), 85.1% of respondents felt that the advertisement communicated a "no antibiotics" claim. In the third cell (qualified "Raised Without

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

Antibiotics" print advertisement), 63.4% of respondents reported that a "no antibiotics" claim was communicated and about half (54.9%) referred to "no antibiotics" without mentioning antibiotic resistance. In addition, 9.2% of respondents mentioned "no antibiotics" and "antibiotic resistance" as separate but related ideas. Quite significant to this Court is the fact that only 4.6% of respondents understood the claim to mean what the experts at the USDA understood it to mean-*i.e.,* that **Tyson** uses antibiotics, but that the antibiotics it uses do not cause antibiotic resistance in humans.

Professor Mazis testified that the participants appeared to break down the qualified "Raised Without Antibiotics" into two distinct parts. The first part, "Raised Without Antibiotics," was taken literally by participants to mean that **Tyson's** chicken was not given antibiotics, which is not accurate. The second part of the qualified claim, "that impact antibiotic resistance in humans," was taken by participants to mean that **Tyson's** chicken does not impact antibiotic resistance in humans *because***Tyson's** chicken has no antibiotics, which is also inaccurate. Taken together, participants largely misunderstood the entire qualified claim to mean that **Tyson's** chicken had no antibiotics and therefore could not impact antibiotic resistance in humans.[FN9] Indeed, based on Professor Mazis's testimony, this Court finds that the qualifying language may actually serve to reinforce the false impression that **Tyson's** chicken is antibiotic-free.

**B. Close-Ended Questions-Participants Believed That Tyson's** Chicken Was Safer and Healthier

Participants were first asked "[w]hat is the name of the company that put out or sponsored the advertisement that you just looked at?"If the participant answered this question correctly, the following series of additional close-ended questions was asked:

Q2-"What is the main idea that the advertisement is trying to communicate? Anything else?"

Q3-"Does or doesn't the advertisement (TV commercial) imply or state anything about **Tyson** chicken and

antibiotics?"If the respondent answered affirmatively, he or she was also asked question Q3A: "What does the advertisement imply or state about **Tyson** and antibiotics? Anything else?"

**\*9** Q4-"Does or doesn't the advertisement imply or state anything about **Tyson** chicken and taste?"If the respondent answered affirmatively, he or she was also asked Q4A: "What does the advertisement imply or state about **Tyson** and taste? Anything else?"

Question four specifically asked about something entirely unrelated to this lawsuit, *i.e.,* taste, to avoid highlighting the focus of the study.

In analyzing these closed-ended questions, Professor Mazis concluded that the respondents in the "qualified" cell (cell three) provided similar responses to the advertisements as respondents in the two "unqualified" cells (cells one and two). In response to Q3, 85.1% and 79.1% of respondents in the two "unqualified" cells thought the advertisement they had seen implied or stated something about **Tyson** and antibiotics, while 81.0% of respondents in the "unqualified" cell answered the same way.

Respondents were then told that a series of statements would be read to them, some, all or none of which may have been implied by or stated in the **Tyson** advertisement. The respondent was then told to answer: (1) yes, the statement was implied; (2) no, the statement was not implied; (3) I don't know whether the statement was implied; or (4) no opinion. The respondent was then read the following statements, the order of which was rotated differently for each respondent:

• **Tyson** chicken is fresher than other chicken

• **Tyson** chicken is safer than other chicken

• **Tyson** chicken contains more protein than other chicken

• **Tyson** chicken is better for you than other chicken

• **Tyson** chicken tastes better than other chicken

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

• **Tyson** chicken is more healthful than other chicken

The questions asking about whether **Tyson's** chicken was safer, better for you, and more healthful were the most relevant to this lawsuit. The other questions were asked so that the purpose of the questions remained unknown.

First, Professor Mazis calculated the percentage of people who believed that **Tyson's** chicken was safer, more healthful, or better for you. Next, he adjusted the results for "noise" (*e.g.*, guessing, pre-existing beliefs, suggestive question wording, bias, etc.) by subtracting the percentage of positive responses obtained from the control cell. The following chart summarizes the consumer survey data, with the boldfaced number indicating the final results of the survey:

|  | **Tyson** chicken is safer than other chicken | **Tyson** chicken is more healthful than other chicken | **Tyson** chicken is better for you than other chicken |
|---|---|---|---|
| Cell One- | 65.6% - 29.9% = | 72.1% - 46.3% = | 60.4% - 46.3% = |
| "Unqualified" TV | **35.7%** | **25.8%** | **14.1%** |
| Cell Two- | 59.1% - 29.9% = | 68.2% - 46.3% = | 57.1% - 46.3% = |
| "Unqualified" Print | **29.2%** | **21.9%** | **10.8%** |
| Cell Three- | 63.4% - 29.9% = | 70.6% - 46.3% = | 60.1% - 46.3% = |
| "Qualified" Print | **33.5%** | **24.3%** | **13.8%** |

**\*10** Based on the responses controlled for noise, about one-third of all respondents in cells one, two and three-including both unqualified and qualified language-agreed that the advertisement communicated that **Tyson's** chicken is safer than other chicken, and about one-quarter of respondents in cells one, two, and three-again, including both unqualified and qualified language-agreed that the advertisement communicated that **Tyson's** chicken is more healthful. Because all three chicken producers in this action use ionophores, these figures represent nothing less than consumer deception about the relative safety and health of **Tyson's** chicken. Moreover, the percentages remained consistent for all three implied claims of superiority (safer, more health-ful, and better for you), regardless of whether the language was unqualified (cells one and two) or qualified (cell three). In fact, for print advertisements (cells two and three), a greater percentage of respondents who viewed the qualified language believed that it contained an implied claim of superiority than did respondents who viewed the unqualified language.

### CONCLUSIONS OF LAW

[1][2] Under Rule 65 of the Federal Rules of Civil Procedure, the decision whether to issue a preliminary injunction is committed to the sound discretion of the trial court. *Hughes Network Sys. v. InterDigital Commc'ns*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Corp.,* 17 F.3d 691, 693 (4th Cir.1994). To determine whether a preliminary injunction is appropriate, the court must apply the four-factor hardship balancing test established by the United States Court of Appeals for the Fourth Circuit in *Blackwelder Furniture Co. of Statesville, Inc. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir.1977). The four *Blackwelder* factors are 1) the likelihood of irreparable harm to the plaintiff if injunctive relief is denied, 2) the likelihood of harm to the defendant if injunctive relief is granted, 3) the likelihood that the plaintiff will succeed on the merits, and 4) the public interest. *Id.* at 195;*see also Rum Creek Coal Sales, Inc. v. Caperton,* 926 F.2d 353, 359 (4th Cir.1991).

In *Scotts Co. v. United Industries Corp.,* 315 F.3d 264 (4th Cir.2002), the Fourth Circuit summarized the proper analysis to determine whether a preliminary injunction should be granted:

When deciding whether to grant a preliminary injunction, the court must first determine whether the plaintiff has made a strong showing of irreparable harm if the injunction is denied; if such a showing is made, the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant. If the balance of the hardships "tips decidedly in favor of the plaintiff,"... then typically it will "be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation,".... But if the balance of hardships is substantially equal as between the plaintiff and defendant, then "the probability of success begins to assume real significance, and interim relief is more likely to require a clear showing of a likelihood of success."

**\*11** *Id.* at 271 (internal citations omitted); *see also Sun Microsystems, Inc. v. Microsoft Corp.,* 333 F.3d 517, 526 (4th Cir.2003) (stating that the *Blackwelder* test represents a "sliding scale that demands less of a showing of likelihood of success on the merits when the balance of hardships weighs strongly in favor of the plaintiff, and vice versa").

**[3]** Applying the *Blackwelder* factors, this Court concludes that Plaintiffs' Supplemental Motion for Preliminary Injunction should be granted. The preliminary injunction proceeding in this case was extensive. Although naturally incomplete at this stage in the litigation, the record is hardly insufficient and this Court does not reach its legal conclusions in haste. *See Sole v. Wyner,* --- U.S. ----, 127 S.Ct. 2188, 2195, 167 L.Ed.2d 1069 (2007) ("In some cases, the proceedings prior to a grant of temporary relief are searching; in others, little time and resources are spent on the threshold contest.").

**I. Likelihood of Irreparable Harm to Plaintiffs If Injunctive Relief Is Denied**

Based on the consumer survey, this Court finds that Plaintiffs have demonstrated that consumers are in fact misled by Defendant's advertisements. This Court also finds that, even in the absence of a presumption, the continuation of Defendant's advertisements during the pendency of this case will cause further harm that is neither "remote nor speculative, but actual and imminent."*Scotts Co.,* 315 F.3d at 271.

**A. Evidence of Consumer Confusion**

In *Scotts Co.,* the Fourth Circuit "did not reach the issue [of an irreparable harm presumption] in a false advertising context because the plaintiff had failed to make a prima facie showing of consumer confusion."*Pediamed Pharms., Inc. v. Breckenridge Pharm., Inc.,* 419 F.Supp.2d 715 (D.Md.2006) (citing *Scotts Co.,* 315 F.3d at 272). The presumption that was not addressed by the Fourth Circuit was discussed in *United Industries Corp. v. Clorox Co.,* 140 F.3d 1175 (8th Cir.1998), where the United States Court of Appeals for the Eighth Circuit suggested that a presumption of irreparable harm should be applied in all Lanham Act false advertising cases where the plaintiff has established a tendency to deceive.[FN10] *Id.* at 1183.

The Fourth Circuit noted that other district courts in this circuit have applied the *United Industries* presumption. *See Scotts Co.,* 315 F.3d at 273 (citing *JTH Tax, Inc. v. H & R Block Eastern Tax Servs., Inc.,* 128 F.Supp.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

926, 948 (E.D.Va.2001) ("[A] demonstration that the competitor's advertising tends to mislead consumers satisfies the [Lanham] Act's irreparable harm requirement."), *aff'd in part, vacated in part, and remanded,*28 Fed.Appx. 207 (4th Cir.2002) and *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.,* 26 F.Supp.2d 834, 862 (E.D.Va.1998) ("Courts have explained that a demonstration that the competitor's advertising tends to mislead consumers satisfies the Lanham Act's irreparable harm requirement.")). In *JTH Tax,* the district court explained that, "[b]ecause it is 'virtually impossible to prove that so much of one's sales will be lost as a direct result of a competitor's advertisement,' a demonstration that the competitor's advertising tends to mislead consumers satisfies the [Lanham] Act's irreparable harm requirement."128 F.Supp.2d at 948 (internal citations omitted).

**\*12** In this case, unlike in *Scotts Co.,* Plaintiffs have sufficiently demonstrated consumer confusion. There are two distinct aspects to this inquiry, each requiring different quanta of proof: "If the advertising is literally false, no evidence of consumer confusion is required. But if the advertising is impliedly false, the plaintiff must present extrinsic evidence of consumer confusion."*Scotts Co.,* 315 F.3d at 274.

Plaintiffs have established the literal falsity of Defendant's unqualified "Raised Without Antibiotics" claim. Indeed, the evidence before this Court conclusively demonstrates that the United States Department of Agriculture, the Food and Drug Administration, and the American Veterinary Medical Association, as well as the scientific community at large, are all in agreement that ionophores are antibiotics. Having demonstrated the literal falsity of the unqualified "Raised Without Antibiotics" claim and having demonstrated consumer confusion, Plaintiffs have established irreparable harm as to Defendant's unqualified "Raised Without Antibiotics" claim.

Plaintiffs have also established that the qualified "Raised Without Antibiotics" claim leads to consumer confusion. Because the qualified language, "Raised Without Antibiotics that impact antibiotic resistance in humans," was approved for labels by FSIS as being not

"false and misleading," *see* Poultry Products Inspection Act, 21 U.S.C. § 457(b)-(c), this Court will not consider the claim to be literally false, at least not at the preliminary injunction stage of this litigation. Nonetheless, Plaintiffs' consumer survey sufficiently demonstrates that "a not insubstantial number of consumers" are likely to be confused or misled. *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.,* 960 F.2d 294, 298 (2d Cir.1992).

Plaintiffs' consumer survey found that 63.4% of respondents reported that the qualified "Raised Without Antibiotics" language meant that Defendant used no antibiotics in its chicken. The consumer survey also found that 54.9% of respondents referred to "no antibiotics" without mentioning anything about the qualifying language "that impact antibiotic resistance in humans."Defendant's own expert witness, Steve Roth, acknowledged during his testimony that these figures far exceed the level of consumer survey evidence usually required by courts. *See, e.g., Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 594 (3d Cir.2002) ("We believe that survey evidence demonstrating that 15% of the respondents were misled ... is sufficient to establish the 'actual deception or at least a tendency to deceive a substantial portion of the intended audience,' necessary to establish a Lanham Act claim for false or misleading advertising."(internal citation omitted)).FN11

Having heard testimony for four days and having reviewed hundreds of exhibits, this Court is convinced by a preponderance of the evidence that a substantial percentage of consumers are misled by Defendant's advertisements carrying the message "Raised Without Antibiotics that impact antibiotic resistance in humans."The qualifying language does not appear to serve its intended purpose-the consumer is still led to believe that Defendant does not use antibiotics, when in fact Defendant uses ionophores in its chicken feed and injects its chicken eggs with antibiotics. Indeed, the qualification may only serve to reinforce that Defendant's chicken is "Raised Without Antibiotics," a claim that is literally false.

**\*13** Moreover, Plaintiffs' consumer survey does not suf-

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

fer from the flaws highlighted by the Fourth Circuit in *Scotts Co.* In *Scotts Co.,* the Fourth Circuit found that the critical issue in the case was not adequately answered by the questions posed in the consumer survey and that the answers given to those questions were ambiguous. *See Scotts Co.,* 315 F.3d at 279.Plaintiffs' consumer survey answers the precise issue in his case, *i.e.,* whether Defendant's qualified "Raised Without Antibiotics" claim misleads the consumer into believing that Defendant does not use antibiotics. Furthermore, the consumer survey answers are not ambiguous-the sample responses underscore the fact that a substantial portion of consumers do not appear to understand that Defendant's chicken is not antibiotic-free. *See supra* note 9 (listing sample responses of survey participants that understood the qualified "Raised Without Antibiotics" advertisements to mean that Defendant did not use antibiotics).

Therefore, this Court credits Plaintiffs' consumer survey and finds that the results establish consumer confusion. Therefore, Plaintiffs have met their burden of establishing the irreparable harm prong of the *Blackwelder* analysis.

**B. Financial Impact on Plaintiffs**

Alternatively, even in the absence of any presumption, Plaintiffs have demonstrated that they will suffer irreparable harm that is "neither remote nor speculative, but actual and imminent."*Scotts Co.,* 315 F.3d at 271 (citations omitted). Defendant's advertising campaign has already had a "dramatic" effect on its sales, directly resulting in a thirty-five million pound increase. During the same time period, Defendant's advertisements have had a negative impact on Plaintiffs' respective businesses. **Sanderson** submitted evidence establishing that it lost a $4.1 million account, and **Perdue** submitted evidence that it lost three accounts totaling approximately $10 million.

Indeed, Defendant believed that the advertising campaign caused incalculable loss to **Perdue**. Internal memoranda indicate that Defendant's advertising campaign "wrecked **Perdue's** overall enterprise strategy"

and that "elevating the **Tyson** brand with RWA has also devalued the **Perdue** brand."(Pls.' Ex. 106.) This is precisely the sort of loss that the issuance of a preliminary injunction is designed to prevent. As a result, a preliminary injunction would serve to limit the continued gravitation of consumer purchasing decisions towards Defendant's product as a result of the qualified "Raised Without Antibiotics" advertising campaign.

Moreover, there is no evidence before this Court showing that the damage already incurred by Plaintiffs will not be made worse during the pendency of this case. *See Scotts Co.,* 315 F.3d at 283-84 (finding that the plaintiff had not met its burden of "actual and imminent" irreparable harm largely because of a slow industry-specific business cycle during the pendency of the trial). Tellingly, even while the status of the "Raised Without Antibiotics" label was in flux, internal memoranda indicated that "no one should be holding up anything because of the RWA labeling issue" and that employees should "GO! GO! GO!" forward with the advertising campaign. A similarly aggressive position could be taken while Defendant awaits a trial on the merits.

**\*14** Accordingly, this Court finds that Plaintiff has made a strong showing of irreparable harm if the injunction is denied. Such a showing has been made through evidence of consumer confusion and continued economic harm.

**II. Likelihood of Irreparable Harm to Defendant If Injunctive Relief Is Granted**

This Court finds that there is virtually no harm whatsoever to Defendant with respect to non-label advertisements carrying the unqualified "Raised Without Antibiotics" claim. Defendant has informed this Court that they are currently in the process of removing all "Raised Without Antibiotics" advertisements from the marketplace. Thus, a preliminary injunction ensuring that this occurs only reinforces the status quo by way of a court order. On the unqualified "Raised Without Antibiotics" claim, the scale tips decidedly in favor of Plaintiffs.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

As to non-label advertisements carrying the qualified "Raised Without Antibiotics" claim, Defendant will undoubtedly incur substantial costs associated with removing advertising from the marketplace upon the issuance of a preliminary injunction,FN12 which offsets at least part of the financial harm Plaintiffs argue they will suffer if this Court does not issue a preliminary injunction. Defendant also argues that the issuance of a preliminary injunction would result in "consumer mistrust and the loss of goodwill."(Def.'s Mem. Opp'n Prelim. Inj. 6.)

The Fourth Circuit has admonished district courts not to give short shrift to irreparable harm that may appropriately be characterized as self-inflicted by the defendant. In *Scotts Co.,* the Fourth Circuit explained that "[i]f self-made harm is given substantially less weight, as it was by the district court in this case, then the balance of the harms will almost always favor the plaintiff, thus transforming a preliminary injunction from an extraordinary remedy into a routine occurrence."315 F.3d at 284.This Court does not substantially minimize the harm that might befall Defendant upon the issuance of a preliminary injunction, but it does note that such harm could have been mitigated, if not prevented, through the adoption of a less aggressive marketing position. The evidence plainly indicates that Defendant's executives identified an opportunity to increase the company's market share and sought to capitalize on that perceived opportunity despite full knowledge of the risk. Mr. Hogberg candidly acknowledged that he continually assessed the risks associated with Defendant's marketing campaign and that Defendant's executives "made the call" to move forward notwithstanding the risks. *See NaturaLawn of Am., Inc. v. West Group, LLC,* 484 F.Supp.2d 392, 402 (D.Md.2007) (noting that harm created by the defendant's "own willful acts" is "a factor that the court is entitled to consider").

Moreover, not only have Plaintiffs demonstrated that they will suffer irreparable harm if injunctive relief is denied, but, as will be discussed below, Plaintiffs have convinced this Court that there is an extremely high likelihood of success on the merits. As such, the fact that Defendant may suffer some degree of irreparable injury upon the issuance of a preliminary injunction is

alone insufficient for this Court to forgo granting it. Therefore, balanced against the harm that will be suffered by Plaintiffs if the preliminary injunction is not issued, this Court finds that the scale tips slightly in Plaintiffs' favor on the qualified "Raised Without Antibiotics" claim.

## III. Likelihood That Plaintiff Will Succeed on the Merits

**\*15** The Fourth Circuit has explained that "the balance-of-the-hardship question is intertwined with questions about the merits."FN13 *Scotts Co.,* 315 F.3d at 272.As noted above, extensive evidence was presented by **Sanderson**, **Perdue**, and **Tyson** during the four-day hearing. Indeed, with the submission of hundreds of exhibits and the testimony of key witnesses, this Court has, in effect, conducted a mini-trial. This Court has based its factual findings on an extensive record, including a comprehensive consumer survey submitted by Plaintiff. For many of the same reasons discussed in the first *Blackwelder* factor, this Court finds that there is a very strong likelihood that Plaintiffs will succeed on the merits in a trial before a jury.

[4] The elements of a false advertising claim under the Lanham Act are as follows:

(1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product;

(2) the misrepresentation is material, in that it is likely to influence the purchasing decision;

(3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience;

(4) the defendant placed the false or misleading statement in interstate commerce; and

(5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

*Scotts Co.,* 315 F.3d 264 at 272 (citing *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 310-11 (1st Cir.), *cert. denied,*537 U.S. 1001, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002)).

With respect to the first element, the unqualified "Raised Without Antibiotics" claim is literally false, and the qualifying language has proven to be of little effect to the consumer, as demonstrated by Plaintiffs' consumer survey. Furthermore, Defendant's advertising does not communicate to the consumer the fact that Defendant injects antibiotics into its chicken eggs two to three days before hatch.

The evidence also demonstrates that Defendant's misrepresentation is material. Nine out of ten consumers considered it important to have antibiotic-free chicken and a claim of antibiotic-free chicken is the second most important claim that consumers looked for when shopping for chicken. Therefore, Plaintiffs are likely to succeed on the second and third elements. The fourth element will be met because Defendant's advertisements were clearly disseminated nationwide. The fifth element will likely be met for the same reasons this Court found that Plaintiffs are likely to suffer irreparable harm in the absence of a preliminary injunction.

Defendant again makes the same argument in defense of this motion as it did in support of its Motion to Dismiss, which was denied by this Court by Order dated April 14, 2008 (Paper No. 73.) In short, Defendant argues that "courts repeatedly have rejected Lanham Act claims based upon advertisements that simply repeat information in labeling that a government agency has determined not to be 'false or misleading.' " (Def.'s Mem. Opp'n Prelim. Inj. 6-7.) Defendant relied on cases involving the FDA, an agency with substantially broader jurisdiction than the USDA, the government agency at issue in this case. Unlike the FDA, the USDA does not have congressional authority to review advertisements. Therefore, this Court held that

**\*16** a non-label false advertising claim brought under the Lanham Act is not precluded because the language on which the claim is based was approved for use on labels by the USDA. The opposite conclusion would extend USDA expertise into an area, *i.e.,* advertising, which the agency has no congressional authority to enter, while at the same time significantly curtailing the congressional protections explicitly accorded to "persons engaged in such commerce" under the Lanham Act.

(Mem. Op. 20.) For the reasons stated in the Memorandum Opinion (Paper No. 72), this argument is without merit.

## IV. The Public Interest

The public interest is served by the issuance of a preliminary injunction in this case. There is a significant and immediate public interest concern when specific advertising misrepresents that a product is something that it is not, even if the product does not pose an immediate health or safety concern. *See Scotts Co.,* 315 F.3d 264 at 286 ("[T]here is a strong public interest in the prevention of misleading advertisements.") (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,* 290 F.3d 578, 587 (3d Cir.2002)).

This Court is satisfied that the consumer public is being misled by Defendant's "Raised Without Antibiotics" advertising. Defendant's chicken is not "Raised Without Antibiotics" when ionophores are used in chicken feed and other antibiotics are injected into the chicken egg two to three days before hatch. This Court, having heard testimony and reviewed voluminous exhibits and a comprehensive consumer survey, is satisfied that the qualifying language, *i.e.,*"that impact antibiotic resistance in humans," is not understood by a substantial portion of the consumer public. Indeed, it may even reinforce consumer misconception. Defendant has persisted in this advertising effort since September 2007, when the USDA clearly placed Defendant on notice that it intended to revoke its prior label approval because ionophores are antibiotics. The public interest compels that this advertising stop and that a preliminary injunction be issued in this case.

***CONCLUSION***

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))

For the reasons stated in this Memorandum Opinion, Plaintiffs' Supplemental Motion for Preliminary Injunction (Paper No. 44) is GRANTED. Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, a separate Order detailing the scope of the preliminary injunction follows.

### PRELIMINARY INJUNCTION ORDER

For the reasons stated in the accompanying Memorandum Opinion issued this date, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, this Court, having conducted a hearing over four days between April 7, 2008 and April 10, 2008 and having considered memoranda and oral arguments, as well as testimony and evidence submitted by the parties, finds that Plaintiffs **Sanderson** Farms, Inc. and **Perdue** Farms, Inc. will suffer imminent and irreparable harm from non-label advertising being disseminated by Defendant **Tyson** Foods, Inc., unless Defendant is preliminarily enjoined as set forth in this Order. Accordingly, it is this 22nd day of April 2008, HEREBY ORDERED:

**\*17** 1. That Plaintiffs' Supplemental Motion for a Preliminary Injunction (Paper No. 44) is GRANTED, as follows:

a. That Defendant must remove any and all non-label advertisements, as defined in paragraphs 1.c and 1.d, containing language claiming that its chicken products are "Raised Without Antibiotics," regardless of whether the statement has qualifying language such as "Raised Without Antibiotics that impact antibiotic resistance in humans";

b. That Defendant is further enjoined from using non-label advertisements, as defined in paragraphs 1.c and 1.d, containing language claiming that its chicken products are "Raised Without Antibiotics," regardless of whether the statement has qualifying language such as "Raised Without Antibiotics that impact antibiotic resistance in humans," during the pendency of this case;

c. That non-label advertising consists of television commercials, radio spots, print ads, billboards, cir-

culars, and posters;

d. That non-label advertising also consists of any and all labeling, including point-of-purchase materials, that contain either the "Raised Without Antibiotics" or "Raised Without Antibiotics that impact antibiotic resistance in humans" language in association with other promotional language and images, regardless of whether such articles are located in proximity to Defendant's chicken products; and

e. That Defendant's labels are exempt from this Order and consist of language placed immediately upon Defendant's chicken products or container.

2. It is HEREBY FURTHER ORDERED that:

a. This Order shall take effect at 12:01 a.m., Thursday May 1, 2008, so as to accord Defendant an opportunity to appeal the issuance of this Preliminary Injunction Order to the United States Court of Appeals for the Fourth Circuit;

b. By 12:01 a.m., Thursday May 1, 2008, Plaintiffs shall post a bond, not to be released unless by further Order of this Court. The amount of the bond will be set by this Court by 5:00 p.m., Friday, April 25, 2008 after the parties have had an opportunity to file submissions on their respective positions on the appropriate amount of the bond;

c. Upon the effective date of this Order, pursuant to Rule 65(d)(2)(C), Defendant shall notify all retailers and other third parties disseminating its advertising of the scope and effect of this Order;

d. This Order shall remain in effect pending a trial in this matter; and

e. The Clerk of this Court transmit copies of this Order and accompanying Memorandum Opinion to counsel for both parties.

FN1. The parties also addressed the Defendant's Motion to Dismiss (Paper No. 50), which was denied on the record on April 10, 2008.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1838719 (D.Md.))**

That denial was supplemented by a Memorandum Opinion (Paper No. 72) and accompanying Order (Paper No. 73) issued by this Court on April 15, 2008, --- F.Supp.2d ----, 2008 WL 1733607.

FN2. Plaintiffs' counsel read into the record portions of Walter Leggett's deposition in lieu of his live testimony. Mr. Leggett took the photographs introduced as evidence by Plaintiffs.

FN3. Dr. Pilkington acknowledged that fluoroquinolones, once thought by experts to have no impact on human antibiotic resistance, were pulled for use by the FDA when it was learned that they did, in fact, impact human antibiotic resistance.

FN4.**Perdue's** application remains pending. This is highly unusual, as most applications are resolved within a week. Dr. Brown and John Bartelme both testified that it is industry practice to engage the USDA in dialogue through the application process. By reviewing which applications are approved and which are denied, a company can glean USDA's internal policy.

FN5. Defendant argued in support of its Motion to Dismiss (Paper No. 50) that point-of-purchase materials are beyond the scope of Plaintiffs' Amended Complaint because they are exclusively within the purview of the USDA under the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. § 451, et seq. Addressing the qualified claim, this Court determined in its Memorandum Opinion dated April 14, 2008 (Paper No. 72) that "Plaintiffs' Amended Complaint fairly encompasses any labeling that, despite including language approved by the USDA, contains additional images and promotional slogans that effectively turn the labeling into an advertisement."(Mem. Op. 15.)

FN6. Mr. Hogberg testified that **Tyson** set an internal deadline to remove all point-of-purchase materials using the unqualified "Raised Without Antibiotics" language from the marketplace no later than April 14, 2008, before the temporary window authorized by FSIS had expired.

FN7. Professor Mazis's consumer survey was completed with sufficient procedures to ensure accuracy. Participants qualified for the survey if they had purchased fresh raw chicken in the past three months and expected to purchase fresh raw chicken in the next three months. Potential respondents were excluded if (a) they or members of their households worked for an advertising agency or public relations firm, a marketing research firm, a law firm, or a manufacturer, distributor, or retailer of food products, or (b) if they wore eyeglasses or contact lenses but did not have their corrective eye wear with them at the time of the interview. The study was "double blind," in that neither the interviewers nor the respondents were aware of the identity of the client or the purpose of the study. The responses to all questions were then entered into a data file using 100% keypunch verification-i.e., all data were keypunched twice to avoid any errors.

FN8. Steve Roth testified for Defendant regarding Professor Mazis's consumer survey. This Court finds his testimony to be of limited value. More importantly, his testimony did not cast any doubt on Professor Mazis's findings. To a large extent, the thrust of Mr. Roth's testimony was simply that he would have asked more open-ended questions because he prefers them over close-ended questions. On cross examination, he admitted that more participants viewed **Tyson's** chicken as "better" or "safer" than competitors' chicken than he had previously acknowledged on direct examination, and he also admitted that it is statistically significant that over half (54.9%) of respondents in cell three referred to "no antibiotics" without

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

mentioning anything about antibiotic resistance. In fact, he testified that he was aware that 54.9% is greater than what has been deemed sufficient in other Lanham Act cases.

FN9. The following sample responses were included in Professor Mazis's expert report (Pls.' Supp. Mot. Prelim. Inj. Ex. 3):

• "These chickens were raised without antibiotics. It does not impact resistance in humans."(# 01202);

• "No antibiotics in chicken. Resistance for us humans."(# 01909);

• "The chicken was raised without antibiotics. Makes humans more resistant."(# 04306);

• "The chicken from **Tyson** is raised without antibiotics. It cuts down on antibiotics' resistance in humans."(# 07804);

• "That this chicken is raised and fed right, without antibiotics so that people will not become resistant to antibiotics."(# 08617);

• "Chicken without antibiotics. It won't affect your immunity to antibiotics."(# 11612);

• "That their chickens are antibiotic free. It makes us less resistant to them if they don't have them."(# 01215); and

• "That the chickens don't have antibiotics fed to them. That it doesn't affect antibiotic resistance in humans."(# 11610).

FN10. As the Fourth Circuit explained in *Scotts Co.,* some courts limit the presumption to cases involving direct comparative advertising. 315 F.3d at 273-74;*see Ortho Pharm. Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 696 (2d Cir.1994) (explaining that the presumption of irreparable harm is generally limited to cases involving false comparative advertising); *Mutual Pharm.*

*Co. v. Ivax Pharms., Inc.,* 459 F.Supp.2d 925, 944-45 (C.D.Cal.2006) ("Outside the context of comparative advertisements (that is, those that make no direct reference to a competitor's product), a presumption of irreparable injury to a party is unwarranted."); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:37 at 27-75 to 27-76 (4th ed. 2006) ("Where the challenged advertising makes a misleading comparison to a competitor's product irreparable harm is presumed. But if the false advertising is non-comparative and makes no direct reference to a competitor's product, irreparable harm is not presumed.").

Although Plaintiffs' consumer survey indicates that one third of consumers believe that Defendant's advertisements make an implied claim of safety superiority, and that one fourth of consumers believe Defendant's advertisements make an implied claim of health superiority, the claims are clearly not direct claims of superiority. Therefore, the comparative advertising presumption is inapplicable in this case.

FN11.*See also Stiffel Co. v. Westwood Lighting Group,* 658 F.Supp. 1103, 1114 (D.N.J.1987) (finding that between 22% and 57% of potential consumers being misled was sufficient to warrant preliminary injunctive relief under the Lanham Act); *R.J. Reynolds Tobacco Co. v. Loew's Theatres, Inc.,* 511 F.Supp. 867, 876 (S.D.N.Y.1980) (finding between 20% and 33% of consumers being deceived sufficient to warrant preliminary injunctive relief); *McNeil-ab, Inc. v. Am. Home Prod. Corp.,* 501 F.Supp. 517, 527 (S.D.N.Y.1980) (finding 23% of consumers being confused sufficient to support a claim that the Lanham Act had been violated).

FN12. The costs will be mitigated by the bond to be posted by Plaintiffs under Rule 65(c) of the Federal Rules of Civil Procedure. In *Scotts Co.,* the Fourth Circuit found that the defendants would "suffer only minimal harm" despite

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the fact that they "would incur the monetary costs of complying with the injunction by creating new packaging or placing stickers to cover the offending graphic on the existing packaging." 315 F.3d at 285 (citing *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 421 n. 3 (4th Cir.1999) ("In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order.")).

FN13. Indeed, the *Scotts Co.* court found that the plaintiff did not meet its burden under either the irreparable harm prong or the likelihood of success prong for the exact same reason. *See* 315 F.3d at 283 (finding, in the irreparable harm inquiry, that "because we have rejected [the plaintiff's] evidence of consumer confusion (and its various arguments as to why no extrinsic evidence was required), it follows that the district court erred by applying the presumption of irreparable harm, a presumption that was dependent on [the plaintiff] establishing consumer confusion"); *id.* at 285 (finding that "because the evidence presented by [the plaintiff] is insufficient to show a likelihood of consumer confusion, [the plaintiff] has therefore failed to show a likelihood of success on the merits").

D.Md.,2008.
Sanderson Farms, Inc. v. Tyson Foods, Inc.
--- F.Supp.2d ----, 2008 WL 1838719 (D.Md.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

**USDA** Food Safety and Inspection Service

# *STATEMENT*

Congressional and Public Affairs
Amanda Eamich (202) 720-9113
June 3, 2008

**STATEMENT by Under Secretary for Food Safety Dr. Richard Raymond
Regarding the Tyson Foods, Inc. Raised without Antibiotics Label Claim Withdrawal**

"On June 2, FSIS issued a letter to Tyson Foods, Inc. rescinding the "Raised Without Antibiotics That Impact Human Antibiotic Resistance" label.

"FSIS is required to ensure labels are not false and misleading.  In December 2007, FSIS approved the qualified raised without antibiotics label based on information provided by Tyson Foods, Inc.

"The label is being rescinded based on additional information provided to FSIS only after the qualified claim had been approved.

"In contrast to information presented by Tyson Foods, Inc., FSIS found that they routinely used the antibiotic Gentamicin to prevent illness and death in chicks which raises public health concerns.

"FSIS notified Tyson Foods, Inc. that the company must stop using the qualified raised without antibiotics labels, or any variation of a "Raised without antibiotics" claim by June 18.

"On May 23, FSIS notified Tyson Foods Inc. that FSIS, along with the USDA's Agricultural Marketing Service, will initiate a public process to review policies on "Raised without antibiotics" claims for poultry.

"To ensure that this process is equitable, FSIS will review any claim relating to the use of antibiotics in poultry that it has already approved for companies other than Tyson Foods, Inc."

#



**USDA** United States Department of Agriculture
**Food Safety and Inspection Service**

Home | About FSIS | **News & Events** | Fact Sheets | Careers | Forms | Help | Contact Us | En Español

You are here: **Home** / News & Events / News Releases / Jun 3, 2008 Statement by Under Secretary Raymond

## News & Events

Search FSIS

[          ] [Go]

Browse by Audience

[Information For...        ▼]

Browse by Subject

▷ Food Safety Education
▷ Science
▷ Regulations & Policies
▷ FSIS Recalls
▷ Food Defense &
   Emergency Response

### News Releases

**Statement by Under Secretary for Food Safety Dr. Richard Raymond Regarding the Tyson Foods, Inc. Raised without Antibiotics Label Claim Withdrawal**

Congressional and Public Affairs
(202) 720-9113
Amanda Eamich

"On June 2, FSIS issued a letter to Tyson Foods, Inc. rescinding the "Raised Without Antibiotics That Impact Human Antibiotic Resistance" label.

"FSIS is required to ensure labels are not false and misleading. In December 2007, FSIS approved the qualified raised without antibiotics label based on information provided by Tyson Foods, Inc.

"The label is being rescinded based on additional information provided to FSIS only after the qualified claim had been approved.

"In contrast to information presented by Tyson Foods, Inc., FSIS found that they routinely used the antibiotic Gentamicin to prevent illness and death in chicks which raises public health concerns.

"FSIS notified Tyson Foods, Inc. that the company must stop using the qualified raised without antibiotics labels, or any variation of a "Raised without antibiotics" claim by June 18.

"On May 23, FSIS notified Tyson Foods Inc. that FSIS, along with the USDA's Agricultural Marketing Service, will initiate a public process to review policies on "Raised without antibiotics" for poultry.

"To ensure that this process is equitable, FSIS will review any claim relating to the use of antibiotics in poultry that it has already approved for companies other than Tyson Foods, Inc."

                                         #

**News & Events**

◉ News Releases
   ☑ FSIS Recalls
   ☑ Video News Releases
   ☑ News Release Subscription
◉ Meetings & Events
◉ Speeches & Presentations
◉ Communications to Congress
◉ Newsletters & Magazines
◉ Image Libraries
◉ Multimedia



Questions about food safety? **Ask Karen**

Last Modified: June 3, 2008



United States        Food Safety        Washington, D.C.
Department of        and Inspection     20250/3700                    JUN 3 2008
Agriculture          Service

Mr. Randall K. Miller
Arnold & Porter LLP
Suite 900
1600 Tyson Boulevard
McLean, VA 22102-4865

                        Re: Your Petition of April 16, 2008

Dear Mr. Miller:

This is to advise you that, after carefully considering your petition of April 16, 2008, the information that you submitted on May 5, 2008, and information submitted by Tyson Foods, Inc., we have decided to grant your petition based on the first point made therein. It is FSIS' policy not to discuss the basis for the actions that it takes in response to competitor complaints with the complainants. Since the first issue raised by your petition was dispositive, we are not addressing the other allegations in your petition.

Based on our evaluation of your petition, we have significant questions about whether claims that are truthful and not misleading relating to the use of antibiotics in the raising of poultry can be made, about the circumstances in which they can appropriately be made, and about FSIS' ability to verify that such claims are truthful and not misleading. Additionally, USDA's FSIS and Agricultural Marketing Service intend to initiate a public process to review policies on claims relating to the use of antibiotics in raising poultry. In the interim, FSIS will approve claims related to the use of antibiotics only when an establishment demonstrates to the satisfaction of the agency that no antibiotics were used for any purpose whatsoever at any time, with the exception of antibiotics used as a preservative in a vaccine and added to the vaccine at the vaccine manufacturing site.

To ensure that this process is equitable, FSIS will also conduct a review of any claim relating to the use of antibiotics in poultry products that it has already approved. The Agency is contacting all poultry companies that have received approval of such claims to determine whether, among other things, they are injecting eggs with antibiotics or using poultry derived from eggs that have been injected with antibiotics.

Sincerely,

Philip S. Derfler
Assistant Administrator
Office of Policy and Program Development

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TYSON FOODS, INC., <br><br>       Plaintiff, <br><br>       v. <br><br> DEPARTMENT OF AGRICULTURE, <br><br>       Defendants. | Civil Action No. 08cv01000 |

## **ORDER**

This matter having come before the Court on Movants' motion to intervene, and for good and sufficient cause shown,

It is hereby ORDERED that

1.       The Motion is GRANTED.

2.       Movants are permitted to intervene in this case pursuant to Rule 24 of the Federal Rules of Civil Procedure.

3.       Movants may appear and be heard at any hearing in this matter including on any status conference or hearing on Tyson's motion for injunctive relief.

Entered this _____ day of _____, 2008

_____
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TYSON FOODS, INC.,

    Plaintiff,

    v.                                                    Civil Action No. 08cv01000

DEPARTMENT OF AGRICULTURE, et al.

    Defendants.

    and

TRUTHFUL LABELING COALITION,
SANDERSON FARMS, INC., PERDUE
FARMS, INC., AND FOSTER FARMS,

    Defendants-Intervenors.

### DEFENDANT-INTERVENORS'
### MOTION TO TRANSFER VENUE

Pursuant to 28 U.S.C. § 1404(a), proposed Defendant-Intervenors Truthful Labeling

Coalition, Sanderson Farms, Inc., Perdue Farms, Inc., and Foster Farms, hereby move to transfer

this action to the U.S. District Court for the District of Maryland (Baltimore Division) where a

closely related matter is pending.  Proposed Defendant-Intervenors are filing herewith an

emergency motion to intervene pursuant to Rule 24.

As explained in the attached, in the Baltimore case, Plaintiff Tyson Foods, Inc. has

already developed an extensive record concerning the USDA process that it challenges in this

second-filed suit.

A supporting memorandum and proposed Order are attached; also in support is the

declaration of Randall K. Miller attached to the Motion to Intervene filed herewith.

777996_4.DOC

Respectfully submitted,

ARNOLD & PORTER LLP

David Fauvre (DC Bar # 488381)
555 Twelfth St, NW
Washington, DC 20004-1206
Direct: 202.942.5041
Facsimile: 202.942.5999
Email. David.Fauvre@aporter.com

Randall K. Miller (DC Bar #460682)
Nicholas M. DePalma (DC Bar #974664)*
1600 Tyson Boulevard, Suite 900
McLean, VA 22102-4865
Direct: 703.720.7030
Facsimile: 703.720.7399
Email: Randall.Miller@aporter.com
Email: Nicholas.Depalma@aporter.com

Dated: June 13, 2008

* subject to admission to this Court

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2008, I have caused the foregoing Motion to Transfer Venue to be served via first class mail and email on the following:

Paul J. Zidlicky, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington D.C.  20005
Pzidlicky@sidley.com

Thomas Walsh, Esq.
Assistant General Counsel for Regulatory Division
U.S. Department of Agriculture
Washington, D.C.
Thomas.Walsh@usda.gov

Jim Gilligan, Esq.
Managing Attorney
Federal Program Branch
U.S. Department of Justice
Washington, D.C.
By Facsimile:  202-616-8470

David Fauvre

UNITED STATES DISTRICT COURT
FOR THE DISTRICT COLUMBIA

| | |
|---|---|
| TYSON FOODS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DEPARTMENT OF AGRICULTURE, <br><br> Defendants. <br><br> and <br><br> TRUTHFUL LABELING COALITION, SANDERSON FARMS, INC., PERDUE FARMS, INC., AND FOSTER FARMS, <br><br> Proposed Defendants-Intervenors. | Civil Action No. 08cv01000 |

**MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO TRANSFER VENUE**

Proposed Defendant-Intervenors Truthful Labeling Coalition ("TLC"), Sanderson Farms,

Inc. ("Sanderson"), Perdue Farms, Inc. ("Perdue"), and Foster Farms ("Foster") hereby submit

this memorandum in support of their motion to transfer venue under 28 U.S.C. § 1404(a).

**BACKGROUND AND OVERVIEW**

The instant action is a second-filed case involving exactly the same "raised without

antibiotics" ("RWA") claims that Tyson litigated and lost in the U.S. District Court for the

District of Maryland, approximately 50 days ago. *See Sanderson Farms, Inc. v. Tyson Foods,*

*Inc.*, --- F. Supp. 2d ---, 2008 WL 1838719 (D. Md. 2008) (preliminarily enjoining Tyson from

advertising its chicken as RWA). Tyson is based in Arkansas, not D.C., and has no connection

to this forum.  Rather than appropriately pursue its grievances in the court already handling the

overlapping issues, Tyson pursues a strategy of forum shopping to get a second bite at the apple.

The Court should reject Tyson's strategy:

1.  The case in Baltimore involves exactly the same issues of whether Tyson uses antibiotics in its chicken production process and therefore lied to consumers and unfairly competed with the proposed intervening defendants by using its "raised without antibiotics" slogan.

2.  In fact, Tyson specifically interjected extensive materials from the same USDA process into the Maryland case.  For example, Tyson filed with the court proposed Defendant-Intervenors' submissions to the USDA and urged the court to consider and rely upon the USDA process in evaluating the case.  *See* Miller Decl. ¶ 11.

3.  Tacitly acknowledging that Maryland is the appropriate forum for this case, Tyson nominally lists the Maryland case as "related" but fails to describe what happened in that case (Tyson was enjoined for deceiving consumers on the identical RWA claims) or set forth the background of that case in any of its voluminous papers.

Accordingly, for these reasons and those set forth below, the motion to transfer venue

should be granted, and this case should be transferred to Maryland and consolidated with the

"related" case pending there.

## ARGUMENT

## I.    THIS ACTION SHOULD BE TRANSFERRED TO THE DISTRICT OF MARYLAND PURSUANT TO § 1404(a)

### A.    The Legal Standard

This Court has authority to transfer a civil action to any other judicial district or division

pursuant to 28 U.S.C. § 1404(a) if it is in the interest of justice, judicial economy and furtherance

of the convenience of the witnesses and parties.  As set forth below, the Section 1404 factors

weigh heavily in favor of transfer to the forum where "related" litigation involving identical

issues is pending.

**B.     The Related Case Now Pending Against Tyson in the District of Maryland Weighs Heavily in Favor of Transfer**

The pendency of the related case in which Tyson is defending its RWA claim weighs heavily in favor of transfer and ultimately, consolidation.  District Judge Richard D. Bennett has presided over the case since its inception in January 2008, and has developed substantial expertise on the matters at issue, including the details of the USDA process challenged in this case.

Judge Bennett received into evidence scores of materials that were part of the USDA agency process.  In fact, correspondence with USDA represented the largest collection of materials admitted into evidence.  At the preliminary injunction hearing, there was substantial testimony about the interactions between USDA and Tyson.  In fact, Tyson expressly interjected the USDA proceeding as a significant part of its defense and went on at length about the written record and numerous meetings and verbal discussions between Tyson and USDA involving its "raised without antibiotics" label.  Miller Decl. ¶ 11.

This Court has consistently held that under these circumstances, where related litigation is pending in a different jurisdiction, judicial efficiency favors transfer and consolidation with the first-filed case.  For example, in *Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11 (D.D.C. 2001), a patent infringement action, this Court transferred the case to Georgia due to the a related case was already pending in Georgia.  The Court held that transfer "under § 1404(a) is appropriate when there is an ***ongoing related case in another jurisdiction***."  *Id.* at 13 (emphasis added).  The Court transferred to avoid "piecemeal litigation" so that "*all*" of the parties' related claims could be considered "and ***decided in the same court***."  *Id*. at 14 (emphasis added) (citing *In re Scott*, 709 F.2d 717, 721 n. 10 (D.C. Cir. 1983)).

The Court's decision in *Biochem* is consistent with a well established line of authority in this Court. *See F.T.C. v. Cephalon, Inc.*, --- F. Supp. 2d ---, 2008 WL 1867103 (D.D.C. 2008) (granting motion to transfer to **forum where related litigation was pending** because of that court's "familiarity with these facts - and the law as applied to these facts") (emphasis added); *S.E.C. v. Roberts*, 2007 WL 2007504, at *2-5 (D.D.C. July 10, 2007) (same); *Williams v. Purdue Pharma Co.*, 2004 WL 1219061 (D.D.C. June 3, 2004) ("[T]he Court agrees that the interests of justice are better served when a case is transferred to the district court **where related actions are pending**") (emphasis added).

In *Williams*, the Court further explained that "transfer will prevent a '**waste of time, energy, and money**' and will 'protect litigants, witnesses and the public against unnecessary inconvenience and expense,' which § 1404(a) was designed to avoid." Id. at *1 (emphasis added).

## C.    Transfer Will Avert Inconsistent Judicial Decisions

Tyson's strategy of suing in this Court is to take a second bite at the apple. Tyson's case invites this court to reconsider identical issues that are being tried in the earlier-filed Baltimore case, and risk inconsistent decisions. For example, Tyson's Complaint in this case asserts that there is "debate" about whether the ionophores that Tyson feeds its chicken "should be considered antibiotics," Compl. ¶ 37; however, the Baltimore federal court found it "**undisputed** in this case that ionophores are antibiotics" adding that the scientific literature, USDA, the FDA, the American Veterinary Medical Association ("AVMA"), and both Plaintiffs' and Defendant's witnesses "are all in agreement on this point," *Sanderson Farms, Inc.* --- F. Supp. 2d ---, 2008 WL 1838719 at *2 (emphasis added) -- **including Dr. Patrick Pilkington**, a witness in Baltimore and a declarant in this case. Tyson's Complaint in this case also asserts that there are "no food

-4-

safety or public health concerns at issue," Compl. ¶ 10, but Judge Bennett found that Tyson's

claim caused "consumer deception about the relative *safety and health* of Tyson's chicken." *10

(emphasis added).

The list goes on and on.  In Baltimore, at a 4-day preliminary injunction hearing,

Movants Perdue and Sanderson (1) proved by scientific evidence that consumers are deceived by

the RWA slogan; (2) proved that Tyson lied to consumers and retail accounts that its chicken

was different and somehow superior to other chicken with regard to antibiotics; and (3) proved

that the slogan directly and seriously harms competitors.  In this case, Tyson directly and

expressly seeks to relitigate all of those conclusions.  Tyson wants this Court to disagree and

contradict the findings of the Baltimore federal court.  Section 1404 and the doctrine of judicial

efficiency should prohibit this blatant tactical gamesmanship, piecemeal litigation, and invitation

to duplicative and inconsistent judicial rulings.

### D.     Tyson Is an Arkansas Company With No Significant Connections to D.C.

The Court should consider the fact that Arkansas-based Tyson is not from the District of

Columbia and has brought this second-filed action in this district.  This weakens any deference

typically shown to a plaintiff's choice of forum.  *See, e.g.*, *Rosales v. U.S.*, 477 F. Supp. 2d 213,

216 (D.D.C. 2007) ("[T]hat Plaintiffs chose to file their lawsuit here is entitled to little deference,

if any, because they do not reside in the District of Colombia").

### E.     The Convenience of the Witnesses and Parties Are Not Significantly Affected by Transfer to Baltimore

Given that Tyson is an Arkansas defendant and that Baltimore is relatively close to

USDA's DC offices, the convenience of the parties and witnesses is not significantly

compromised by transfer.  Baltimore is just a short 45-minute drive from the nation's capitol and

the Department of Justice lawyers and USDA witnesses, if any, would not be significantly

inconvenienced. *See Bearham v. UBS Financial Servs.*, 2007 WL 2206845, at *5 (D.D.C. 2007,

Aug. 2, 2007) (transferring case to Maryland and observing "in reality this court sits fewer than

15 miles from the Greenbelt Division of the District of Maryland, and transferring this action is

unlikely to inconvenience any current party."). Whatever inconvenience may exist from transfer

to Baltimore would be greatly outweighed by the fact that the District Court in Maryland is

significantly more experienced in its learning and understanding of the issues.

## CONCLUSION

For the foregoing reasons, the proposed Intervenor-Defendants respectfully request that

this Court transfer this action to the District of Maryland (Baltimore).

Respectfully submitted,

ARNOLD & PORTER LLP

David Fauvre (DC Bar # 488381)
555 Twelfth St, NW
Washington, DC 20004-1206
Direct: 202.942.5041
Facsimile: 202.942.5999
Email. David.Fauvre@aporter.com

Randall K. Miller (DC Bar #460682)
Nicholas M. DePalma (DC Bar #974664)*
1600 Tyson Boulevard, Suite 900
McLean, VA 22102-4865
Direct: 703.720.7030
Facsimile: 703.720.7399
Email: Randall.Miller@aporter.com
Email: Nicholas.Depalma@aporter.com

Dated: June 13, 2008

* subject to admission to this Court

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of June, 2008, I have caused the foregoing

Memorandum of Law in Support of Motion to Transfer Venue to be served via first class mail

and email on the following:

Paul J. Zidlicky, Esq.
Sidley Austin LLP
1501 K Street, N.W.
Washington D.C.  20005
Pzidlicky@sidley.com

Thomas Walsh, Esq.
Assistant General Counsel for Regulatory Division
U.S. Department of Agriculture
Washington, D.C.
Thomas.Walsh@usda.gov

Jim Gilligan, Esq.
Managing Attorney
Federal Program Branch
U.S. Department of Justice
Washington, D.C.
By Facsimile:  202-616-8470


David Fauvre

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TYSON FOODS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DEPARTMENT OF AGRICULTURE, <br><br> Defendants. | Civil Action No. 08cv01000 |

## **ORDER**

This matter having come before the Court on Defendant-Intervenors' motion to transfer venue,

It is on this ___ day of _____ 2008

     ORDERED that

     1.  The Motion is granted.

     2.  This case is transferred to the District of Maryland, Baltimore Division.


                                             _____
                                           UNITED STATES DISTRICT JUDGE